# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| **JOHN DOE,** | : |
| | : **Civil Action No:** |
| | : |
| **Plaintiff,** | : |
| | : |
| | : **COMPLAINT** |
| **-against-** | : |
| | : |
| | : **JURY TRIAL** |
| **YALE UNIVERSITY and YALE UNIVERSITY** | : |
| **BOARD OF TRUSTEES,** | : |
| | : |
| | : |
| **Defendants.** | : |

Plaintiff John Doe[1] (hereinafter referred to as "Plaintiff" or "John Doe"), by his attorneys Nesenoff & Miltenberg, LLP, and William B. Bilcheck, Jr. as and for his Complaint, respectfully alleges as follows:

## THE NATURE OF THIS ACTION

1.       This case arises out of the actions taken and procedures employed by Defendants Yale University ("Defendant Yale" or "Yale" or the "University") and Yale University Board of Trustees (collectively, "Defendants") concerning actions taken by Defendants and their employees and/or agents against Plaintiff, a male junior student at Yale, as a result of false allegations of "groping" and "creating a hostile academic environment" with fellow Yale students Jane Roe and Sally Roe.[2] The allegation of "creating a hostile academic environment" was as to Jane Roe only.

---

[1] Plaintiff herewith files a Motion to proceed pseudonymously.
[2] Plaintiff refers to Jane Roe and Sally Roe pseudonymously.

2.      On December 27, 2017, twenty days before he was to begin his second semester junior year and participation in the very prestigious Brady-Johnson Program in Grand Strategy[3], Plaintiff was banned from the Yale campus. Plaintiff was suspended for the upcoming Spring 2018 and Fall 2018 semesters based upon events that allegedly occurred back in June and November of 2016. ("the Sanction")

3.      Prior to the December 27, 2017 two (2) semester suspension, Plaintiff was offered and accepted a second consecutive summer internship with a very selective and highly respected Wall Street investment banking firm.

4.      It is uncontroverted that Jane Roe and Sally Roe are longtime friends. It is further uncontroverted that Jane Roe actively sought to recruit other women to file complaints against Plaintiff. Jane Roe and Sally Roe filed their complaints only minutes apart, on September 18, 2017, alleging an incident from nearly a year prior.

5.      Further, as discussed in detail below, during the Defendants' University Wide Committee on Sexual Misconduct ("UWC") November 27, 2017 hearing, (the "Hearing") Jane Roe and Sally Roe were communicating through text messages, while listening live to each other's testimony, in an obvious attempt to present consistent and unified testimony against the Plaintiff.  Despite learning of Jane Roe and Sally Roe's devious actions, Defendants elected to continue with the tainted proceeding instead of ordering an immediate new hearing.

6.      The allegations made by Jane Roe concern an alleged groping that occurred well over a year (June 2016 in Paris, France) prior to the complaint being made. Jane Roe also alleged a groping incident occurring on November 18, 2016. Subsequent to her September 18, 2017

---

[3] The Brady-Johnson Program in Grand Strategy is a highly selective Yale University two (2) semester program. The acceptance rate in this program is under 20%.  http://grandstrategy.yale.edu/about

complaint, Jane Roe amended her complaint to allege that the Plaintiff engaged in conduct that created a hostile academic environment. ("Jane Roe Complaint").

7.     On September 18, 2017 Sally Roe filed a complaint alleging that Plaintiff groped her on a bus ride to Cambridge, MA on November 18, 2016. ("Sally Roe Complaint").

8.     On January 12, 2018, Defendants denied Plaintiff's appeal and upheld the December 27, 2017 two (2) semester suspension. ("the Appeal").

9.     A non-exhaustive list of Defendants' wrongful actions include the following: (i) Defendants failed to conduct a thorough and impartial investigation; (ii) Defendants evidenced a gender bias against Plaintiff as the male accused throughout the investigative and hearing process; (iii) Defendants made assessments of credibility and evidentiary weight with respect to each party and witness without any ascertainable rationale or logic; (iv) Defendants failed to afford Plaintiff the requisite presumption of innocence required by a preponderance of the evidence standard;  (v) Defendants unlawfully utilized a different standard of proof for this proceeding as compared to other University student conduct hearings;  (vi) a lack of due process by allowing the Complainants to hear each other's testimonies during the Hearing;   (vii) Defendants erroneous decision of placing the burden of proof on Plaintiff to prove that collusion had occurred between Jane Roe and Sally Roe as the two (2) Complainants were texting with each other during The Hearing ; (viii) conflicts of interest that resulted in a biased adjudication; (ix) lack of an official record of the hearing; (x) the failure to properly investigate and collect all available evidence (xi) the improper inclusion of information in the Fact-Finder's report which the hearing panel and decision maker relied upon as a determination of  responsibility; (xii) failure to define the policy violation; (xiii) lack of a rationale for the Decision and Sanction; and, (xiv) the imposition of an unduly harsh and unwarranted sanction of suspension. All of these

procedural errors, individually and when taken together, unfairly and materially affected the outcome of Plaintiff's case.

10.     As a result of Defendants' discriminatory and unlawful conduct, Plaintiff has been denied the opportunity to continue with his Yale University education, participation in Yale University's prestigious Brady-Johnson Program in Grand Strategy, and employment with a well-known highly respected Wall Street Investment Banking Firm for the summer of 2018. The summer position would have been Plaintiff's second consecutive summer position with this firm which is a precursor to a full-time position following graduation in May 2019. The marking of Plaintiff's academic transcript with two semesters of suspension for a violation of student conduct policy will permanently deny Plaintiff educational and career opportunities. Moreover, Plaintiff has been ostracized from his friends and from the campus community, made a social pariah, and forever damaged emotionally by the excruciating and unfair process and the terribly unjust results flowing therefrom. Plaintiff has also sustained damages to his future education and career prospects as a result of the Decision and Sanction.

11.     Plaintiff therefore brings this action to obtain relief based on causes of action for violations of Title IX of the Education Amendments of 1972, breach of contract, and other state law causes of action.

## THE PARTIES

12.     Plaintiff is a natural person, citizen of the United States, and resident of the State of New York. During the events described herein, Plaintiff was enrolled as a full-time student at Yale University. When Plaintiff was attending Yale, he resided in New Haven, Connecticut.

13.     Upon information and belief, Defendant Yale University is a private, Ivy League, research University, ranked top-three of universities in the United States, located in the city of New Haven, Connecticut, with an address of Yale University, New Haven, Connecticut 06520.

14.     Upon information and belief, Defendant Board of Trustees is the governing body of Yale University. It is composed of 17 regular members (10 appointed successor trustees and six elected alumni trustees) with Connecticut's Governor and Lt. Governor serving as "board members ex officio". Upon information and belief, Defendant Board of Trustees oversees and approves Yale's written policies, including Yale's Sexual Misconduct Policy.

15.     Plaintiff and Defendants Yale University and Yale University's Board of Trustees are sometimes hereinafter collectively referred to as the "Parties."

## JURISDICTION AND VENUE

16.     This Court has federal question, diversity and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332 and under 28 U.S.C. § 1367 because: (i) the federal law claim arises under the constitution and statutes of the United States; (ii) Plaintiff and Defendants are citizens of different states and the amount in controversy exceeds $75,000.00, exclusive of costs and interest; and (iii) the state law claims are so closely related to the federal law claim as to form the same case or controversy under Article III of the United States Constitution.

17.     This Court has personal jurisdiction over Defendant Yale on the grounds that it is conducting business within the State of Connecticut.

18.     This Court has personal jurisdiction over Defendant Board of Trustees on the grounds that it is conducting business within the State of Connecticut and is the governing body of Yale University.

19.     Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391 because Yale is considered to reside in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### Agreements, Representations, Covenants and Warranties Between Plaintiff and Yale University

20.     Plaintiff's parents immigrated to the United States in 2011 where they raised him and his two siblings in New York.

21.     Prior to matriculating to Yale University, Plaintiff attended, with scholarship, a prestigious university-preparatory high school, which demonstrated Plaintiff's exceptional intellectual and leadership potential. During high school, Plaintiff taught kindergarten part time and participated in a mentorship program for underprivileged students.

22.     Plaintiff entered Yale in the fall of 2015. He has excelled academically.  He has been a conservative columnist for the *Yale Daily News*. On April 28, 2017, Yale's President Peter Salovey penned a personal letter to Plaintiff expressing his appreciation for an article Plaintiff wrote in support of a recent controversial gift made to Yale University. Prior to November 2017, Plaintiff maintained an unblemished disciplinary record.

23.     Upon Plaintiff's acceptance to the University, Yale provided him with copies of its university policies, including the Sexual Misconduct Policies (the "Policy"). The 2017-2018 edition of the Policy was provided as an attachment to the September 22, 2017 Notice of Complaint sent by the UWC to Plaintiff.

24.     With respect to cases involving allegations of sexual discrimination, sexual harassment, and sexual assault, the Policy states in relevant part:

> "Yale University is committed to maintaining and strengthening an educational, employment, and living environment founded on civility and mutual respect. Sexual misconduct is antithetical to the standards and ideals of our community,

and it is a violation of Yale policy and the disciplinary regulations of Yale College and the Graduate and Professional Schools. Sexual misconduct will not be tolerated."

25.     The Policy, on its face, is meant to support accusers, rather than *both* the accuser and the accused. David Post, UWC Chair, in an October 26, 2016 letter to the *Wall Street Journal* defended the institution's "procedures for sexual misconduct" rather than procedures for *allegations* of sexual misconduct. (Emphasis added.)

### *Directives from the Office for Civil Rights*

26.     On April 4, 2011, the Office for Civil Rights ("OCR") of the U.S. Department of Education ("DOE") issued a guidance letter to colleges and universities in the United States, widely known as the "Dear Colleague Letter" ("DCL"). The letter advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 *et seq*. and its regulations, and directed schools to "take immediate action to eliminate the harassment, prevent its recurrence, and address its effects."

27.     On April 29, 2014, OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* ("Q&A"). Like the DCL, the Q&A was aimed at addressing educational institutions' sexual misconduct policies, including the procedures schools "must" have in place "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence."

28.     In response to the Q&A, Yale substantially revised its Sexual Misconduct Policy in August 2015 and UWC Procedures in October 2015. The new Procedures, as outlined in an email by Yale University President Peter Salovey, "was to focus on (3) three key issues: the

confidentiality of UWC proceedings, the decision-making process and the relationship between findings and sanctions."

29.     "The decision-making process, especially, has come under scrutiny after the *New York Times* revealed last November that Provost Benjamin Polak had lightened the recommended punishment for former School of Medicine cardiology Chief Michael Simons MED '84 after Simons was found responsible for sexual harassment." *Yale Daily News,* October 27, 2015.

30.     The new, revised 2015 Procedure was "spearheaded by University Title IX Coordinator and Deputy Provost Stephanie Spangler... In addition to suggestions from UWC members, deputy Title IX coordinators and the Women Faculty Forum, the review also incorporated student input from an undergraduate survey conducted in January by the Yale College Council and Women's Center as well as recommendations from a faculty committee appointed in April, according to Salovey's email."  The appointed faculty committee consisted of five (5) women and (2) men. The women included the Title IX Coordinator and the Women Faculty Forum Chairwoman. *Yale Daily News*, October 27, 2015.

31.     The 2015 Sexual Misconduct Policy and Procedures, under which Plaintiff was adjudicated, were drafted, approved and authorized almost entirely by women's groups and women representatives at Yale.

32.     The Title IX Steering Committee charged with revising the Procedures was made up of fourteen (14) women and five (5) men. Two (2) of the five (5) men were representatives from the Yale Police Department and not from the students, faculty or administrative staff of the University.

33.     The Title IX Steering Committee, however, did incorporate student input with a survey administered by the Yale College Council-Women's Center Task Force. The survey outcome in the April 21, 2015 "Report on University Sexual Misconduct Policies and Procedures" focused on "addressing sexual violence on campus" specifically the needs of survivors and victims, and "barriers to reporting sexual misconduct."

34.     UWC members also provided revision suggestions for the Policy and Procedures under which Plaintiff was investigated and adjudicated. The current UWC is comprised of 47 members and, upon information and belief, more than 70% of the membership is female.

35.     Among the revisions in 2015, the Procedures were revised to restrict the decision maker from altering the hearing panel's determination of findings and recommended sanction without first meeting with the hearing panel. The hearing panel's recommended sanction would no longer be disclosed to the parties, only with the final determination by the decision maker.

36.     "One out of five hearings before the UWC has ended without a finding against the accused." In other words, *80% of hearings before the UWC* have resulted in a finding of responsibility *against* the accused. (Yale Office of Public Affairs & Communications, April 5, 2016)

37.     The Yale Sexual Misconduct Policy and Procedures, drafted and enacted principally by women, is enforced by the UWC, whose membership is predominantly female, to discipline students who, upon information and belief, are disproportionately male.

38.     On information and belief, Defendant Board of Trustees reviewed and authorized the Policy in its current form.

### *The Policy and Procedures*

39.    Yale's 2016-2017 Policy to which Plaintiff was subject at the time of the alleged events sets forth the sexual misconduct policy by which Yale students who have been accused of violating one or more of the enumerated offenses are investigated and, possibly, disciplined.

40.    Relevant to the instant matter is the process by which complaints of sexual misconduct are investigated and adjudicated after a report of alleged sexual misconduct is made to Yale's Title IX Coordinator.

41.    The Title IX Coordinators "seek to address any immediate concerns, connect complainants with appropriate resources, ensure that they are fully aware of the options available for further action, and help facilitate those actions. Except in rare cases involving an acute threat to community safety, coordinators defer to complainants' wishes. Information shared with coordinators is kept confidentially within the Title IX Office."

42.    "A coordinator will not directly impose discipline but may work with supervisors or help to initiate formal processes that may produce disciplinary outcomes. Complainants are also free to file a formal complaint at any point, and coordinators can facilitate that process." Formal complaints of sexual misconduct are adjudicated by the UWC.

43.    Upon receipt of a complaint, a Fact-Finder is tasked by the UWC with interviewing all parties and witnesses and collecting all relevant information. The Fact-Finder is assigned by the UWC Secretary.

44.    The Procedures state, "The essential qualifications for serving as a fact-finder are 1) impartiality; and 2) the appropriate expertise and training in investigating allegations of sexual misconduct."

45.     The respondent is informed of the complaint and is given five (5) days to submit a written response. "The Title IX Coordinator(s) with responsibility for the parties will coordinate appropriate interim measures, including measures to protect and support the complainant and other individuals as appropriate." The Procedures do not include measures to support the respondent.

46.     According to the Procedures, "Some examples of accommodations and interim measures include providing an escort for the complainant; ensuring that the parties have no contact with one another; providing counseling or medical services; providing academic support, such as tutoring; and arranging for the complainant to re-take a course or withdraw from a class without penalty, including ensuring that any changes do not adversely affect the complainant's academic record." There are no examples of any accommodations or interim measures provided for the respondent.

47.     The UWC Chair will appoint a hearing panel of five UWC Members and will appoint one of these Members as the panel chair. The panel members and the decision maker (Dean of the College) "receive a copy of the complaint and response and must withdraw from the proceedings if their relationship to the complainant or the respondent or other circumstances lead them to believe that they cannot judge the matter fairly."

48.     The Secretary will send a notice to the complainant and the respondent, providing the names of the panel members and the decision maker and informing them of their right to object to the participation of a panel member or decision maker. The objection must be in writing to the Secretary and must state the party's grounds for believing the panel member or decision maker is incapable of fairly judging the matter. The UWC Chair will decide whether an objection is justified, and that decision is final.

49. The Fact-Finder's report "will describe the relevant facts and circumstances and may address the credibility of witnesses but will not reach conclusions as to whether those facts and circumstances constitute a violation of University policy." The report, complaint and response, and all documents relating to the complaint and response will be provided to the hearing panel and to the parties.

50. Unless both parties ask to appear jointly, the complainant and the respondent will not appear jointly before the panel at any stage of the hearing. The party who is not before the panel will be in a private room with audio access to the proceedings.

51. "The hearing is intended primarily to allow the panel to interview the complainant and the respondent with respect to the fact-finder's report." The parties can each make an opening statement, and submit questions to the Chair to be asked of the other party. The panel chooses which, if any, questions will be asked.

52. "The panel may not take into account as evidence of culpability previous accusations of other acts of sexual misconduct that did not result in formal discipline or the fact that a criminal investigation or prosecution is pending in relation to the events complained of."

53. "Following the hearing, the panel will consider whether the respondent has violated University policy, giving an affirmative answer if it is satisfied that a violation has been shown by a preponderance of the evidence.

54. Based on evidence presented in the fact finder's report or elicited at the hearing, the panel may find violations of Yale policy in addition to the violation(s) charged. The panel will reach its conclusions by a majority vote and by secret ballot, with no abstentions allowed. If a party is found to have violated University policy, the panel will recommend a penalty. "The penalty is also determined by majority vote and by secret ballot.

55.     The panel will complete a report, setting out its findings of fact, its conclusion as to whether or not those facts constitute a violation of University policy, and its recommended penalty, if any. The Secretary forwards the report to the decision maker and the parties.

56.     Each party may submit a single written response to the panel's findings of fact and conclusions. The Secretary will forward the response to the decision maker and to the other party."

57.     "The decision maker will then accept the panel's findings of fact, but may accept, reject, or modify the panel's conclusions or recommendations, in whole or in part." However, if the decision maker contemplates materially modifying or rejecting the panel's conclusions or recommendations, the decision maker must meet with a majority of the panel members to discuss the proposed decision.

58.     Appeal of the decision is considered by the provost. The only grounds for an appeal are procedural error that prevented the hearing panel or decision maker from judging the matter fairly, or new information regarding the allegation that was not available at the time of the hearing.

59.     If an appeal is granted, the matter is returned to the hearing panel for further consideration, and then again to the decision maker for a final determination. As before, any deviation by the decision maker from the hearing panel's reconsideration will require the decision maker to meet with the hearing panel and provost prior to issuing a decision.

60.     There is no audio recording, transcription or any record of the hearing. "The minutes of a UWC hearing consist of a protocol annotated to indicate the time at which each phase of the process started and ended. The minutes do not record statements, testimony, or questions."

61.     "In formulating its recommendations about discipline in a particular case, the UWC considers a full range of penalties, *beginning with expulsion*. Yale has imposed severe penalties, including expulsion and suspension, and will continue to do so when the circumstances warrant."     (emphasis     supplied)https://provost.yale.edu/sites/default/files/files/Title%20IX-FAQs_2-3-14.pdf

62.     According to the Policy and Procedures, both the complainant and the respondent are entitled to certain expectations throughout the process, including, without limitation, the right to:

      a.  a trained body (UWC) to answer informal inquiries and fairly and expeditiously address formal complaints;

      b.   an impartial fact-finder to assist in the investigation of the allegations;

      c.   confidentiality of its proceedings and the information obtained for those proceedings;

      d.  Parties and witnesses must provide truthful information in all phases of a UWC proceeding.

63.     Although Yale promised John Doe these (and other) rights, Defendants nevertheless treated Doe in a manner that clearly violated his rights under the Policy, Title IX, and other state laws, as set forth more fully below.

64.     Significantly, on September 22, 2017, the same day that John Doe received the Notice of Investigation, the OCR rescinded the "2011 Dear Colleague Letter" and put in place an interim guidance while the current administration reviews and revises its practices with regard to the adjudication of complaints of sexual misconduct on college campuses receiving federal funding. *See*, *e.g.*, https://www.ed.gov/news/press-releases/department-education-issues-new-interim-guidance-campus-sexual-misconduct.

65.     In response, on that same date of September 22, 2017, Yale Title IX Coordinator Stephanie S. Spangler issued a statement, "Based on our initial review, Yale's current policies and practices, which were adopted after broad engagement of the university community, are *largely consistent* with the requirements set out in the new guidance. In particular, Yale has no plans to deviate from the evidentiary standards the university now applies to sexual misconduct cases." (emphasis supplied)

66.     In fact, Yale utilized a "clear preponderance" of the evidence standard for all other investigations with the exception of sexual misconduct. In direct contradiction the September 22, 2017 guidelines, Yale used a lower standard, "preponderance" of the evidence for sexual misconduct matters.

67.     The interim guidance and review suggest that the practices in place at Yale at all times relevant to this lawsuit were unfair and, ultimately, out of step with the goal of gender equity in Title IX-related proceedings. *See* "Q&A on Campus Sexual Misconduct," available at https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

### Pressure on Yale to Expel Alleged Perpetrators

68.     In the wake of the "2011 Dear Colleague Letter", as well as the additional "2014 Q&A", the DOE commenced numerous investigations into colleges and universities, with the underlying threat that those not in compliance stood to lose federal funding.

69.     Federal funding is a major source of income for Yale. The 2016-2017 Yale Annual Financial Report states, "The quality and promise of our faculty's work continue to attract major funding from the federal government, which finances 49 percent of research at Yale." And, "The federal government funded $567 million, or 74%, of 2017 grant and contract income, in support of Yale's research and training programs."

70.     The investigation of colleges and universities to determine compliance with Title IX was upheld by Catharine Lhamon, Assistant Secretary for Civil Rights at the U.S. Department of Education, who told a group of college administrators at a 2014 conference, ""Do not think it's an empty threat," when she stated that the ultimate punishment for a school violating Title IX is a complete loss of federal funding. *https://www.huffingtonpost.com/2014/07/14/funding-campus-rape-dartmouth-summit_n_5585654.html*

71.     In fact, in March 2011, a group of sixteen (16) Yale students and alumni filed a federal Title IX complaint against the university, alleging that it had failed to eliminate a sexually hostile environment. The investigation has since been resolved, with the DOE not finding Yale in violation of Title IX, but criticizing some of its previous policies. Under the settlement, Yale agreed, among other things, to continue to improve and publicize efforts to prevent and respond to sexual harassment and violence, implement its new grievance process, and train students and employees.  It marked the first major settlement after the Education Department's letter to colleges in 2011 signaling stricter enforcement of Title IX. *https://projects.chronicle.com/titleix/campus/Yale-Universit*y

72.     In response, in 2011 Yale University President, Richard C. Levin ("President Levin"), created the Marshall Committee, a group including three (3) women and one (1) man, who reviewed Yale's sexual misconduct policies. The Marshall Committee declared "the UWC will be the sole channel for *pursuing formal complaints against perpetrators*." (*emphasis supplied)* This determination denied the accused the presumption of innocence.

73.     In addition, the Marshall Committee recommended standard penalties so that there would be clear understanding of the consequences of misbehavior. President Levin instructed, "the UWC to apply any and all penalties, including expulsion where warranted" and

that the UWC is "setting appropriate precedents...of the disciplinary consequences that result from sexual misconduct."

74.      President Levin promoted the Sexual Harassment and Assault Response and Education Center ("SHARE"), the UWC, and Communication and Consent Counselors (CCE's) as resources for those affected by sexual misconduct. Significantly, at no time was the UWC referred to as a fair and impartial arbiter of allegations of sexual misconduct.

75.      Despite the foregoing, Yale found itself on the receiving end of at least one such investigation by the Department of Education for failure to disclose four (4) forcible sex offenses. In 2013, Yale was fined $165,000 for failure to comply with the Clery Act. Additionally, Yale University has been under OCR investigation for two complaints of non-compliance.

76.      The case involving John Doe arose during a critical period at Yale in which the University faced mounting criticism concerning its handling of allegations of sexual assault.

77.      Specifically, Yale students openly and vocally accused the University of not taking allegations of sexual misconduct seriously enough and of failing to harshly punish perpetrators of sexual assault.

78.      In June 2016, expelled Yale basketball captain, Jack Montague, filed a lawsuit against Yale when "the university strove to make an example of a star athlete to prove they are "indeed tough on men who 'victimize' female students." Yale accused Montague in October 2015 of having non-consensual intercourse with a female student in the fall of 2014. The woman in the Montague case did not file a complaint, and did not allege nonconsensual sex with him; however, Montague [claimed] deputy Title IX coordinator Angela Gleason told the hesitant woman that she was not the first victim to come forward with a sexual misconduct complaint

17

against   Montague."   *http://reason.com/archives/2017/12/06/yale-holds-transcript-of-former-basketba*

79.     Notwithstanding, the same set of circumstances were inflicted upon Plaintiff when the Fact-Finder during John Doe's investigation contacted Title IX Coordinator Angela Gleason ("Ms. Gleason"), without John Doe's permission, to discuss a prior informal complaint against him, in direct violation of the confidentiality imposed by Yale policy.

80.     In a breach of confidentially, the Fact-Finder contacted and questioned the Title IX Coordinator and John Doe's Dean, without his permission, to interview them about confidential conversations they had with John Doe.

81.     As a consequence of the OCR investigations, Clery fine, lawsuits and media scrutiny, Yale was under enormous pressure to show it was willing to take a hard line against students accused of sexual assault in order to dispel the notion that its campus was an unfriendly and unsafe environment.

82.     Yale in its publication, "Preventing and Responding to Sexual Misconduct," encourages and promotes reporting, *seriously*. "If you have experienced sexual misconduct of any kind, the University urges you to take action to seek the help and support that you need, which may include making a report and pursuing disciplinary and criminal sanctions."

   a) "*Serious situations* can often be averted by responding at the first sign of trouble"
   b) "Take any signs of reluctance or refusal, including nonverbal signs, *very seriously*."
   c) "Take sexual pressure *seriously*. Many sexual assaults begin with low-level pressure."
   d) "Be alert to patterns, not just isolated actions. Take repeated disrespect intimidation, and threats *seriously*, even if they seem small alone."
   e) "Stalking can sometimes seem merely annoying or even flattering, but its intrusive nature must be taken *seriously*, whether it is online or in person."
   (*emphasis supplied*)

83.     Yale support services include SHARE which provides information, advocacy, and support for complainants. Complainants are told "Title IX coordinators, the UWC, and the YPD

work hard, along with SHARE, to streamline and coordinate complaint processes, so it does not matter where you begin. The options are not mutually exclusive; you can pursue any or all of them as you wish. You will always be part of the decision-making process and the choices regarding whether or how to proceed are generally up to you."

84.     During the 2014 - 2015 academic year, the SHARE center served 223 students: 189 women and 34 men (15 of the men for "Information").

*http://sharecenter.yale.edu/sites/default/files/files/SHARE%20Center%20Report%2014-15.pdf*

85.     At 85% female utilizing SHARE to seek services for experiences with sexual misconduct, it is clear that Yale funded support services which include SHARE, the Title IX Coordinators and the UWC, to provide support services primarily to women.

86.     On information and belief, the materials used for training the staff of SHARE and the UWC are the same, and focused on providing "victim-centered" response.

87.     When students enter into a Title IX disciplinary matter at Yale, the institution will provide a vastly disproportionate number of support services to the complainant, who is female in 85% of cases, based upon the foregoing data from SHARE.

88.     Even the Yale Police Department ("YPD") has a Sensitive Crimes & Support Coordinator, "who provides services to victims, such as safety planning and assistance in obtaining a protective order."  Upon information and belief, there are no support services offered by YPD to respondents.

89.     Complainants at Yale have access to University funded SHARE, the UWC, Title IX Coordinators, and Yale Police Department. Upon information and belief, no specific University funded resources are offered at Yale to respondents, who are disproportionately male.

19

90.     The resources provided to complainants, who are nearly all female, overlap with UWC adjudication. The advice and counsel complainants receive is from Yale staff who have been trained in UWC decision-making. As a result, complainants are frequently better prepared by Yale staff to present a case before the UWC.

91.     Yale has student organizations, also funded by the university, such as the Communication and Consent Educators (CCE) Program. "We aim to end sexual violence by transforming our corner of contemporary culture into one where respect, mutuality, and mindfulness are the norms." *https://cce.yalecollege.yale.edu.*

92.     Jane Roe was a trained CCE and active participant of the organization. She stated numerous times during her interviews with the investigator and with the hearing panel that she took her role as a CCE very seriously.

93.     Upon information and belief, Defendants actively adopted the Title IX Coordinator's mission of increasing reporting of alleged sexual misconduct at Yale. Unfortunately, the UWC did so at the expense of properly vetting complaints of sexual misconduct to ensure the students who were making the reports did so on a good faith basis.

94.     Plaintiff himself became the victim of a vicious and vindictive campaign to smear his reputation and get him expelled from Yale.

## The Complaints by Jane Roe and Sally Roe Against Plaintiff

95.     During September 2017, two Yale junior undergraduates who were close friends, Jane Roe and Sally Roe, both emailed formal complaints within minutes of each other against the same respondent, John Doe, for alleged events from one year prior in 2016.

96.     On September 18, 2017 at 4:03 p.m. Sally Roe filed a complaint alleging an instance of groping by John Doe on November 18, 2016.  The alleged incident had not occurred on campus.

97.     On September 18, 2017 at 4:06 p.m. Jane Roe filed a complaint alleging two instances of groping by John Doe, one in June 2016 and the other on November 18, 2016. Neither of the alleged incidents occurred on campus.

98.     The November 18, 2016 incidents claimed by Sally Roe and Jane Roe allegedly took place on November 18, 2016 on a chartered bus from Yale to Harvard.  This event was not sanctioned, organized or in any way affiliated with Yale University.

99.     In addition, Jane Roe stated she was "filing a complaint in regards to a hostile environment created by John Doe for countless women at Yale, including myself, who are in fear and discomfort because of his behavior."

100.    Both complaints were emailed and addressed to the UWC chair, David Post ("Mr. Post").  Sally Roe included in copy on her email two Deputy Title IX Coordinators, both of whom served as advisors to the complainants in filing their reports.

101.    On September 22, 2017, John Doe was called to attend a meeting, without warning and without an advisor, where he received hand delivered letters from Aley Menon ("Ms. Menon"), UWC Secretary. The letters were Notices of Investigation, one for each complainant, informing John Doe he would be investigated for groping and sexual harassment.

102.    The UWC had already engaged an independent Fact-Finder to begin an investigation. The Fact-Finder interviewed each of the complainants at length.  The Fact-Finder then interviewed eight (8) witnesses whose names were provided by the complainants.

103.     The Fact-Finder interviewed Jane Doe a total of four (4) times. Two interviews were at the UWC offices on October 2 and October 17 with a Yale advocate as her advisor, and twice more by phone on October 23 and November 2, 2017.

104.     The Fact-Finder interviewed Sally Roe a total of three (3) times. Two interviews were at the SHARE office on October 2 and October 17 with a Yale advocate as her advisor, and again by phone on November 8, 2017.

105.     John Doe was interviewed only twice, in total, to respond to the allegations made by *both* complainants (compared to the seven (7) total interviews of the complainants by the Fact-Finder.)

106.     John Doe was interviewed by the Fact-Finder on October 16 and October 31. At the time of John Doe's first interview, the Fact-Finder had already conducted 10 witness interviews.

107.     The Fact-Finder did not follow-up again with six (6) of those ten (10) witnesses after her interview with John Doe to confirm, challenge or elicit further details about John Doe's statement. Critically, the hearing panel and decision maker relied on and cited all of the six (6) witnesses interviewed prior to John Doe's interview in finding John Doe responsible for violations of the sexual misconduct policy.

108.     The allegations against John Doe were for violations of Yale's Sexual Misconduct Policy for "groping," a violation included under the policy for "sexual assault."  Sexual assault was defined in the policy as "any kind of nonconsensual sexual contact, including rape, groping or any other nonconsensual touching."  The policy does not have a definition for "groping".

109.     Jane Roe, in her complaint, did not define what she meant by "groping," which body part she alleged had been groped, or how the action of groping had occurred.

*The Alleged Paris Incident*

110.    Jane Roe claimed that in June 2016, while she and John Doe were each independently studying abroad in Paris, France that they met at a mutual friend's apartment for a small party.

111.    Everyone was drinking wine and vodka at the party, and several photos were taken. Some of the photos depicted Jane Roe with her arms around John Doe while she was making a seductive gesture to the camera.

112.    Later that evening, a group of the party-goers including John Doe and Jane Roe decided to leave and walk to a nightclub. Upon arriving, the nightclub had refused the group admission because they did not have a reservation.

113.    The group, five (5) friends including John Doe and Jane Roe, began walking down a street together. Jane Roe was holding John Doe's hand and skipping and, as she stated, "acting playful" with John Doe.

114.    Jane Roe claimed that as they walked, John Doe put his hand on her buttock. She claimed to have moved his hand away and that he tried to touch her twice more. Jane Roe did not say anything to John Doe alleging groping at that time or any time after.

115.    One of the friends walking behind John Doe and Jane Roe took a photo of the two walking together.  **None of the three friends walking behind Jane Roe and John Doe stated that they ever saw any groping occur**.

116.    Jane Roe, sixteen (16) months after that evening in Paris, suddenly claimed that John Doe had groped her buttock three (3) times as the two had walked ahead of the three friends down the street in Paris. There were no witnesses to Jane Roe's claims of groping, even though she and John Doe were in full view of three (3) witnesses walking behind them the entire time.

### The Alleged Harvard-Yale Bus Incident

117.    Jane Roe's second filed complaint was that John Doe had groped her on November 18, 2016 on a chartered bus traveling from Hew Haven to Cambridge for the Yale-Harvard football game. This was a private charter and not a university sponsored bus.

118.    There were approximately twenty-two (22) students on the chartered bus. The bus departed New Haven, Connecticut at approximately 5:00 p.m. arriving in Cambridge, Massachusetts approximately three (3) hours later. Many of the students brought a variety of alcoholic beverages on the trip, and there was considerable drinking, drinking games, and dancing during the bus ride.

119.    Jane Roe claimed that during the bus ride, John Doe had sat down next to her and had grabbed her buttock. **Jane Roe also claimed, "he was groping every woman on the bus'" yet all of the women on the bus were interviewed and none of the women claimed either to be victim of or a witness to John Doe's alleged groping (excluding the two complainants).**

### The Alleged Fence Club Incident

120.    During the course of the investigation, Jane Roe included an additional incident during which she and John Doe had been at a party given by an organization called the Fence Club.

121.    At this party, Jane Roe claimed she saw John Doe standing very close to a woman and was "clearly pressing her for sexual interaction."

122.    According to the investigation report, the interaction made Jane Roe uncomfortable and concerned for the woman in question.

## Sally Roe's Complaints Against Plaintiff

123.    As previously stated, Sally Roe, a close friend of Jane Roe, submitted on September 18, 2017, a complaint to David Post, UWC chair, three minutes prior to Jane Roe's complaint, alleging an incident of groping by John Doe, said to have occurred on the chartered Harvard-Yale bus ride on November 18, 2016.

124.    Sally Roe *did not* claim, as had Jane Roe, that the alleged incident with John Doe had created a hostile academic environment for her at Yale. Sally Roe reiterated this during the hearing.

125.    Sally Roe alleged in her complaint that John Doe had sat down next to her on the bus, "and groped my left breast and butt, which was sexual harassment. **This was in view of others**."

126.    **Notably, on the crowded bus, there were no witnesses to the groping alleged by Sally Roe. Significantly, the hearing panel, in their final decision, concluded, "*The Panel notes that no witness reported seeing [John Doe] grope [Sally Roe].*"**

127.    In fact, during the hearing, Sally Roe changed her statement to claim that the alleged groping had been the side of her breast (also known as the armpit or ribcage) and the side of her buttock (also known as the hip or upper high).

128.    Nonetheless, based only upon vague and unsubstantiated allegations of groping by Jane Roe and Sally Roe, two (2) close friends, made nearly one year after the event, and John Doe's adamant denial, the UWC determined an investigation was necessary, and engaged an independent Fact-Finder to investigate.

*The Investigation*

129.    The Fact Finder began her investigation on September 22, 2017. She interviewed Jane Roe and Sally Roe and eight witnesses to take their accounts, then finally met with John Doe on October 16, 2017.

130.    At the time of the first interview, John Doe had only been informed about the allegations regarding the Harvard-Yale bus trip. John Doe denied the allegations of groping, and detailed his recall of the events in question.

131.    UWC chair David Post had stated in an email to John Doe that the interview with the Fact-Finder would relate to one specific alleged incident on Nov. 18, 2016, yet in the first interview the Fact Finder went far afield of that incident, referring to allegations by the complainants of which he had not received notice.

132.    The Fact Finder questioned John Doe about an informal report made by Jane Roe and Sally Roe to Title IX Coordinator Angela Gleason in 2016.  John Doe told the investigator he would not discuss the confidential conversation he had with Ms. Gleason.

133.    On Monday, October 16, 2017, John Doe's advisor contacted Ms. Menon to inform her that during the initial interview that afternoon the Fact Finder had violated John Doe's right to a fair and impartial investigation by asking about confidential conversations he had with Title Coordinator Ms. Gleason, and by questioning John Doe about alleged incidents unrelated to the investigation and without prior notice.

134.    On Tuesday, October 17, 2017, John Doe sent this information in an email to UWC Chair Mr. Post explaining that the Fact Finder had not been impartial, and had violated procedures set by the UWC.

135.     Despite the foregoing, and in direct contradiction to the emails John Doe had sent to Ms. Menon and Mr. Post specifically stating that the Fact Finder had improperly interrogated him, on the following day, October 18, 2017, the Fact Finder interviewed Ms. Gleason and on October 19, 2017 the Fact Finder interviewed John Doe's Dean, improperly questioning both as witnesses about confidential conversations they had with John Doe. Summaries of the Dean's and Ms. Gleason's interviews were included in the Fact Finder's report. Furthermore, John Doe was questioned by the panel during the hearing regarding the confidential discussions he had with Ms. Gleason and his Dean.

136.     The UWC Procedures, Section 7.3 also states: *"The fact-finder will not consider information that is provided solely to attest to a party's character."*   However, the Fact-Finder included in the investigative report unrelated hearsay and derogatory character statements about John Doe that had nothing to do with the allegations. The female complainants had no such descriptions of their character in the report.

137.     On November 17, 2017, John Doe was sent the Fact-Finder's report by the UWC Secretary. This was the first time John Doe was informed of the details of Jane Roe's and Sally Roe's claims.

### The UWC Panel Hearing

138.     The hearing panel and chair were selected by UWC chair Mr. Post. John Doe was instructed to review the membership of the UWC for conflicts of interest. John Doe notified the UWC that the conflicts of interest that concerned him was the relationships of the complainants with members of the UWC.

139.     John Doe informed Mr. Post and Ms. Menon that Sally Roe's father was a well-known faculty member at Yale and that Jane Roe's parents were Yale alumni and her father a

27

published legal scholar who frequently was quoted as a Yale alumnus. Moreover, Mr. Post himself was a colleague in the same field as Sally Roe's father.

140.   UWC chair Mr. Post stated he would inform the panel with regard to the identities of the complainants' parents and ask any members who could not judge the matter fairly to recuse themselves.  Mr. Post continued to oversee the UWC process for John Doe.

141.   On November 27, 2017, a hearing was held to determine the charges against John Doe. A five (5) member panel of faculty, staff and a student were assembled. John Doe, Sally Roe, and Jane Roe, each with their advisors, were placed in separate rooms with a speakerphone so as to be able to listen to the proceedings in the conference room with the hearing panel.

142.   Each of the parties was brought individually before the panel to make an opening statement, to be interviewed by the panel, to answer questions submitted by the other parties as determined by the hearing panel, and to make a closing statement.

143.   Jane Roe told the panel how she had tried to enlist all of her witnesses, who were her roommates and friends, to bring a group complaint against John Doe.  Jane Roe stated she had tried to "plant that seed in their heads".

144.   As the hearing progressed, John Doe's advisor heard one of the complainants make a statement identical to the complainant who had just been before the panel, even referencing what her friend had just said.  John Doe's advisor sent a text to the UWC Coordinator to ask if the two complainants had been allowed to listen to each other's testimony throughout the hearing.

145.   When there was no response to the text, Ms. Menon was asked and she responded affirmatively that the Complainants had full audio access at all times during the entire hearing.

146.     Yale Senior General Associate Counsel, who acted as legal counsel to the UWC panel during the hearing, stated that because John Doe had agreed to having the two complaints heard by one hearing panel that this somehow excused the UWC from following proper protocol with regard to sequestering witnesses.

147.     While the complainants could obtain information about each other's complaint through the Fact-Finder's report, the purpose of the UWC hearing was to adjudicate each allegation of policy violation separately, requiring each party to address the panel *only* about the alleged policy violation involving the individual complainant and the respondent.

148.     Allowing the complainants to reference each other's statements to the hearing panel to influence and further support her own individual complaint was prejudicial, denying the panel and later the decision maker the opportunity to adjudicate the charges against John Doe in a fair and impartial manner.  Ms. Menon dismissed John Doe's concerns and nothing was done to rectify the situation.

149.     The next step in the hearing process was for the parties to respond to questions. John Doe submitted a list of questions for the panel to ask each complainant. Due to the striking similarity in their responses to the panel, John Doe submitted a question for the panel to ask Sally Roe: "Have you exchanged any text messages with [Jane Roe] since the start of this hearing today?"

150.     Following a long hesitation, Sally Roe admitted that she and Jane Roe had been sending text messages to one another during the hearing. The hearing panel asked, "What did you discuss in your texts?" and Sally Roe responded that they had been "talking about dinner plans for tonight. She is not doing well. I was comforting her." The panel then asked, "Was there a discussion of the contents of hearing?"  After a long pause, Sally Roe responded, "We made

one comment about his testimony." Subsequent review of the text messages determined Sally Roe's responses as untrue.

151.     The response by the UWC panel and administrators was to request that the complainants provide copies of the texts they had exchanged. This was voluntary and the panel had no way of knowing how many texts had been deleted or excluded from those proffered by the complainants. In fact, the text messages stated that one of the complainants had also been on Snapchat all morning, involving messages exchanged with others that could not be retrieved.

152.     The complainants made comments in their texts about John Doe's ethnicity and remarks about his testimony. "[John Doe] is in hell," one wrote. Jane Roe, complaining of a hangover, wrote in her texts that she "kind of wanted to puke while [the hearing panel] were questioning me just for dramatic effect."

153.     In further evidence to the improprieties of the hearing, the complainants were each asked by the hearing chair about the timing and nature of her texts while the other complainant listened to the answers.

154.     John Doe's advisor sent an email at 2:34 p.m. to Ms. Menon and Mr. Post declaring, "For the record, due to the texting between the complainants, the credibility of both parties and the hearing has been compromised. This constitutes a mistrial."

155.     The response by Ms. Menon and General Counsel Harold Rose ("Mr. Rose") was to present John Doe and his advisor with copies of the complainants' text messages that were exchanged between the time period of 12:30 p.m. to 2:20 p.m., as if to say this was sufficient, and Mr. Rose requested that John Doe provide him with evidence from the text messages to support his assertion of collusion by the complainants.

156.    John Doe decided, after waiting what by that time had been more than eight (8) hours to appear before the panel to answer their questions, that he would go ahead with concluding the hearing, despite all the improprieties and the unwillingness of the UWC to acknowledge or correct the issues cause by the complainants.

157.    John Doe had discussed in his prior written responses, and now before the hearing panel, that Jane Roe, Sally Roe and their roommates and friends who had all been interviewed as witnesses, held a palpable animosity towards him because of his political views. John Doe was well known on campus as a conservative political columnist for the *Yale Daily News*.

158.    The Harvard-Yale bus trip on November 18, 2016, had been one week after the presidential election with Donald Trump's victory.  At that time, the campus climate at Yale was such that, although dean's excuses were denied, "Yale administrators and faculty members flooded student inboxes with messages of support and consolation during a potentially difficult time for many. In an email to undergraduates Wednesday afternoon, [Yale College Dean Jonathan] Holloway called on students to come together in what he called "a very difficult period on campus." *Yale Daily News*, Nov. 10, 2016

159.    John Doe expressed to the hearing panel his social isolation on campus for his conservative political views and what he perceived to be rejection by the students on the bus trip. One panel member began a line of questioning about whether John Doe's political beliefs were an underlying issue to the complainants' reports. Suddenly, Yale General Counsel Mr. Rose got up from his chair to confer with Ms. Menon.  John Doe and his advisor were asked to leave the room for approximately ten (10) minutes, without explanation.

160.    John Doe and his advisor were brought back to the room with the hearing panel and a new line of questioning began. The discussion regarding the political climate at Yale had been abruptly discontinued and not pursued again during the hearing.

161.    The hearing concluded after eleven (11) hours. The UWC never followed up with the complainants to verify that the texts messages they provided were the only messages they had exchanged that day.

162.    The hearing panel, after questioning John Doe, requested that the Fact-Finder interview two witnesses who had not been interviewed. A Supplemental Report was delivered by the Fact-Finder and John Doe submitted a response to the additional information.

163.    On December 15, 2017, the hearing panel delivered their determination report of findings and recommended sanctions. Only the findings are disclosed to the respondent. John Doe. The panel determined that John Doe was responsible for all charges:  two incidents of groping Jane Roe, one incident of groping Sally Roe, and for creating a hostile environment for Jane Roe.

### *The Sanction*

164.    On December 22, 2017, John Doe submitted a response to the report in the form of a letter to the decision maker, Dean Marvin Chun ("Dean Chun"). John Doe pointed out the lack of evidence and rationale for the hearing panel's decision by a preponderance of the evidence.

165.    On December 27, 2017, John Doe received a brief one-page reply from Dean Chun informing John Doe that his decision was to uphold the findings of the hearing panel. The sanction imposed was that John Doe should (i) be suspended from Yale for the spring semester 2018 and the fall semester 2018; (ii) be required to petition for readmission upon the end of the

period of suspension; (iii) be required to receive sexual harassment training before his return to Yale or immediately upon return; and (iv) continue to receive alcohol counseling upon his return to Yale.

166.    During the nearly four months of investigation and adjudication of the allegations against John Doe, at no time did the University find the need to impose an interim suspension or other restrictions because he was not a threat to anyone nor did he create a hostile environment on campus. It was therefore a baseless Decision that the sanction of immediate suspension was imposed.

167.    The "Yale University Reports of Complaints of Sexual Misconduct" by Title IX Coordinator Stephanie Spangler detailed the actions taken and penalties imposed by the UWC for the designated time period. According to the report, during the twelve (12) months July 2016 - July 2017, there were three (3) Yale College respondents disciplined by the UWC. The three (3) respondents were all found responsible for <u>sexual penetration without consent, and were sanctioned the same penalty of suspension that John Doe was sanctioned</u>. In effect, the Decision, based on credibility without evidence, to impose a Sanction suspending John Doe for two semesters equated allegations of groping (brief contact over clothing) to findings of sexual penetration without consent, i.e. rape, without distinction. The arbitrary and capricious Sanction handed down to John Doe was unduly harsh, and unsubstantiated.

### *The Appeal*

168.    On January 3, 2018, John Doe submitted his appeal of the findings and sanctions on the only grounds allowed by UWC: procedures: (1) procedural error that prevented the hearing panel or decision maker from judging the matter fairly, and (2) the discovery of facts that

were not reasonably available to the appealing party prior to the UWC hearing and that refute the allegation of sexual misconduct.

169.    The procedural errors that prevented the hearing panel or decision maker from judging the matter fairly included:

(1) a lack of due process by allowing the Complainants to hear each other's testimonies;

(2) the constitutional violation of dismissing the Complainants' texting during the hearing and placing the burden of proof on John Doe to prove that collusion had occurred;

(3) conflicts of interest that resulted in a biased adjudication;

(4) lack of an official record of the hearing

(5) the failure to properly investigate and collect all available evidence;

(6) the failure to thoroughly interview all relevant witnesses;

(7) the complete disregard of contradictions and inconsistencies in the Complainants' and witnesses' statements when making assessments of fact and credibility;

(8) the improper inclusion of information in the Fact-Finder's report which the hearing panel and decision maker relied upon as a determination of John Doe's responsibility;

(9) failure of the University to demonstrate a burden of proof using the preponderance of the evidence standard;

(10) failure to define the policy violation;

(11) lack of a rationale for the Decision and Sanction; and,

(12) the imposition of an unduly harsh and unwarranted sanction of suspension. All of these procedural errors, individually and when taken together, unfairly and materially affected the outcome of John Doe's case.

170.    The discovery of facts that were not reasonably available to John Doe prior to the hearing included: (a) the additional investigation undertaken by the Fact-Finder and her resulting Supplemental Fact-Finder's report, which included interviews with three (3) witnesses; (b) the text messages between the Complainants during the hearing; and (c) the complainants' responses to the final report by the panel, in which both of the complainants were allowed to introduce new information that was not in the Fact-Finder's report, without any objection or redaction by Ms. Menon or Mr. Post before forwarding the complainants' responses to Dean Chun.

171.    Despite the foregoing, on January 12, 2018, John Doe's appeal was denied by Provost Ben Polak who found no procedural errors throughout the entire UWC process.

172.    John Doe's official Yale transcript will now bear the notation "Suspended" after a finding of responsibility for a code of conduct violation.

173.    As a result of Defendants' unlawful actions, John Doe has suffered immense losses. It will be enormously difficult for John Doe to obtain a college degree from any four-year institution, let alone one comparable to Yale, and similarly difficult to obtain any graduate degree. Because of the black mark on his transcript, he will forever have to explain to admissions committees the reason for his suspension.

174.    John Doe has also experienced extreme emotional, psychological, and physical distress as a result of the investigation process and his suspension. Without limitation, John Doe will be denied junior year participation in the very prestigious Brady-Johnson Program in Grand Strategy and denied the summer internship position at the highly selective investment banking firm which he has worked for years to obtain.

175.    The marking of Plaintiff's academic transcript with two semesters of suspension for a violation of student conduct policy will permanently deny Plaintiff educational and career

opportunities as he will forever be forced to explain that he was found responsible for sexual assault.  Plaintiff will never be able to pursue a career in professions which require a license or background check, which will permanently alter the trajectory of John Doe's life.

### COUNT I
### Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*.
### Erroneous Outcome and Unjustly Severe Penalty
### (Yale University)

176.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

177.    Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

178.    Title IX of the Education Amendments of 1972 applies to all public and private educational institutions that receive federal funding, which includes Defendant Yale.

179.    Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault or by the imposition of university discipline where gender is a motivating factor in the decision to discipline.

180.    Plaintiff was innocent and wrongly found to have committed a violation of Defendant Yale's Sexual Misconduct Policy, and gender bias was a motivating factor.

181.    Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the *prompt and equitable resolution* of student... complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (*emphasis added*). Such

prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.[4]

182.    The "prompt and equitable" procedures that a school must implement include, at a minimum:

- "Notice . . . of the procedure, including where complaints may be filed";

- "Application of the procedure to complaints alleging [sexual] harassment...";

- "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

- "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

- "Notice to the parties of the outcome of the complaint......"[5]

183.    Based on the foregoing, Defendants failed to conduct an adequate, reliable, and impartial investigation of the complaints.

184.    Particular circumstances suggest that gender bias was a motivating factor behind the erroneous findings and the decision to impose an unjustly severe penalty upon Plaintiff. These circumstances include, *inter alia*:

   a.    Yale support services include SHARE: Sexual Harassment and Assault Response and Education Center which provides information, advocacy, and support for complainants. Complainants are told "Title IX coordinators, the UWC, and the YPD work hard, along with SHARE, to streamline and coordinate complaint processes, so it does not matter where you begin. The options are not mutually exclusive; you can pursue any or all of them as you wish. You will always be part of the decision-making process and the choices regarding whether or how to proceed are generally up to you."

   b.    85% of the students utilizing SHARE are females seeking services for experiences with sexual misconduct, it is clear that Yale funded support services which include SHARE, the Title IX Coordinators and the UWC, to provide support services primarily to women.

---

[4] *See generally* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) at 19-20, 21 & nn.98-101.
[5] *Id.* at 20.

c.   When students enter into a Title IX disciplinary matter at Yale, the institution will provide a vastly disproportionate number of support services to the complainant, who are female in 85% of cases, based upon the foregoing data from SHARE.

d.   Even the Yale Police Department has a Sensitive Crimes & Support Coordinator, "who provides services to victims, such as safety planning and assistance in obtaining a protective order."  Upon information and belief, there are no support services offered by YPD to respondents.

e.   Complainants at Yale have access to University funded SHARE, the UWC, Title IX Coordinators, and Yale Police Department. Upon information and belief, no specific University funded resources are offered at Yale to respondents, who are disproportionately male.

f.   Yale has student organizations, also funded by the university, such as the Communication and Consent Educators (CCE) Program. "We aim to end sexual violence by transforming our corner of contemporary culture into one where respect, mutuality, and mindfulness are the norms." *https://cce.yalecollege.yale.edu*

g.   Upon information and belief, Defendants actively adopted the Title IX Coordinator's mission of increasing reporting of alleged sexual misconduct at Yale. Unfortunately, the UWC did so at the expense of properly vetting complaints of sexual

185.   As demonstrated above, it is apparent that Yale views all women who simply make complaints of alleged sexual misconduct, as "victims". This attitude and policy implementation clearly leads to gender bias against males. The Association of Title IX Administrators published "2014 Whitepaper" entitled *Equity is Such a Lonely Word*, includes training materials presented to college Title IX departments and states: "victims have historically been accorded 3/5 of the rights of an accused individual (or less), and **victims are typically women**, equity may require institutions to recalibrate the pendulum to right the historical imbalance." (emphasis added). Upon information and belief, Yale University was a recipient of these training materials.

186.   Yale's policies and procedures discriminated against Plaintiff on the basis of his sex and led to an erroneous outcome. Contrary to the Question and Answers published by the

United States Department of Education, Office for Civil Rights in September of 2017, Yale improperly utilized a "preponderance of the evidence" standard in adjudicating Plaintiff's responsibility,

Question 8:

What procedures should a school follow to adjudicate a finding of responsibility for sexual misconduct?

Answer:

The investigator(s), or separate decision-maker(s), with or without a hearing, must make findings of fact and conclusions as to whether the facts support a finding of responsibility for violation of the school's sexual misconduct policy. If the complaint presented more than a single allegation of misconduct, a decision should be reached separately as to each allegation of misconduct. The findings of fact and conclusions should be reached by applying either a preponderance of the evidence standard or a clear and convincing evidence standard19

The standard of evidence for evaluating a claim of sexual misconduct should be consistent with the standard the school applies in other student misconduct cases. In a recent decision, a court concluded that a school denied "basic fairness" to a responding party by, among other things, applying a lower standard of evidence only in cases of alleged sexual misconduct. Doe v. Brandeis Univ., 177 F. Supp. 3d 561, 607 (D. Mass. 2016) ("[T]he lowering of the standard appears to have been a deliberate choice by the university to make cases of sexual misconduct easier to prove—and thus more difficult to defend, both for guilty and innocent students alike. It retained the higher standard for virtually all other forms of student misconduct. The lower standard may thus be seen, in context, as part of an effort to tilt the playing field against accused students, which is particularly troublesome in light of the elimination of other basic rights of the accused."). When a school applies special procedures in sexual misconduct cases, it suggests a discriminatory purpose and should be avoided. A postsecondary institution's annual security report must describe the standard of evidence that will be used during any institutional disciplinary proceeding arising from an allegation of dating violence, domestic violence, sexual assault, or stalking. 34 C.F.R. § 668.46(k)(1)(ii).

187.    As evidenced by Yale's Spring 2016 Executive Committee's Report, Yale University utilized a "**clear** preponderance" of the evidence standard for other disciplinary proceeding other than sexual misconduct cases. (Emphasis added).

https://www.yale.edu/search/google/Clear%20preponderance

188.    Yale's UWC's policy 7.5 states as follows:

**7.5. Findings, Conclusions, and Recommendations**
Following the hearing, the panel will consider whether the respondent has violated University policy, giving an affirmative answer if it is satisfied that a violation has **been shown by a preponderance of the evidence**. (Emphasis added).

189.    The fact that Defendants implemented a lower burden of proof in sexual misconduct cases is in direct line with the University's stated policy to ignore and defy the 2017 OCR's recommendations and stated guidance.

190.    On September 22, 2017, the same day that John Doe received the Notice of Investigation, the OCR rescinded the "2011 Dear Colleague Letter" and put in place an interim guidance while the current administration reviews and revises its practices with regard to the adjudication of complaints of sexual misconduct on college campuses receiving federal funding. See, e.g., https://www.ed.gov/news/press-releases/department-education-issues-new-interim-guidance-campus-sexual-misconduct.

191.    In response, on that same date of September 22, 2017, Yale Title IX Coordinator Stephanie S. Spangler issued a statement, "Based on our initial review, Yale's current policies and practices, which were adopted after broad engagement of the university community, are *largely consistent* with the requirements set out in the new guidance. In particular, Yale has no plans to deviate from the evidentiary standard recommended by the OCR and **Yale has no plans to deviate from the evidentiary standards the university now applies to sexual misconduct cases**." (emphasis supplied)

192.    Challenges to university disciplinary proceedings for sex discrimination fall in two categories: (1) "erroneous outcome" cases, in which the claim is that plaintiff was innocent and wrongly found to have committed an offense and gender bias was a motivating factor behind

the erroneous findings; and (2) "severity of penalty/selective initiation" cases, in which the claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.

193.    An "erroneous outcome" occurred in this case because John Doe was innocent and wrongly found to have committed sexual assault and gender bias was a motivating factor. The denial of due process in this case resulted in an "erroneous outcome" based on erroneous and distorted conception of the facts.

194.    Defendant Yale failed to conduct an adequate, reliable, and impartial investigation when it conducted its investigation of Jane Roe and Sally's allegations and subsequent adjudication in a manner that was biased against John Doe.  Further, John Doe was severely prejudiced by Defendants allowing complaints to hear each other's statements to the panel and permitted the panel to render a decision despite the fact that the complaints were texting each other during the hearing.

195.    Defendant Yale made no provision, to John Doe as the respondent, of the evidence that supposedly supported the false allegations, and thus John Doe was severely prejudiced in being able to prepare a defense to those false allegations.

196.    As discussed above, Defendant Yale has created a victim-centered process in which an accused male student is prosecuted under a presumption of guilt and improperly places the burden of proof in John Doe. Such a one-sided process deprived John Doe, as a male student, of educational opportunities at Defendant Yale on the basis of his sex. Defendant Yale also imposed an unwarranted and unjustly severe sanction on Plaintiff, and gender bias was a motivating factor. During the twelve (12) months of July 2016-July 2017, there were three (3) Yale College respondents disciplined by the UWC. The three (3) were all found responsible for

sexual penetration without consent, and were sanctioned the same penalty of suspension that John Doe was sanctioned. In effect, the Decision, based on credibility without evidence, to impose a Sanction suspending John Doe for two semesters equated allegations of groping (brief contact over clothing) to findings of sexual penetration without consent, i.e. rape, without distinction. The arbitrary and capricious Sanction handed down to John Doe was unduly harsh, and unsubstantiated.

197.    On information and belief, all students that have been suspended and expelled from Yale for sexual misconduct have been male.

198.    Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and unfair process in violation of Title IX designed to find him, the male, responsible for sexual assault and be punished severely for it.

199.    This unlawful discrimination in violation of Title IX proximately caused Plaintiff to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future employment prospects.

200.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

**COUNT II**
**Breach of Contract**
**(All Defendants)**

201.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

202.    Plaintiff applied to and enrolled at Yale and paid associated fees and expenses. Plaintiff did so in reliance on the understanding and with the reasonable expectation that Yale

would implement and enforce the provisions and policies set forth in its official publications, including Sexual Misconduct Policy. Plaintiff declined acceptance, including foregoing scholarship money, from several other Universities including other Ivy schools to attend Yale University.

203.    An express contract or, alternatively, a contract implied in law or in fact was formed between Plaintiff and Yale.

204.    The contract contained an implied covenant of good faith and fair dealing. It implicitly guaranteed that any proceedings would be conducted with basic fairness.

205.    Based on the aforementioned facts and circumstances, Defendants breached express and/or implied agreement(s) with Plaintiff, and the covenant of good faith and fair dealing contained therein.

206.    Defendants committed several breaches of their agreements with Plaintiff during the investigation process. A non-exhaustive list of Defendants' breaches includes the following:

**Defendants failed to properly notify Plaintiff of the charges against him and rights under Yale's policies.**

207.    Plaintiff was called to attend a meeting, without warning and without an advisor, where he received hand delivered letters from Ms. Menon. The letters were Notices of Investigation, one for each complainant, informing John Doe he would be investigated for groping and sexual harassment stemming from a November 18, 2016 incident.

208.    The Fact-Finder during her first meeting with the Plaintiff inquired about alleged incidents for which he did not receive any notice of. Additionally, the Fact-Finder questioned the Plaintiff regarding confidential conversations he previously had with his Dean and Title IX Coordinator.

**Defendants failed to properly follow their policies as the Fact-Finder improperly obtained information which was erroneously incorporated into her Investigative Report.**

209.    On October 18, 2017, the Fact Finder interviewed Ms. Gleason and on October 19, 2017 the Fact Finder interviewed John Doe's Dean, improperly questioning both as witnesses about confidential conversations they had with John Doe. Summaries of the Dean's and Ms. Gleason's interviews were included in the Fact Finder's report. Furthermore, John Doe was questioned by the panel during the hearing regarding the confidential discussions he had with Ms. Gleason and his Dean.

210.    The Yale's UWC Procedures, Section 7.3 states: "The fact-finder will not consider information that is provided solely to attest to a party's character."  However, the Fact-Finder included in the investigative report unrelated hearsay and derogatory character statements about John Doe that had nothing to do with the allegations. The female complainants had no such descriptions of their character in the report.

**Defendants failed to provide the Plaintiff with an impartial Fact-Finder and impartial hearing panel.**

211.    In addition to the flagrant violations of Yale's policies as noted above, the Fact-Finder's investigation was biased against the Plaintiff.  The Fact-Finder conducted a total of seven (7) interviews with the complainants as compared to only two (2) with the Plaintiff.

212.    At the time of Plaintiff's first interview, the Fact-Finder had already conducted 10 witness interviews. Moreover, the Fact-Finder **did not** follow-up again with six (6) of those ten (10) witnesses after her interview with the Plaintiff to confirm, challenge or elicit  further  details about Plaintiff's statement. Critically, the hearing panel and decision maker relied on and cited all of the six (6) witnesses interviewed prior to John Doe's interview in finding John Doe responsible for violations of the sexual misconduct policy.

213.     The hearing panel and chair were selected by UWC chair Mr. Post. Yale policy permitted Plaintiff to review the membership of the UWC for conflicts of interest. Plaintiff did follow the policy and notified the UWC that the conflicts of interest that concerned him were the relationships of the complainants with members of the UWC.

214.     Plaintiff immediately informed Mr. Post and Ms. Menon that Sally Roe's father was a well-known faculty member at Yale and that Jane Roe's parents were Yale alumni and her father a published legal scholar who frequently was quoted as a Yale alumnus.

215.     Instead of obtaining an objective UWC panel from outside the Yale community, UWC chair Mr. Post elected the panel members to self-recuse themselves. To no surprise of the plaintiff, and solely to his detriment, none of the members recused themselves. Moreover, Mr. Post continued to oversee the UWC process against Plaintiff despite the fact that he himself was a colleague of Sally Roe's father.

216.     As the hearing progressed, it was evident that the complainants were able to listen to each complainants' statements to the hearing panel as one complainant subsequently gave the same exact statement to panel. Yale's Senior General Associate Counsel, who acted as legal counsel to the UWC panel during the hearing, indicated that the UWC elected not to sequester the complainants as each presented their statements to the panel since the matter was being adjudicated in one (1) hearing.

217.     The use of one (1) hearing panel cannot serve as the basis to violate Plaintiff's fundamental right of due process. The act of sequestering of witness is such a basic right of the accused. Moreover, not permitting one complainant from listening to the other in no way would violate the non-testifying complainant's right.

218. Plaintiff immediately voiced his objection to the fact that the complainants' were able to listen to each other's statements and this objection was dismissed and nothing was done to rectify the situation.

219. Shortly after learning of the non-sequestration of the complainants, Plaintiff learned that the complainants were texting during throughout the proceedings. Instead of immediately declaring the need for a new hearing, as requested by the Plaintiff, the response by the UWC and Yale's administrators was simply to have the complainants provide copies of the texts they had exchanged. This was voluntary and the panel had no way of knowing how many texts had been deleted or excluded from those proffered by the complainants. In fact, the text messages stated that one of the complainants had also been on Snapchat all morning, involving messages exchanged with others that could not be retrieved.

220. Additionally, Yale's General Counsel Mr. Rose directed that the Plaintiff provide him with evidence from the text messages to support his assertion of collusion by the complainants.

221. Yale's General Counsel Mr. Rose once again interjected his bias against the Plaintiff during the panel hearing when one of panel members began a line of questioning about whether Plaintiff's conservative political beliefs were an underlying issue to the complainants' reports. Mr. Rose got up from his chair to confer with Ms. Menon. Plaintiff and his advisor were asked to leave the room for approximately ten (10) minutes, without explanation.

222. Once Plaintiff and his advisor returned to the room, a new line of questioning began. The discussion regarding the political climate at Yale had been abruptly discontinued and not pursued again during the hearing.

**Defendants found the Plaintiff responsible for alleged "Groping" despite the fact that Yale does not have a definition of "Groping" in UWC's policies.**

223.    The allegations against John Doe were for violations of Yale's Sexual Misconduct Policy for "groping," a violation included under the policy for "sexual assault."  Sexual assault was defined in the policy as "any kind of nonconsensual sexual contact, including rape, groping or any other nonconsensual touching."  The policy does not have a definition for "groping".

224.    Neither Jane Roe or Sally Roe's complaints any description of the alleged "groping" to provide Plaintiff with proper notice of the allegations.

225.    Here, and as set forth above, the preponderance of evidence did not support a finding of "groping," as that term is **undefined** in the Policy.

**The decision maker did not provide a rationale for the decision and sanction in violation of Yale's policy.**

226.    The decision maker's (Dean Chun) decision lacked any stated rationale for his determination and final decision and sanction. The arbitrary and capricious finding of Plaintiff's responsibility had been pre-determined. The decision maker failed to conduct due diligence in writing his report. The decision lacked any analysis of what had been recommended at the panel level.   There was no data regarding sanctions from similar matters. Ms. Menon, who had received Plaintiff's letter to Dean Chun on Friday, December 22, 2017 (Christmas weekend) received the decision from Dean Chun on Tuesday, December 26, 2017. Significantly, had Dean Chun decided to deviate at all from the UWC panel's recommendation, according to policy, he would have had to meet with the panel before providing me with his Decision:

> *"Based on extensive feedback from the University community, and to reflect*
> *the UWC's current practice, the procedures were modified to require the decision*
> *maker  to meet with members of the panel to discuss the proposed decision, if the*
> *decision maker contemplates materially modifying the panel's conclusions*
> *or recommendations.  This is intended to ensure that the decision maker has a*

> *thorough understanding of the UWC panel's deliberations, conclusions and recommendations. (UWC Procedures, Section 7.5)"*

227.    Given the holidays and University closure for the week, it would require reconvening the panel in January if the decision maker wanted to consider a different finding or sanctions other than those recommended by the panel. Clearly, this was easily avoided with a one-page letter by the decision maker effectively "rubber-stamping" the hearing panel's unsubstantiated Decision. The decision maker provided no rationale for upholding the flawed recommendation by the hearing panel in a rush by the UWC to finalize my suspension before the start of the next semester.

228.    As a direct and foreseeable consequence of the foregoing breaches, Plaintiff sustained damages, including, without limitation, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

229.    Plaintiff is entitled to recover damages for Defendants' breaches of the express and/or implied contractual obligations described above in an amount to be determined at trial.

<u>**COUNT III**</u>
<u>**Breach of Contract/Common Law: Denial of Basic Fairness/**</u>
<u>**Arbitrary and Capricious Decision Making**</u>
**(All Defendants)**

230.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

231.    Defendants had a duty, either under an express or implied contract or as a matter of common law, to ensure that the proceedings against Plaintiff were conducted in good faith and with basic fairness.

232.    Defendants breached this duty of good faith and basic fairness by, without limitation:

- Failing to provide Plaintiff with the same protections explicitly afforded the complainant under Yale's Sexual Misconduct Policy, including, without limitation, the right to policies and procedures designed to protect the rights of *both* complainants and respondents; the right to have the sexual misconduct investigation process explained to him in detail prior to engaging in that process; and the right to a presumption of innocence unless and until the preponderance of evidence warrants a finding of responsibility;

- Failing to provide Plaintiff the opportunity of a fair hearing;

- Failing to sequester the complainants during the other's reading of their own statement to the hearing panel;

- Failing to immediately order a new panel hearing once Defendants learned of the complainants' collusion by texting with each other during the panel hearing;

- Arbitrarily and capriciously finding that the Plaintiff responsible for "groping" the complainants  as Defendants have no definition for the act of "groping";

- Arbitrarily and capriciously suspending the Plaintiff for two (2) semesters when the same penalty of suspension had been handed down to others found responsible for non-consensual penetration (rape);

233.   Defendants' breach of the duty to ensure basic fairness proximately caused Plaintiff to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

234.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial.

## COUNT IV
## Invasion of Privacy (Violation of Confidentiality and False Light)
## (Yale University)

235.   Plaintiff restates each of the foregoing paragraphs as if fully restated herein.

236.     In October 2017 the Fact Finder interviewed Ms. Gleason and John Doe's Dean, improperly questioning both as witnesses about confidential conversations they had with John Doe concerning prior informal complaints. Summaries of the Dean's and Ms. Gleason's interviews were included in the Fact Finder's report. Furthermore, John Doe was questioned by the panel during the hearing regarding the confidential discussions he had with Ms. Gleason and his Dean.

237.     The Fact-Finder was prohibited by Yale's policies and procedures from obtaining this information. Additionally, Ms. Gleason and the Dean were prohibited from disclosing this information. Said disclosure was a violation of Plaintiff's right to privacy, *to wit*, his right to have the information kept confidential.

238.     These statements were a major misrepresentation of Plaintiff 's character,

239.      As a direct and foreseeable result of the false light in which the Fact-Finder placed the Plaintiff, Plaintiff experienced, and continues to experience, emotional and mental suffering.

## COUNT V
## Estoppel and Reliance
### (All Defendants)

240.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

241.     Yale's various policies constitute representations and promises that Yale should have reasonably expected to induce action or forbearance by Plaintiff.

242.     Yale expected or should have expected Plaintiff to accept its offer of admission, incur tuition and fees expenses, and choose not to attend other colleges based on its express and implied promises that Yale would not tolerate, and Plaintiff would not suffer, discrimination or

harassment by fellow students or faculty members and would not deny Plaintiff his procedural rights should he be accused of a violation of Yale's policies.

243.    Plaintiff relied to his detriment on these express and implied promises and representations made by Yale, by choosing to attend Yale rather than other schools of equal caliber and paying the required tuition and fees.

244.    Based on the foregoing, Yale is liable to Plaintiff based on Estoppel.

245.    As a direct and proximate result of the above conduct, Plaintiff sustained damages, including, without limitation, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

246.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

(i)      on the first cause of action for violation of Title IX of the Education Amendments of 1972, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(ii)     on the second cause of action for breach of contract, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, past

and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

(iii)    on the third cause of action for denial of basic fairness under contract and common law, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)    on the fourth cause of action invasion of privacy (false light), a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v)    on the fifth cause of action for estoppel and reliance, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to past and future economic losses, loss of educational and career opportunities, and loss of future career prospects,

(vi)    a declaratory judgment, pursuant to 28 U.S.C. § 2201, declaring that: (i) the outcome and findings made by Yale should be reversed; (ii) Plaintiff immediately reinstated as a student in good standing and permitted to begin classes during the Spring 2018 semester (iii) Plaintiff's reputation should be restored; (iv) Plaintiff's disciplinary record be expunged; (v) the record of Plaintiff's expulsion be removed from his education file; and (vi) any record

of the complaint against Plaintiff be permanently destroyed; and (vii) awarding Plaintiff such other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

Dated:   New York, New York
         January 18, 2018

Respectfully submitted,

**LAW OFFICES OF WILLIAM B. BILCHECK, JR.**

By: */s/ William B. Bilcheck Jr*
William B. Bilcheck, Jr. *(Federal Bar No. CT04402)*
12 Brookside Road
Madison, Connecticut 06443
(203) 245-6252
madctatty@aol.com

**NESENOFF & MILTENBERG, LLP**
*Attorneys for Plaintiff John Doe*

By: */s/ Andrew T. Miltenberg*
Andrew T. Miltenberg, Esq. (pro hac vice
                 admission pending)
Stuart Bernstein, Esq. (pro hac vice admission
                 pending)
Phillip Byler, Esq.      (pro hac vice admission
                 pending)
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
amiltenberg@nmllplaw.com
sbernstein@nmllplaw.com
pbyler@nmllplaw.com

*Attorneys for Plaintiff*