UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOHN DOE, | : | |
| | : | Civil Action No: |
| | : | |
| Plaintiff, | : | |
| | : | |
| | : | |
| -against- | : | |
| | : | |
| | : | |
| YALE UNIVERSITY and YALE UNIVERSITY | : | |
| BOARD OF TRUSTEES, | : | |
| | : | |
| | : | |
| Defendants. | : | |

PLAINTIFF JOHN DOE'S MEMORANDUM OF LAW IN SUPPORT
OF PLAINTIFF JOHN DOE'S MOTION FOR A
<u>TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION</u>

LAW OFFICES OF WILLIAM B. BILCHECK, JR.
12 Brookside Road
Madison, Connecticut 06443
(203) 245-6252

NESENOFF & MILTENBERG, LLP
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500

Attorneys for Plaintiff

**<u>TABLE OF CONTENTS</u>**

<u>**Page**</u>

TABLE OF AUTHORITIES ………………………………………………………………iii

PRELIMINARY STATEMENT ………………………………………………...…….1

STATEMENT OF FACTS …...……………………………………………………….....2

    A.  The Parties ………………………………………………...……….….2

    B.  Plaintiff's Background and Matriculation To Yale University; the Contract ………...2

    C.  The April 4, 2011 Dear Colleague Letter, the 2014 OCR Q&A
       And the Formulation Of The Yale 2015 Sexual Misconduct Policies…………...……3

    D.  Yale Sexual Misconduct Policies and Procedures Applicable To Plaintiff …..…….…5

    E.  Pressure On Yale to Expel Alleged Male "Perpetrators"……………………….…..8

    F.  The University Complaints By Jane Roe and Sally Roe Against Plaintiff ……….....11

       (i)  *The Alleged Paris Incident*……………………………………………....12

       (ii) *The Alleged Harvard-Yale Bus Incident* …………………………………13

    G.  The Investigation …………………………………………………....…14

    H.  The UWC Panel Hearing …………………………………………………16

    I.  The Disciplinary Decision ………………………………………………….19

    J.  The Appeal …………………………………………………………….…20

    K.  Plaintiff's Injuries …………………………………………………....……21

ARGUMENT ……………………………………………………………22

I.  THE REQUESTED TEMPORARY RESTRAINING ORDER AND
    PRELIMINARY INJUNCTION IS PROPER UNDER THE LAW…………….……..22

II.  APPLICATION OF THE FOUR-PRONG TEST FOR PRELIMINARY
    INJUNCTIVE RELIEF ESTABLISHES THAT A TEMPORARY RESTRAINING
    ORDER AND PRELIMINARY INJUNCTION SHOULD BE GRANTED………..….24

    A.  Plaintiff Will Suffer Irreparable Injury From the Suspension ………………..…25

B. Plaintiff Is Likely To Succeed On The Merits Of The Title IX and
   Contract Claims (Or Show Serious Merits Questions and Hardship)................…......26

    1. The Contract.......................................................................27

    2. The Breaches of Contract ................................................…....29

        a. Defendants Failed To Properly Notify Plaintiff of
   The Charges Against Him Under Yale's Policies .........…..................29

        b. Defendants Failed To Follow Their Policies As The
   Fact-Finder Improperly Obtained Information Which Was
   Erroneously Incorporated Into Her Investigative Report ...................29

        c. Defendants Failed To Provide the Plaintiff With An
   Impartial Fact-Finder and Impartial Hearing Panel.........................30

        d. Defendants Found the Plaintiff Responsible for Alleged
   "Groping" Even Though Yale Does Not Have A Definition
   of "Groping" in UWC's Policy.................................................32

        e. The Decision Maker Did Not Provide A Rationale For
   The Decision and Sanction In Violation of Yale's Policy...................32

        f. The Breach of the Duty Of Good Faith To Provide A Fair Hearing.…..…33

    3. Title IX ...................................................................…....34

    4. The Title IX Violations ..........................................................36

C. The Balance Of Hardships Tips Decidedly In Plaintiff's Favor ........................38

D. The Requested Temporary Restraining Order and Preliminary
   Injunction Is In The Public Interest ...........................................…....39

CONCLUSION ............................................................................40

REQUEST FOR EVIDENTIARY HEARING ................................................40

## <u>TABLE OF AUTHORITIES</u>

**Page**

<u>Cases</u>

*Am. Civil Liberties Union v. Clapper*, 785 F.3d 787 (2d Cir. 2015) …………………………...…23

*ASA v. Pictometry Intern. Corp.*, 757 F. Supp. 2d 238 (W.D.N.Y. 2010)…………………...…23

*Banerjee v. Roberts*, 641 F. Supp. 1093, 1106 (D. Conn. 1986)…………………………………27

*Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F. 3d 887 (2d Cir. 2015)…………………….…23

*Burns v. Quinnipiac University*, 120 Conn. App. 311, 991 A.2d 666 (2010)……………………27

*Coleman v. Newburgh Enlarged City School Dist.*, 319 F. Supp. 2d 446 (S.D.N.Y. 2004) …….26

*Collick v. William Paterson Univ.*, No. 16-471 (KM) (JBC), 2016 WL 6824374,
      2016 U.S. Dist. LEXIS 160359 (D.N.J. Nov. 17, 2016) …………………………………28

*Davis v. Monroe Bd. Of Education*, 526 U.S. 629 (1999) …………………………………………34

*Doe v. Amherst* College, 238 F.Supp.3d 195 (D. Mass. 2017) ……………………………………28

*Doe v. Brandeis Univ.*, 177 F.3d 561 (D. Mass. Mar. 31, 2016) ……………………….………27, 28

*Doe v. Brown Univ.*, 166 F.Supp.3d 177 (D. R.I. 2016)…………………………………….………27

*Doe v. Brown Univ.,* 210 F. Supp.3d 310 (D.R.I. 2016) …………………………………………24

*Doe v. Columbia*, 831 F.3d 46 (2016) ……………………………………………….………35, 36

*Doe v. Lynn Univ., Inc.*, 235 F.Supp.3d 1336 (S.D. Fla. 2017) …………………………………28

*Doe v. Middlebury College,* No. 1:15-cv-192-jgm, 2015 WL 5488109,
      2015 U.S. Dist. LEXIS 124540 (D. Vt. Sep. 16, 2015) ……………………………...…24, 25

*Doe v. New York Univ.*, 666 F.2d 761 (2d Cir. 1981)…………………………………………………26

*Doe v. Pennsylvania State Univ.*, No. 17-CV-01315, 2017 WL 3581672,
      2017 U.S. Dist. LEXIS 132186 (M.D.Pa. Aug. 18, 2017) …………………………...…23-24

*Doe v. University of Cincinnati*, 223 F. Supp.3d 704 (S.D. Ohio 2016) …………………….…24

*Doe v. Univ. of Notre Dame*, No. 3:17CV298, 2017 WL 1836939,
      2017 U.S. Dist. LEXIS 69645 (N.D.Ind. May 8, 2017) …………………………………24

*Entegee, Inc. v. Korwek*, 2015 WL 5202902 (D. Conn. Sep. 4, 2015) ……………………………23

*General Mills, Inc. v. Chobani, LLC*, 158 F. Supp.3d 106, 114-115 (N.D.N.Y. 2016) .........22-23

*Havlik v. Johnson & Wales Univ.*, 509 F.3d 25 (1st Cir. 2007).....................................27

*Johnson v. Schmitz*, 119 F. Supp.2d 90, 93 (D. Conn. 2000) .....................................27

*King v. DePauw Univ.*, No. 2:14-cv-70, 2014 WL 4197505,
    2014 U.S. Dist. LEXIS 117075 (S.D. Ind. Aug. 22, 2014) .................24, 25-26, 38-39

*LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48 (2d Cir. 2004) ...........................25

*LaRouche v. Kezer*, 20 F.3d 68 (2d Cir. 1994) ...................................................23

*Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980)...............................................30, 36

*Marblegate Asset Mgmt. v. Educ. Mgmt. Corp.*, 75 F. Supp. 3d 592, 604 (S.D.N.Y. 2014).......23

*Maczaczyj v. State of N.Y.*, 956 F. Supp. 403 (W.D. N.Y. 1997) ...................................26

*Naumov v. McDaniel College, Inc.*, No. GJH-15-482, 2017 WL 1214406,
    2017 U.S. Dist. LEXIS 49887 (D. Md. Mar. 31, 2017) .....................................28

*Nokes v. Miami Univ.*, No. 1:17-cv-482, 2017 WL 3674910,
    2017 U.S. Dist. LEXIS 136880 (S.D.Ohio Aug. 25, 2017)...................................23

*O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973 (10th Cir. 2004).....23

*Phillip v. Fairfield University*, 118 F.3d 131 (2d Cir. 1997)....................................23

*Phillip v. Nat'l Collegiate Athletic Ass'n*, 960 F. Supp. 552 (D. Conn. 1997) .....................26

*Reuters Ltd v. United Press International, Inc.*, 903 F.2d 904 (2d Cir. 1990).......................

*Ritter v. Oklahoma*, No. CIV-16-043 8-HE, 2016 WL 2659620,
    2016 U.S. Dist. LEXIS 60193 (W.D.Okla. May 6, 2016) ...................................24

*Ross v. Creighton University*, 957 F.2d 410 (7th Cir. 1992) .....................................27

*Travelers Casualty & Surety Co. of America v. The Netherlands Ins. Co.*,
    312 Conn. 714 (2014)................................................................27-28

*Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7 (2008) .....................................23

*Wisdom Import Sales Co., LLC v. Labatt Brewing Co., Ltd.*, 339 F.3d 101 (2d Cir. 2003).........25

*Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994) …………………………………34, 36

## Constitution, Statutes & Rules

Fed. R. Civ. P. 65(a) ……………………………………………………………..…….1

Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 ……………………*passim*

## Other Authorities

A.Scalia, *Reading Law: The Interpretation of Legal Texts* (West Pub. 2012) ………………..35

A.Gruber, *Anti-Rape Culture*, 64 Kansas L. Rev. 1029 (2016)…………………………………..35

A.Gruber, *Consent Confusion*, 38 Cardozo L. Rev. 415 (2016)…………………………………35

B. DeVos, www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement………………………………………………………………………………....40

N. Gertner, *Complicated Process*, 125 Yale L.J. Forum 442 (2106)……………………….....39

R. Katzman, *Judging Statutes* (Oxford Univ. Press 2014)………………………………………35

S. Henrick, *A Hostile Environment for Student Defendants: Title IX and Sexual Assault on College Campuses*, 40 N. Ky. L. Rev. 49 (2013) …………………………….39

## PRELIMINARY STATEMENT

Plaintiff John Doe (a pseudonym) ("Plaintiff"), a male junior student at Yale University, hereby moves, pursuant to Fed. R. Civ. P. 65(a), for a temporary restraining order and a preliminary injunction enjoining Defendants Yale University and Yale University Board of Trustees ("Yale Defendants") from enforcing Plaintiff's suspension.  On December 27, 2017, twenty days before Plaintiff was to begin his second semester junior year and participation in the very prestigious and highly selective two-semester Brady-Johnson Program in Grand Strategy, Plaintiff was banned from the Yale campus and was suspended for the upcoming Spring 2018 and Fall 2018 semesters based upon alleged brief outside-the-clothing "groping" that Plaintiff flatly denies and no non-party witnesses who would have seen it say happened, but that two female classmates say occurred back in June 2016 in Paris, France and in November 2016 on a bus travelling from Yale to Harvard. Prior to the two-semester suspension issued December 27, 2017, Plaintiff had been offered and he had accepted a second consecutive summer internship with a very selective and highly respected investment banking firm -- an internship and potential future employment now in jeopardy.  Given the university appeal denied Friday, January 12, 2018, Plaintiff respectfully makes application for a temporary restraining order and a preliminary injunction that will allow him to resume his studies forthwith.

In a Complaint filed in this Court on January 18, 2018, Plaintiff sets forth in detail how the Yale Defendants engaged in Title IX prohibited sex discrimination and violated Plaintiff's contract with the Yale Defendants (the Yale sexual misconduct policies and procedures) when erroneously finding Plaintiff responsible for "groping" over a year earlier and sanctioning with undue severity Plaintiff in order to strike a blow against male perpetrators of sexual assault and justify a gender biased university Title IX administration.  As shown herein, Plaintiff meets the requirements for a temporary restraining order and a preliminary injunction: irreparable injury, a

substantial likelihood of success on the merits, balance of hardships tipping decidedly in Plaintiff's favor and the public interest.

## STATEMENT OF FACTS

**A.      The Parties.**

Plaintiff is a natural person, citizen of the United States, and resident of the State of New York. During the events described herein, Plaintiff was enrolled as a full-time student at Yale University and while attending Yale, he resided in New Haven, Connecticut.  (Cmplt ¶ 12; Doe Decl. ¶¶ 3-5.)

Defendant Yale University is a private, Ivy League, research University, ranked top-three of universities in the United States, located in the city of New Haven, Connecticut.  Defendant Board of Trustees is the governing body of Yale University. The Complaint alleges that upon information and belief, Defendant Board of Trustees oversees and approves Yale's written policies, including Yale's Sexual Misconduct Policy.  (Cmplt, ¶¶ 13-14.)

**B.      Plaintiff's Background and Matriculation To Yale University; the Contract.**

Prior to matriculating to Yale University, Plaintiff attended, with scholarship, a prestigious New York City university-preparatory high school, which demonstrated Plaintiff's exceptional intellectual and leadership potential. During high school, Plaintiff taught kindergarten part time and participated in a mentorship program for underprivileged students.  (Cmplt ¶¶ 2-21; Doe Decl. ¶¶ 3-5.)

Plaintiff entered Yale in the fall of 2015. He has excelled academically. Plaintiff is on the Board of the Yale Hunger and Homelessness Action Project. He is a recognized writer of a column for the Yale Daily News, has a show for Yale Radio, and was on Yale's Model UN team during his freshman and sophomore years. Prior to November 2017 and the university complaints at issue, Plaintiff maintained an unblemished disciplinary record.  (Cmplt. ¶ 22; Doe Decl. ¶ 4; Bilcheck

2

Decl. Ex. B.)  Upon Plaintiff's acceptance to the University, Yale provided him with copies of its university policies, including the Sexual Misconduct Policies (the "Policy"). The 2017-2018 edition of the Policy was provided as an attachment to the September 22, 2017 Notice of Complaint sent by the Yale University Wide Committee on Sexual Misconduct ("UWC") to Plaintiff.  (Cmplt. ¶ 23; Doe Decl. ¶ 4.)

With respect to cases involving allegations of sexual discrimination, sexual harassment, and sexual assault, the Policy states in relevant part:

> Yale University is committed to maintaining and strengthening an educational, employment, and living environment founded on civility and mutual respect. Sexual misconduct is antithetical to the standards and ideals of our community, and it is a violation of Yale policy and the disciplinary regulations of Yale College and the Graduate and Professional Schools. Sexual misconduct will not be tolerated.

(Cmplt. ¶ 24; Bilcheck Decl. Exs. A-B.)  The Policy, on its face, is meant to support accusers, rather than *both* the accuser and the accused. David Post, UWC Chair, in an October 26, 2016 letter to the *Wall Street Journal* defended the institution's "procedures for sexual misconduct" rather than procedures for *allegations* of sexual misconduct. (Cmplt ¶ 25.)

## C.    The April 4, 2011 Dear Colleague Letter, the 2014 OCR Q&A And the Formulation Of The Yale 2015 Sexual Misconduct Policies.

On April 4, 2011, the Office for Civil Rights ("OCR") of the U.S. Department of Education ("DOE") issued a guidance letter to colleges and universities in the United States, widely known as the "Dear Colleague Letter" ("DCL").   The DCL advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 *et seq*. and its regulations, and directed schools to "take immediate action to eliminate the harassment, prevent its recurrence, and address its effects."  The DCL also laid out what were rules for the handling of sexual misconduct complaints.  (Cmplt. ¶ 26.)

3

On April 29, 2014, OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* ("Q&A"). Like the DCL, the Q&A was aimed at addressing educational institutions' sexual misconduct policies, including the procedures schools "must" have in place "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence."  (Cmplt. ¶ 27.)

In response to the OCR Q&A, Yale substantially revised its Sexual Misconduct Policy in August 2015 and UWC Procedures in October 2015. The new Procedures, as outlined in an email by Yale University President Peter Salovey, "was to focus on (3) three key issues: the confidentiality of UWC proceedings, the decision-making process and the relationship between findings and sanctions." (Cmplt. ¶¶ 28-29.)

The work on the revised 2015 Procedure was "spearheaded by University Title IX Coordinator and Deputy Provost Stephanie Spangler. . . . In addition to suggestions from UWC members, deputy Title IX coordinators and the *Women Faculty Forum*, the review also incorporated student input from an undergraduate survey conducted in January by the Yale College Council and Women's Center as well as recommendations from a faculty committee appointed in April, according to Salovey's email."  The appointed faculty committee consisted of five (5) women and (2) men. The women included the Title IX Coordinator and the Women Faculty Forum Chairwoman. (Yale Daily News, October 27, 2015.)  (Cmplt. ¶ 30.)

The 2015 Sexual Misconduct Policy and Procedures, under which Plaintiff was adjudicated, was determined almost entirely by women's groups and women representatives at Yale.  The Title IX Steering Committee charged with revising the Procedures was made up of fourteen (14) women and five (5) men. Two (2) of the five (5) men were representatives from the Yale Police Department and not from the University.   The Title IX Steering Committee

incorporated student input with a survey administered by the Yale College Council-Women's Center Task Force. The survey outcome April 21, 2015 "Report on University Sexual Misconduct Policies and Procedures" focused on "addressing sexual violence on campus" specifically the needs of survivors and victims, and "barriers to reporting sexual misconduct."  UWC members also provided suggestions for the Policy and Procedures under which Plaintiff was investigated and adjudicated. The current UWC is comprised of 47 members and, upon information and belief, more than 70% of the membership is female.  (Cmplt. ¶¶ 31-35.)

Under the revised Policy, "[o]ne out of five hearings before the UWC has ended without a finding against the accused." In other words, *80% of hearings before the UWC* have resulted in a finding of responsibility *against* the accused. (Yale Office of Public Affairs & Communications, April 5, 2016.)  (Cmplt. ¶ 36.)

In short, the Yale 2015 Sexual Misconduct Policy and Procedures, drafted and enacted principally by women, is enforced by the UWC, whose membership is predominantly female, to discipline students who, upon information and belief, are disproportionately male.  On information and belief, Defendant Board of Trustees reviewed and authorized the Policy in its current form. (Cmplt. ¶¶ 37-38.)

**D.**     **Yale Sexual Misconduct Policies and Procedures Applicable To Plaintiff.**

The 2015 Yale Sexual Misconduct Policy and Procedures remained in effect unchanged in subsequent years and were the Policy and Procedures to which Plaintiff was subject.  Under the Yale Policy: (i) formal complaints of sexual misconduct are adjudicated by the UWC; (ii) upon receipt of a complaint, a "Fact-Finder" is assigned by the UWC Secretary and tasked by the UWC with interviewing all parties and witnesses and collecting all relevant information; (iii) the Yale Sexual Misconduct Policy and Procedures state as to "Impartiality of the Fact-Finder" that "[th]e essential qualifications for serving as a fact-finder are 1) impartiality [] and 2) the appropriate

5

expertise and training in investigating allegations of sexual misconduct"; (iv) the respondent is informed of the complaint and is given five days to submit a written response; (v) "appropriate interim measure" are instituted, mostly with the protection of complainant in mind; (vi) the  UWC Chair will appoint a hearing panel of five UWC Members and will appoint one of these Members as the panel chair; (vii) the UWC Secretary will send a notice to the complainant and the respondent, providing the names of the panel members and the decision maker and informing them of their right to object to the participation of a panel member or decision maker, although the UWC Chair will decide whether an objection is justified; (viii) the Fact-Finder's report "will describe the relevant facts and circumstances and may address the credibility of witnesses but will not reach conclusions as to whether those facts and circumstances constitute a violation of University policy"; (ix) the Fact-Finder's report, the complaint, the respondent's response and all documents relating to the complaint and response are provided to the hearing panel and to the parties; (x) unless both parties ask to appear jointly, the complainant and the respondent will not appear jointly before the panel at any stage of the hearing; (xi) "[t]he hearing is intended primarily to allow the panel to interview the complainant and the respondent with respect to the fact-finder's report"; (xii) at the hearing, the parties can each make an opening statement and can submit questions to the Chair to be asked of the other party, although the hearing panel chooses which, if any, questions will be asked; (xiii) "[f]ollowing the hearing, the panel will consider whether the respondent has violated University policy, giving an affirmative answer if it is satisfied that a violation has been shown by a preponderance of the evidence"; (xiv) the hearing panel will complete a report, setting out its findings of fact, its conclusion as to whether or not those facts constitute a violation of University policy, and its recommended penalty, if any; (xv) the UWC Secretary forwards the report to the "decision maker" and to the parties; (xvi) each party may submit a single written response to the panel's findings of fact and conclusions and the UWC Secretary forwards the

6

response on to the decision maker and to the other party"; (xvii) "[t]he decision maker will then accept the panel's findings of fact, but may accept, reject, or modify the panel's conclusions or recommendations, in whole or in part"; (xviii) appeal of the decision is considered by the provost; (xix) the only grounds for an appeal are procedural error that prevented the hearing panel or decision maker from judging the matter fairly, or new information regarding the allegation that was not available at the time of the hearing; (xx) if an appeal is granted, the matter is returned to the hearing panel for further consideration, and then again to the decision maker for a final determination; (xxi) there is no audio recording, transcription or any record of the hearing and the Minutes of a UWC hearing do not record statements, testimony, or questions"; (xxii) "[i]n formulating its recommendations about discipline in a particular case, the UWC considers a full range of penalties, beginning with expulsion"; (xxiii) Yale has imposed severe penalties, including expulsion and suspension, and will continue to do so when the circumstances warrant." (Cmplt. ¶¶ 39-61; Bilcheck Decl. Ex. A.)

According to the Policy and Procedures, both the complainant and the respondent are entitled to certain expectations throughout the process, including, without limitation, the right to: (i) a trained body (UWC) to answer informal inquiries and fairly and expeditiously address formal complaints; (ii) an impartial fact-finder to assist in the investigation of the allegations; (iii) confidentiality of its proceedings and the information obtained for those proceedings; and (iv) parties and witnesses provide truthful information in all phases of a UWC proceeding.  (Cmplt. ¶¶ 62-63; Bilcheck Decl. Ex. A.)

Significantly, on September 22, 2017, the OCR rescinded the "2011 Dear Colleague Letter" and put in place an interim guidance while the current administration reviews and revises its practices with regard to the adjudication of complaints of sexual misconduct on college campuses

receiving federal funding. *See* https://www.ed.gov/news/press-releases/department-education-issues-new-interim-guidance-campus-sexual-misconduct. (Cmplt. ¶ 64.)

In response, on September 22, 2017, Yale Title IX Coordinator Stephanie S. Spangler issued a statement, "Based on our initial review, Yale's current policies and practices, which were adopted after broad engagement of the university community, are *largely consistent* with the requirements set out in the new guidance. In particular, Yale has no plans to deviate from the evidentiary standards the university now applies to sexual misconduct cases." (Emphasis supplied.)  This is not true, however; the interim guidance and review indicate that the practices in place at Yale at all times relevant to this lawsuit were unfair and out of step with the goal of gender equity in Title IX-related proceedings. *See* "Q&A on Campus Sexual Misconduct," https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.  (Cmplt. ¶¶ 65-67.)

**E.    Pressure On Yale to Expel Alleged Male "Perpetrators."**

In the wake of the "2011 Dear Colleague Letter," as well as the additional 2014 Q&A, the DOE commenced numerous investigations against colleges and universities, with the underlying threat that those not in compliance stood to lose federal funding. The 2016-2017 Yale Annual Financial Report stated: "The quality and promise of our faculty's work continue to attract major funding from the federal government, which finances 49 percent of research at Yale.… The federal government funded $567 million, or 74%, of 2017 grant and contract income, in support of Yale's research and training programs."  The investigation of colleges and universities to determine compliance with Title IX was upheld by Catharine Lhamon, then Assistant Secretary for Civil Rights at the U.S. Department of Education, who told a group of college administrators at a 2014 conference, ""Do not think it's an empty threat," when she stated that the ultimate punishment for a school violating Title IX is a complete loss of federal funding. (Cmplt. ¶¶ 68-70.)

Yale found itself on the receiving end of at least one such investigation by the Department of Education for failure to disclose four forcible sex offenses. Yale was fined $165,000 for failure to comply with the Clery Act. Additionally, Yale University has been under investigation by the OCR for two complaints of non-compliance.  (Cmplt. ¶ 75.)

In March 2011, a group of sixteen Yale students and alumni filed a federal Title IX complaint against the university, alleging that it had failed to eliminate a sexually hostile environment. The investigation has since been resolved, with the DOE not finding Yale in violation of Title IX, but criticizing some of its previous policies. Under the settlement, Yale agreed, among other things, to continue to improve and publicize efforts to prevent and respond to sexual harassment and violence, implement its new grievance process, and train students and employees.  It marked the first major settlement after the Education Department's letter to colleges in 2011 signaling stricter enforcement of Title IX. https://projects.chronicle.com/titleix/campus/Yale-University. (Cmplt. ¶¶ 71-73.)

The OCR investigation was not the only outside pressure on Yale. The case involving Plaintiff arose during a period at Yale in which the University faced mounting criticism concerning its handling of allegations of sexual assault.  Specifically, Yale students openly and vocally accused the University of not taking allegations of sexual misconduct seriously enough and of failing to harshly punish perpetrators of sexual assault.  As a consequence, Yale was under enormous pressure to show it was willing to take a hard line against students accused of sexual assault in order to dispel the notion that its campus was an unfriendly and unsafe environment. (Cmplt. ¶¶ 71-72, 76-77. 89-81.)  In June 2016, expelled Yale basketball captain, Jack Montague, who filed a lawsuit against Yale when "the university strove to make an example of a star athlete to prove they are "indeed tough on men who 'victimize' female students." Yale accused Montague in October 2015 of having non-consensual intercourse with a female student in the fall of

9

2014. The woman in the Montague case, however, did not file a complaint and did not allege nonconsensual sex with him; it was a university generated case.  (Cmplt. ¶ 78.)

Yale encourages and promotes reporting, *seriously*, stating: (i) "If you have experienced sexual misconduct of any kind, the University urges you to take action to seek the help and support that you need, which may include making a report and pursuing disciplinary and criminal sanctions"; (ii) "*Serious situations* can often be averted by responding at the first sign of trouble"; (iii)  "Take any signs of reluctance or refusal, including nonverbal signs, *very seriously*"; (iv) "Take sexual pressure *seriously*. Many sexual assaults begin with low-level pressure."; (v) "Be alert to patterns, not just isolated actions. Take repeated disrespect intimidation, and threats *seriously*, even if they seem small alone."; (vi) "Stalking can sometimes seem merely annoying or even flattering, but its intrusive nature must be taken *seriously*, whether it is online or in *person*." (Cmplt. ¶ 82.)

Yale support services include "SHARE" ("Sexual Harassment and Assault Response and Education Center") which provides information, advocacy, and support for complainants. Complainants are told "Title IX coordinators, the UWC, and the YPD work hard, along with SHARE, to streamline and coordinate complaint processes, so it does not matter where you begin. The options are not mutually exclusive; you can pursue any or all of them as you wish. You will always be part of the decision-making process and the choices regarding whether or how to proceed are generally up to you."  During the 2014 - 2015 academic year, the SHARE center served 223 students: 189 women and 34 men (and 15 of those men for "Information"). *http://sharecenter.yale.edu/sites/default/files/files/SHARE%20Center%20Report%202014-15.pdf* As 85% female using SHARE to seek services for experiences with sexual misconduct, it is indisputable that University funded support services at Yale, including SHARE, Title IX Coordinators and the UWC, provide support services primarily to females.  (Cmplt. ¶¶ 83-86.)

10

When two students enter into a Title IX disciplinary matter at Yale, the institution will provide a vastly disproportionate number of support services to the complainant, who is female in 85% of cases, based upon data from SHARE.  Even the Yale Police Department has a Sensitive Crimes & Support Coordinator, "who provides services to victims, such as safety planning and assistance in obtaining a protective order."  Complainants at Yale have access to University funded SHARE, the UWC, Title IX Coordinators, and Yale Police Department. In contrast, no specific resources are offered at Yale to respondents, who are disproportionately male.  (Cmplt. ¶¶ 87-90.)

Yale has student organizations, also funded by the university, such as the Communication and Consent Educators (CCE) Program, which has announced: "We aim to end sexual violence by transforming our corner of contemporary culture into one where respect, mutuality, and mindfulness are the norms." *https://cce.yalecollege.yale.edu*. One of the complainants, Sally Roe, was a member of CCE.  (Cmplt. ¶¶ 91-92.)

Yale Defendants actively adopted the Title IX Coordinator's mission of increasing reporting of alleged sexual misconduct at Yale. Unfortunately, the UWC did so at the expense of properly vetting complaints of sexual misconduct to ensure the students who were making the reports did so on a good faith basis.  Plaintiff himself became the victim of a vicious and vindictive campaign to smear his reputation and get him expelled from Yale. (Cmplt. ¶¶ 93-94.)

**F.**     **The University Complaints By Jane Roe and Sally Roe Against Plaintiff.**

On September 18, 2017, two Yale junior women, Jane Roe and Sally Roe (who were close friends), both filed with the UWC Chair formal university complaints within minutes of each other against Plaintiff, for alleged over-the-clothing "groping" that purportedly occurred in June and November 2016.  Sally Roe also sent her complaint to Deputy Title IX Coordinators Jason Killheffer and Ksenia Sidorenko, both of whom had advised the complainants Jane Roe and Sally Roe in filing their complaints.  (Bilcheck Decl. Exs. C-D.)  Yale's Sexual Misconduct Policy

11

includes "groping" under "sexual assault" which is defined as "any kind of nonconsensual sexual contact, including rape, groping or any other nonconsensual touching," but the Yale Sexual Misconduct Policy does not define "groping."  (Cmplt. ¶¶ 95-100, 108; Bilcheck Decl. Ex. B.)

Jane Roe alleged, without any details, in her university complaint two instances of "groping" by Plaintiff, one in Paris, France in June 2016 and the other on a chartered bus travelling from Yale to Harvard om November 18, 2016.  Subsequently, Jane Roe amended her university complaint to state she was "filing a complaint in regards to a hostile environment created by Plaintiff for countless women at Yale, including myself, who are in fear and discomfort because of his behavior."  Sally Roe also alleged in her university complaint groping by Plaintiff on a chartered bus travelling from Yale to Harvard on November 18, 2016, but Sally Roe *did not* claim, as had Jane Roe, that the alleged incident with John Doe had created a hostile academic environment for her at Yale.  (Cmplt. ¶¶ 95-100, 109, 124 Bilcheck Decl. Exs. C-D.)

(i)     *The Alleged Paris Incident*

As for the alleged Paris incident, Jane Roe claimed that in June 2016, while she and Plaintiff were each abroad in Paris, that they met at a mutual friend's apartment for a small party and later walked with those friends on a street in Paris and during that walk, Plaintiff groped one of Jane Roe's buttocks.  (Cmplt. ¶¶ 110-116; Doe Decl. ¶ 9.)

In fact, that evening in Paris in November 2016, everyone at the party was drinking wine and vodka, and several photos were taken. Some of the photos show Jane Roe with her arms around Plaintiff while make a seductive gesture to the camera.  Later in the evening, a group of party-goers including Plaintiff and Jane Roe decided to leave and walk to nightclub. The nightclub refused the group admission because they did not have a reservation.  The group of five friends, which included Plaintiff and Jane Roe, began walking down a street together. Jane Roe was holding Plaintiff's hand and skipping and, as she stated, "acting playful" with Plaintiff.  While Jane

Roe claimed that as they walked, Plaintiff put his hand on her buttock and she moved his hand away and Plaintiff tried to touch her twice more, she did not say anything to Plaintiff alleging groping at that time or any time after.  None of the three friends walking behind Jane Roe saw any groping occur.  One of the friends walking behind Plaintiff and Jane Roe took a photo of the two, Jane Roe and Plaintiff, walking together.  There were thus no non-party witnesses supporting Jane Roe's claims of groping, even though she and Plaintiff were in full view of three witnesses walking behind them the entire time.  (Cmplt. ¶¶ 110-116; Doe Decl. ¶¶ 9-10, 14.)

    **(ii)**    *The Alleged Harvard-Yale Bus Incident*

Both Jane Roe and Sally Roe, in their university complaints, alleged that Plaintiff had groped them on November 18, 2016 on a chartered bus traveling from Hew Haven to Cambridge for the Yale-Harvard football game.  There were approximately twenty-two students on the chartered bus. Many of the students brought a variety of alcoholic beverages on the trip, and there was considerable drinking, drinking games, and dancing during the bus ride.  (Cmplt. ¶¶ 117-119, 123-125; Doe Decl. ¶¶ 11-13.)

Jane Roe claimed that during the bus ride, John Doe had sat down next to her and had grabbed her buttock. Jane Roe also claimed, "he was groping every woman on the bus,'" yet all of the women on the bus were interviewed and none of the women claimed either to be victim of or a witness to John Doe's alleged groping (excluding the two complainants).  Sally Roe alleged in her complaint that John Doe had sat down next to her on the bus, "and groped my left breast and butt, which was sexual harassment. This was in view of others."  Yet, on the crowded bus, there were no witnesses to the groping alleged by Sally Roe. Significantly, the hearing panel, in their final decision, concluded, "*The Panel notes that no witness reported seeing [John Doe] grope [Sally Roe].*"  In fact, during the hearing, Sally Roe changed her statement to claim that the alleged groping had been the side of one of her breasts (also known as the armpit or ribcage) and the side

13

of one of her buttocks (also known as the hip or upper high).  (Cmplt. ¶¶ 117-119, 123-126; Doe Decl. ¶¶ 11-13, 14; Bilcheck Decl. Ex. M.)

**G.**    **The Investigation.**

On September 22, 2017, Plaintiff was called to attend a meeting, without warning and without an advisor, where he received a hand delivered letters from the UWC Secretary. The letters were Notices of Investigation, one for each complainant, informing Plaintiff that he would be investigated for groping and sexual harassment.  Meanwhile, the UWC had already engaged an investigator called a "Fact-Finder" to begin an investigation. The Fact-Finder interviewed the two complainants at length, for a total of seven interviews.  She then interviewed eight witnesses provided by the complainants.  (Cmplt. ¶¶ 101-102, 129-132; Doe Decl. ¶ 16.)

The Fact-Finder interviewed Jane Doe four times. Two interviews were at the UWC offices on October 2 and October 17 with a Yale advocate as her advisor, and twice more by phone on October 23 and November 2, 2017.  The Fact-Finder interviewed Sally Roe three times. Two interviews were at the SHARE office on October 2 and October 17 with a Yale advocate as her advisor, and again by phone on November 8, 2017.  Plaintiff was interviewed only twice in total to respond to both complainants, on October 16 and October 31, 2017. At the time of Plaintiff's first interview, the Fact-Finder had already conducted 10 witness interviews. (Cmplt. ¶¶ 103-106.)

The Fact-Finder did not follow-up again with six (6) of those witnesses after her interview with Plaintiff. Critically, the hearing panel and decision-maker had relied on and cited all of those witnesses in finding Plaintiff responsible for violations of the sexual misconduct policy.  (Cmplt. ¶¶ 107; Doe Decl. ¶ 17.)

Yale's Sexual Misconduct Policy states that "interim measures" may be imposed, including "temporary removal from campus," in order to "ensure the safety of all parties, the broader College community, and/or the integrity of the investigative and/or complaint resolution process."  Other

than the no-contact orders with complainants, Yale did not put in place any interim measures designed to restrict Plaintiff's contact with the student body at large or his access to campus as a result of the complaints of Jane Doe and Sally Roe.  (Cmplt. ¶¶ 45-46, 166; Doe Decl. ¶ 32.)

At the time of the first interview, Plaintiff had only been informed about the allegations regarding the Harvard-Yale bus trip.  Plaintiff denied the allegations of "groping" and detailed his recollection of the events in question.  UWC chair David Post had stated in an e-mail to Plaintiff that the interview with the Fact-Finder would relate to the specific alleged incident on November 18, 2016, yet in the first interview the Fact-Finder went far afield of that incident, referring to allegations by the complainants of which he had not received notice. (Cmplt. ¶¶ 130-131.)

On Monday, October 16, 2017, Plaintiff's advisor contacted Ms. Menon to inform her that during the initial interview that afternoon the Fact Finder had violated John Doe's right to a fair and impartial investigation by asking about confidential conversations he had with Title IX Coordinator Angela Gleason, and by questioning Plaintiff about alleged incidents unrelated to the investigation and without prior notice  On Tuesday, October 17, 2017, Plaintiff sent the same information in an e-mail to UWC Chair Mr. Post explaining that the Fact-Finder had not been impartial and had violated procedures set by the UWC.  (Cmplt. ¶¶ 132-134.)

Despite the foregoing, and in direct contradiction to the emails Plaintiff had sent to Ms. Menon and Mr. Post specifically stating that the Fact Finder had improperly interrogated him, on October 18, 2017 the Fact-Finder interviewed Title IX Coordinator Gleason and on October 19, 2017 the Fact Finder interviewed Plaintiff's Dean, improperly questioning both as witnesses about the informal report. Summaries of the Dean's and Ms. Gleason's interviews were included in the Fact Finder's report. Furthermore, Plaintiff was questioned by the panel during the hearing regarding the confidential discussion he had with Ms. Gleason.  (Cmplt. ¶ 135; Doe Decl. ¶ 20.)

15

The UWC Procedures, Section 7.3 also states: *"The fact-finder will not consider information that is provided solely to attest to a party's character."*   However, the Fact-Finder included in the report unrelated hearsay and derogatory character statements about Plaintiff that had nothing to do with the allegations. The female complainants had no such descriptions of their character in the report.  (Cmplt. ¶ 136; Doe Decl. ¶ 19; Bilchcek Decl. Exs. H-I.)

On November 17, 2017, John Doe was sent the Fact-Finder's report by the UWC Secretary. This was the first time John Doe was informed of the details of Jane Roe's and Sally Roe's claims. (Cmplt. ¶ 137; Bilchcek Decl. Exs. C-I.)

**H.    The UWC Panel Hearing.**

The hearing panel and chair were selected by UWC chair Mr. Post. Plaintiff was instructed to review the membership of the UWC for conflicts of interest. Plaintiff notified the UWC that the conflicts of interest that concerned him was the relationships of the complainants with members of the UWC.  Plaintiff informed the UWC Chair Mr. Post and the UWC Secretary Ms. Menon that Sally Roe's father was a well-known faculty member at Yale and that Jane Roe's parents were Yale alumni and her father a published legal scholar who frequently was quoted as a Yale alumnus. Moreover, Mr. Post himself was a colleague in the same field as Sally Roe's father and, Plaintiff stated, should have recused himself from all involvement in the matter from the beginning.  The UWC chair Mr. Post stated he would inform the panel with regard to the identities of the complainants' parents and ask any members who could not judge the matter fairly to recuse themselves.  Mr. Post continued to oversee the UWC process for Plaintiff.  (Cmplt. ¶¶ 138-140; Doe Decl. ¶¶ 28-30.)

On November 27, 2017, a hearing was held to determine the charges against Plaintiff. A five-member panel of faculty, staff and a student were assembled. Plaintiff, Sally Roe, and Jane

Roe, each with their advisors, were placed in separate rooms with a speakerphone to be able to listen to the proceedings in the conference room with the hearing panel. (Cmplt. ¶ 141.)

Each of the parties was brought individually before the panel to make an opening statement, to be interviewed by the panel, to answer questions submitted by the other parties as determined by the hearing panel, and to make a closing statement. (Cmplt. ¶ 142; Bilcheck Decl. Ex. L.)

As the hearing progressed, Plaintiff 's advisor heard one of the complainants make a statement identical to the complainant who had just been before the panel, even referencing what her friend had just said. Plaintiff 's advisor sent a text to the UWC Coordinator to ask if the two complainants had been allowed to listen to each other's testimony throughout the hearing. When there was no response to the text, Ms. Menon was asked and she responded affirmatively that the complainants had full audio access at all times during the entire hearing. (Cmplt. ¶¶ 144-145; Doe Decl. ¶ 22.)

Yale Senior General Associate Counsel, who acted as legal counsel to the UWC panel during the hearing, stated that because Plaintiff had agreed to having the two complaints heard by one hearing panel that this somehow excused the UWC from following proper protocol with regard to sequestering witnesses. (Cmplt. ¶ 146; Doe Decl. ¶ 23.)

While the complainants could obtain information about each other's complaint through the Fact-Finder's report, the purpose of the UWC hearing was to adjudicate each allegation of policy violation separately, requiring each party to address the panel *only* about the alleged policy violation involving the individual complainant and the respondent. Allowing the complainants to reference each other's statements to the hearing panel to influence and further support her own individual complaint was prejudicial, denying the panel and later the decision maker the opportunity to adjudicate the charges against Plaintiff in a fair and impartial manner. UWC Secretary Ms. Menon dismissed Plaintiff 's concerns and nothing was done to rectify the situation.

Subsequent review of the text messages by the hearing panel and John Doe revealed that Sally Roe's responses had not been truthful. (Cmplt. ¶¶ 147-148.)

The next step in the hearing process was for the parties to respond to questions. Plaintiff submitted a list of questions for the panel to ask each complainant. Due to the striking similarity in their responses to the panel, Plaintiff submitted a question for the panel to ask Sally Roe: "Have you exchanged any text messages with [Jane Roe] since the start of this hearing today?"  Following a long hesitation, Sally Roe admitted that she and Jane Roe had been sending text messages to one another during the hearing. The hearing panel asked, What did you discuss in your texts?" Sally Roe responded that they had been "talking about dinner plans for tonight. She is not doing well. I was comforting her." The panel then asked, "Was there a discussion of the contents of hearing?" After a long pause, Sally Roe responded, "We made one comment about his testimony."  (Cmplt. ¶¶ 149-150.)

The response by the UWC panel and administrators was to request that the complainants provide copies of the texts they had exchanged. This was voluntary and the panel had no way of knowing how many texts had been deleted or excluded from those proffered by the complainants. In fact, the text messages stated that one of the complainants had also been on Snapchat all morning, involving messages exchanged with others that could not be retrieved.   In further evidence to the improprieties of the hearing, the complainants were each asked by the hearing chair about the timing and nature of her texts while the other complainant listened to the answers. (Cmplt. ¶¶ 151-153.)

Plaintiff 's advisor sent an email at 2:34 p.m. to Ms. Menon and Mr. Post declaring, "For the record, due to the texting between the complainants, the credibility of both parties and the hearing has been compromised. This constitutes a mistrial."  The response by Ms. Menon and General Counsel Harold Rose ("Mr. Rose") was to present Plaintiff and his advisor with copies of

the complainants' text messages that were exchanged between the time period of 12:30 p.m. to 2:20 p.m., as if to say this was sufficient, and Mr. Rose requested that Plaintiff provide him with evidence from the text messages to support his assertion of collusion by the complainants. (Cmplt. ¶¶ 154-155.)

Plaintiff decided, after waiting what by that time had been more than eight hours to appear before the panel to answer their questions, that he would go ahead with concluding the hearing, despite all the improprieties and the unwillingness of the UWC to acknowledge or correct the issues caused by the complainants. (Cmplt. ¶ 156.)

Plaintiff stated to the hearing panel that Jane Roe, Sally Roe and their roommates and friends who had all been interviewed as witnesses, held a palpable animosity towards him because of his political views. John Doe was well known on campus as a conservative political columnist for the *Yale Daily News*. Plaintiff noted his social isolation on campus for his conservative political views and what he perceived to be rejection by the students on the bus trip. One panel member began a line of questioning about whether John Doe's political beliefs were an underlying issue to the complainants' reports. Suddenly, Yale General Counsel Mr. Rose got up from his chair to confer with Ms. Menon.  The line of questioning was discontinued. (Cmplt. ¶¶ 157, 159.)

The hearing concluded after eleven hours. The UWC never followed up with the complainants to verify that the texts messages they provided were the only messages they had exchanged that day. (Cmplt. ¶ 161.)

I.    **The Disciplinary Decision.**

On December 15, 2017, the hearing panel delivered their determination report of findings and recommended sanctions. Only the findings are disclosed to the respondent. Plaintiff. The panel determined that Plaintiff was responsible for all charges:  two incidents of groping Jane Roe, one incident of groping Sally Roe, and for creating a hostile environment for Jane Roe.  (Cmplt. ¶ 163;

Bilcheck Decl. Ex. M.)  On December 22, 2017, Plaintiff submitted a response to the report in the form of a letter to the decision maker, Dean Marvin Chun ("Dean Chun"). Plaintiff pointed out the lack of evidence and rationale for the hearing panel's decision by a preponderance of the evidence. (Cmplt. ¶ 164; Bilckeck Decl. Ex. N.)

On December 27, 2017, Plaintiff received a brief one-page reply from Dean Chun informing Plaintiff that his decision was to uphold the findings of the hearing panel. The sanction imposed was that Plaintiff should (i) be suspended from Yale for the spring semester 2018 and the fall semester 2018; (ii) be required to petition for readmission upon the end of the period of suspension; (iii) be required to receive sexual harassment training before his return to Yale or immediately upon return; and (iv) continue to receive alcohol counseling upon his return to Yale. (Cmplt. ¶ 165; Doe Decl. ¶ 31; Bilchcek Decl. Exs. O-P.)  In the period of July 2016-2017, there were three male respondents disciplined for UWC; the three received the same sanction of suspension as Plaintiff but for non-consensual sexual intercourse.  (Cmplt. ¶ 167; Doe Decl. ¶ 33.)

**J.    The Appeal.**

On January 3, 2018, Plaintiff submitted his appeal of the findings and sanctions on the only grounds allowed by UWC: procedures: (1) procedural error that prevented the hearing panel or decision maker from judging the matter fairly, and (2) the discovery of facts that were not reasonably available to the appealing party prior to the UWC hearing and that refute the allegation of sexual misconduct.  (Cmplt. ¶ 168; Doe Decl. ¶ 34; Bilchcek Decl. Ex. Q.)

The procedural errors that prevented the hearing panel or decision maker from judging the matter fairly included: (1) a lack of due process by allowing the complainants to hear each other's testimonies; (2) the constitutional violation of dismissing the complainants' texting during the hearing and placing the burden of proof on Plaintiff to prove that collusion had occurred; (3) conflicts of interest that resulted in a biased adjudication; (4) lack of an official record of the

hearing; (5) the failure to properly investigate and collect all available evidence; (6) the failure to thoroughly interview all relevant witnesses; (7) the complete disregard of contradictions and inconsistencies in the complainants' and witnesses' statements when making assessments of fact and credibility; (8) the improper inclusion of information in the Fact-Finder's report which the hearing panel and decision maker relied upon as a determination of Plaintiff's responsibility; (9) failure of the University to demonstrate a burden of proof using the preponderance of the evidence standard; (10) failure to define the policy violation; (11) lack of a rationale for the Decision and Sanction; and (12) the imposition of an unduly harsh and unwarranted sanction of suspension. All of these procedural errors, individually and when taken together, unfairly and materially affected the outcome of Plaintiff's case. (Cmplt. ¶ 169; Bilcheck Decl. Ex. Q.)

The discovery of facts that were not reasonably available to Plaintiff prior to the hearing included: (a) the additional investigation undertaken by the Fact-Finder and her resulting Supplemental Fact-Finder's report, which included interviews with three witnesses; (b) the text messages between the complainants during the hearing; and (c) the complainants' responses to the final report by the panel, in which both of the complainants were allowed to introduce new information that was not in the Fact-Finder's report, without any objection or redaction by Ms. Menon or Mr. Post before forwarding the complainants' responses to Dean Chun. (Cmplt. ¶ 170; Bilcheck Decl. Ex. Q.)

Despite the foregoing, on January 12, 2018, Plaintiff's appeal was denied by Provost Ben Polak who (absurdly) found no procedural errors throughout the UWC process. (Cmplt. ¶ 171; Doe Decl. ¶ 34; Bilcheck Decl. Ex. R.)

**K.      Plaintiff's Injuries.**

Plaintiff's official Yale transcript will bear the notation "Suspended after a finding of responsibility for a code of conduct violation." (Cmplt. ¶ 172; Doe Decl. ¶ 35.) As a result of

21

Defendants' unlawful actions, John Doe has suffered immense losses. It will be enormously difficult for John Doe to obtain any graduate degree. Because of the black mark on his transcript, he will forever have to explain to admissions committees the reason for his suspension. (Cmplt. ¶¶ 173, 175.)  Plaintiff has also experienced extreme emotional, psychological, and physical distress as a result of the investigation process and his suspension. Without limitation, John Doe will be denied junior year participation in the very prestigious Brady-Johnson Program in Grand Strategy and denied the summer internship position at the highly selective investment bank which he has worked for years to obtain. (Cmplt. ¶ 174.)  The marking of Plaintiff's academic transcript with two semesters of suspension for a violation of student conduct policy will permanently deny Plaintiff educational and career opportunities as he will forever be forced to explain that he was found responsible for sexual assault groping is included in the definition of sexual assault.  Plaintiff will never be able to pursue a career in professions which require a license or background check, which will permanently alter the trajectory of John Doe's life. (Cmplt. ¶ 175.)

## ARGUMENT

## I.

## THE REQUESTED TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION IS PROPER UNDER THE LAW

Plaintiff's motion for a temporary restraining order and preliminary injunction should be granted because, as will be discussed herein, Plaintiff satisfies the four elements for obtaining a temporary restraining order and preliminary injunction: (1) a likelihood of irreparable injury; (2) either a likelihood of success on the merits or sufficiently serious questions as to the merits plus a balance of hardships that tips decidedly in the moving party's favor; (3) the balance of hardships tips in the moving party's favor regardless of the likelihood of success; and (4) the requested injunction is in the public interest. *General Mills, Inc. v. Chobani, LLC*, 158 F. Supp.3d 106, 114-

115 (N.D.N.Y. 2016), citing *Marblegate Asset Mgmt. v. Educ. Mgmt. Corp.*, 75 F. Supp. 3d 592,

604 (S.D.N.Y. 2014); *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F. 3d 887, 895 (2d Cir. 2015)

(incorporating additional factors [set forth in *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7

(2008)]); *Am. Civil Liberties Union v. Clapper*, 785 F.3d 787, 825 (2d Cir. 2015) (same).

A preliminary injunction, while considered an extraordinary remedy, should be issued when

necessary to preserve the status quo pending final outcome of a case. *Reuters Ltd v. United Press*

*International, Inc.*, 903 F.2d 904, 909 (2d Cir. 1990). ("[F]or purposes of a preliminary injunction,

the status quo is 'the situation that existed between the parties immediately prior to the events that

precipitated the dispute'" *Entegee, Inc. v. Korwek*, 2015 WL 5202902, *3 (D. Conn. Sep. 4, 2015),

quoting *ASA v. Pictometry Intern. Corp.*, 757 F. Supp. 2d 238, 243 (W.D. N.Y. 2010).  The "'status

quo' does not mean the situation existing at the moment the law suit is filed, but the 'last peaceable

uncontested status existing between the parties before the dispute developed.'" *General Mills*,

*supra*, 158 F.3d at 117, quoting *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389

F.3d 973, 1013 (10th Cir. 2004) (additional citations omitted). *See also LaRouche v. Kezer*, 20 F.3d

68, 74 n.7 (2d Cir. 1994) (same); *Phillip v. Fairfield University*, 118 F.3d 131, 133-134 (2d Cir.

1997).  The temporary restraining order and preliminary injunction that Plaintiff seeks here

preserves the status quo of his being a student at Yale.

In a number of recent cases federal courts have granted the kind of injunctive relief sought

here prohibiting schools from implementing discipline against students accused of sexual assault:

- In *Nokes v. Miami Univ.*, No. 1:17-cv-482, 2017 WL 3674910, 2017 U.S. Dist. LEXIS 136880 (S.D.Ohio Aug. 25, 2017), a Court in this District granted a preliminary injunction prohibiting a public university from suspending a student who had alleged that the school had acted in violation of his constitutional due process rights to notice and confrontation of adverse witnesses.

- In *Doe v. Pennsylvania State Univ.*, No. 17-CV-01315, 2017 WL 3581672, 2017 U.S. Dist. LEXIS 132186 (M.D.Pa. Aug. 18, 2017), a court granted a preliminary injunction to

23

student who had alleged that a school acted in violation of his due process right to confrontation in disciplinary proceedings

- In *Doe v. University of Cincinnati,* 223 F. Supp.3d 704 (S.D. Ohio 2016), a Court in this District granted a preliminary injunction prohibiting a pubic university from suspending a student who had alleged that the school had acted in violation of his constitutional due process right to confront adverse witnesses.

- In *Doe v. Brown Univ.,* 210 F. Supp.3d 310, 313 (D.R.I. 2016), the court concluded that school breached its contract with a student by the manner in which it conducted his disciplinary hearing on an allegation of sexual misconduct. The school was ordered to vacate its finding and sanction against the student and expunge his record.

- In *Doe v. Univ. of Notre Dame*, No. 3:17CV298, 2017 WL 1836939, 2017 U.S. Dist. LEXIS 69645 (N.D.Ind. May 8, 2017), the court concluded that a student facing discipline for an allegation of sexual misconduct has demonstrated "at least some likelihood of success on the merits of his breach of contract claim and of irreparable harm." The school was ordered to stay it discipline of the student and permit him to sit for final examinations.

- In *Ritter v. Oklahoma*, No. CIV-16-043 8-HE, 2016 WL 2659620, 2016 U.S. Dist. LEXIS 60193 (W.D.Okla. May 6, 2016), the court observed that "universities must ensure that the rights of both the accused and the accuser are protected." The school was ordered to stay any discipline and to permit a student facing discipline for an allegation of misconduct to attempt to complete all remaining graduation requirements.

- In *Doe v. Middlebury College,* No. 1:15-cv-192-jgm, 2015 WL 5488109, 2015 U.S. Dist. LEXIS 124540 (D.Vt. Sep. 16, 2015), the court found that a student accused of sexual misconduct had "demonstrated a sufficiently serious question regarding whether [the school] violated its policies." The court ordered the school to not expel the student and allow him to remain enrolled in his courses.

- In *King v. DePauw Univ.*, No. 2:14-cv-70, 2014 WL 4197505, 2014 U.S. Dist. LEXIS 117075 (S.D. Ind. Aug. 22, 2014), the court found that a student accused of sexual misconduct had demonstrated likely success on breach of contract claims against the school. The court prohibited the school from enforcing a suspension and ordered that the student be permitted to enroll in and attend the school without restriction.

## II.

## APPLICATION OF THE FOUR-PRONG TEST FOR PRELIMINARY INJUNCTIVE RELIEF ESTABLISHES THAT A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION SHOULD BE GRANTED

Application of the four-prong test for preliminary injunctive relief establishes that the requested temporary restraining order and preliminary injunction should be granted.

A.    **Plaintiff Will Suffer Irreparable Injury From The Suspension.**

Plaintiff satisfies the first prong for a preliminary injunction, which is that he will suffer irreparable injury from the suspension.  To make a showing of irreparable harm, the moving party must establish that he is subject to a continuing harm that cannot be adequately addressed by final relief on the merits and for which money damages are inadequate. *See LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48, 56 (2d Cir. 2004); *Wisdom Import Sales Co., LLC v. Labatt Brewing Co., Ltd.*, 339 F.3d 101, 113-114 (2d Cir. 2003).

Plaintiff readily makes such a showing here.  As of the time of his suspension, Plaintiff was to begin his second semester junior year and participation in the very prestigious and highly selective two-semester Brady-Johnson Program in Grand Strategy. Plaintiff had also been offered and he had accepted a second consecutive summer internship with a very selective and highly respected investment banking firm.  Without injunctive relief, Plaintiff will lose the Brady-Johnson Program participation, the internship with the investment banking firm and potential future employment with that investment banking firm; and in the future, Plaintiff will lose out on graduate school and employment opportunities he would have been able to secure with a degree from Yale without the black mark of a sexual misconduct disciplinary sanction on his transcript.  On top of it all, Plaintiff will suffer emotional damage as he has been branded -- unjustifiably -- a sexual predator as he faces an uncertain professional future.  (Citation.)

For these losses, money damages cannot make him whole. *See, e.g., Doe v. Middlebury*, *supra,* No. 1:15-cv-192-jgm, 2015 WL 5488109, 2015 U.S. Dist. LEXIS 124540 (while plaintiff may recover money damages to compensate for lost wages, money damages cannot compensate him for loss of his senior year in college with his class, the delay in completing his degree, or the opportunity to begin his future career upon graduation); *King v. DePauw University*, *supra*, 2:14-cv-70 (S.D. Ind. Aug. 22, 2014) (if plaintiff not permitted to complete studies, he will forever have

25

either a gap or senior-year transfer on his record, which he will have to explain to future employers or graduate school admissions committees by revealing sexual misconduct finding, and money damages would not provide adequate remedy); *Phillip v. Nat'l Collegiate Athletic Ass'n*, 960 F. Supp. 552, 558 (D. Conn. 1997) (plaintiff demonstrated irreparable harm where, if preliminary injunction not granted, plaintiff's education would be interrupted and delayed, perhaps for years); *Coleman v. Newburgh Enlarged City School Dist.*, 319 F. Supp. 2d 446, 453 (S.D.N.Y. 2004) (continued suspension of student, and accompanying preclusion from extracurricular activities, "would result in imminent and irreparable harm by jeopardizing (a) the quantity and quality of the Plaintiff's education, (b) the Plaintiff's chance to graduate from high school, (c) the Plaintiff's chance for a college scholarship, and (d) the Plaintiff's opportunity to attend college"); *Maczaczyj v. State of N.Y.*, 956 F. Supp. 403, 408 (W.D. N.Y. 1997) (plaintiff showed irreparable harm where, in absence of injunction, he would not be able to participate in his master's program, or any other master's program at the college, which exclusion would most likely affect his ability to engage in future employment of his choice and would have an unquantifiable effect on his mental health); *Doe v. New York Univ.*, 666 F.2d 761, 773 (2d Cir. 1981) (distinguishing delay in obtaining admission to school from "interruption or termination of attendance already in progress").

**B.      Plaintiff Is Likely To Succeed On The Merits Of The Title IX and
            Contract Claims (Or Show Serious Merits Questions and Hardship).**

Plaintiff satisfies the second prong for a preliminary injunction, which is that he is likely to succeed on the merits of the contract claim.  As will be discussed below, Plaintiff also satisfies the alternative of demonstrating sufficiently serious questions going to the merits of his claims to make them fair ground for litigation.

Plaintiff has alleged violations of Title IX, breaches of contract, quasi-contract and false light in his Complaint.  Because the Title IX and breach of contract claims can be most easily

26

evaluated on the basis of the undisputed or clearly established facts *currently* known to all parties, it is upon those claims that Plaintiff focuses the instant motion for relief.

1. **The Contract.**

It is well settled that "'the basic legal relation between a student and a private university or college is contractual in nature.'" *Johnson v. Schmitz*, 119 F. Supp.2d 90, 93 (D. Conn. 2000), quoting *Ross v. Creighton University*, 957 F.2d 410 (7th Cir. 1992); *accord Burns v. Quinnipiac University*, 120 Conn. App. 311, 320, 991 A.2d 666 (2010) (same). Indeed, "'there seems to be "no dissent" from the proposition' that the 'catalogues, bulletins, circulars, and regulations of the institution' determine the contractual relationship between the student and the educational institution." *Johnson v. Schmitz*, 119 F. Supp.2d at 93, quoting *Ross*, 957 F.2d at 416 (additional citations omitted). "'[A] court that is asked to enforce an asserted "contract" between a student and his university must examine the oral and written expressions of the parties in light of the policies and customs of the particular institution.'" *Johnson v. Schmitz*, 119 F. Supp.2d at 93, quoting *Banerjee v. Roberts*, 641 F. Supp. 1093, 1106 (D. Conn. 1986).

Here, those expressions come in the form of the UWC Sexual Misconduct Policy and Procedures and other related printed and electronic materials Yale distributes to its community concerning sexual misconduct. Together, these materials constitute Yale's contract with Plaintiff, and the standard for interpreting the contract is that of "reasonable expectation," *i.e.*, "what meaning the party making the manifestation, the university, should reasonably expect the other party to give it." *Doe v. Brandeis Univ.*, 177 F.3d 561, 594 (D. Mass. Mar. 31, 2016); *Doe v. Brown Univ.*, 166 F.Supp.3d 177 (D. R.I. 2016) (same). *See also Havlik v. Johnson & Wales Univ.*, 509 F.3d 25, 34 (1st Cir. 2007) (whether the "process [was] carried out in line with [the Plaintiff] student's reasonable expectations"); *Travelers Casualty & Surety Co. of America v. The*

*Netherlands Ins. Co.*, 312 Conn. 714, 740 (2014) (any ambiguity in contract is construed in accordance with reasonable expectations of non-drafting party when that party entered into the contract).

Plaintiff applied to and enrolled at Yale and paid associated fees and expenses. Plaintiff did so in reliance on the understanding and with the reasonable expectation that Yale would implement and enforce the provisions and policies set forth in its official publications, including Sexual Misconduct Policy.  An express contract or, alternatively, a contract implied in law or in fact was formed between Plaintiff and Yale.  The contract contained an implied covenant of good faith and fair dealing that required any proceedings be conducted with basic fairness.

A number of recent lawsuits challenging the failure to adhere to university procedures have survived preliminary motions as federal courts expressed concern about the failure of schools to comply with their own procedures.  See e.g, *Doe v. Amherst* College, 238 F.Supp.3d 195, 217-218 (D. Mass. 2017) (denying motion for judgment on pleadings for breach of contract for school policies enacted due to OCR pressure); *Naumov v. McDaniel College, Inc*., No. GJH-15-482, 2017 WL 1214406, 2017 U.S. Dist. LEXIS 49887, at *29 (D. Md. Mar. 31, 2017) (rejecting argument that April 4, 2011 Dear Colleague Letter required breach of college handbook); *Collick v. William Paterson Univ*., No. 16-471 (KM) (JBC), 2016 WL 6824374, 2016 U.S. Dist. LEXIS 160359, at *69-70 (D.N.J. Nov. 17, 2016)("the Complaint sufficiently alleges that Defendants did not adhere to [the school's] own rules, that the procedure they followed was unfair, and that the decision was not based on sufficient evidence"); *Doe v. Brandeis Univ*., 177 F. Supp.3d 561, 600 (D.Mass.2016)("the Court concludes that the complaint plausibly alleges that [the school] did not provide 'basic fairness' to" accused student); *Doe v. Lynn Univ., Inc*., 235 F.Supp.3d 1336, 1342 (S.D. Fla. 2017) (plaintiff stated valid claims for of contract and breach of the implied covenant of good faith and fear dealing in connection with sexual assault investigation).

### 2.  **The Breaches of Contract.**

The Yale Defendants have breached their contractual obligations to Plaintiff in myriad, such that he is likely to succeed on his breach of contract claim against the Yale Defendants.

### a.  **Defendants Failed To Properly Notify Plaintiff of The Charges Against Him Under Yale's Policies.**

Plaintiff was called to attend a meeting, without warning and without an advisor, where he received hand delivered letters from Ms. Menon. The letters were Notices of Investigation, one for each complainant, informing John Doe he would be investigated for groping and sexual harassment stemming from a November 18, 2016 incident.  Jane Roe's complaint did not provide details of the alleged "groping," and while Sally Roe's complaint was relatively more informative, it still did not tell Plaintiff very much.  Plaintiff did not receive notice of the specific allegations of complainants until he received the investigator's report.

### b.  **Defendants Failed To Follow Their Policies As The Fact-Finder Improperly Obtained Information Which Was Erroneously Incorporated Into Her Investigative Report.**

On October 18, 2017, the Fact-Finder interviewed Ms. Gleason and on October 19, 2017 the Fact Finder interviewed Plaintiff's Dean, improperly questioning both as witnesses about confidential conversations they had with Plaintiff. Summaries of the Dean's and Ms. Gleason's interviews were included in the Fact Finder's report. Furthermore, Plaintiff was questioned by the panel during the hearing regarding the confidential discussions he had with Ms. Gleason and his Dean.

Yale's UWC Procedures, Section 7.3 states: "The fact-finder will not consider information that is provided solely to attest to a party's character."  However, the Fact-Finder included in the investigative report unrelated hearsay and derogatory character statements about John Doe that

had nothing to do with the allegations. The female complainants had no such descriptions of their character in the report.

The Fact-Finder's prosecutorial investigation was not a neutral fact-finding operation but rather a prosecutorial effort.  The Fact-Finder conducted a total of seven interviews with the complainants as compared to only two with the Plaintiff. At the time of Plaintiff's first interview, the Fact-Finder had already conducted ten witness interviews. Moreover, the Fact-Finder did not follow-up again with six (6) of those ten (10) witnesses after her interview with the Plaintiff to confirm, challenge or elicit further details about Plaintiff's statement.

### c. Defendants Failed To Provide the Plaintiff With An Impartial Fact-Finder and Impartial Hearing Panel.

The hearing panel and chair were selected by UWC chair Mr. Post. Yale policy permitted Plaintiff to review the membership of the UWC for conflicts of interest. Plaintiff did follow the policy and notified the UWC that the conflicts of interest that concerned him was the relationships of the complainants with members of the UWC.  Plaintiff immediately informed Mr. Post and Ms. Menon that Sally Roe's father was a well-known faculty member at Yale and that Jane Roe's parents were Yale alumni and her father a published legal scholar who frequently was quoted as a Yale alumnus.  But instead of obtaining an objective UWC panel from outside the Yale community, UWC chair Mr. Post elected the panel members to self-recuse themselves. To no surprise of the plaintiff, and solely to his detriment, none of the members recused themselves. Moreover, Mr. Post continued to oversee the UWC process against Plaintiff despite the fact that he himself was a colleague of Sally Roe's father.  The constitutional requirement of impartiality was not satisfied. *Marshall v. Jerrico. Inc.*, 446 U.S. 238, 242 (1980).

As the hearing progressed, it was evident that the complainants were able to listen to each complainant's statements to the hearing panel as one complainant subsequently gave the same

exact statement to panel. Yale's Senior General Associate Counsel, who acted as legal counsel to the UWC panel during the hearing, indicated that the UWC elected not to sequester the complainants as each presented their statements to the panel since the matter was being adjudicated in one hearing.

The use of one hearing panel cannot serve as the basis to violate Plaintiff's fundamental right of due process. The act of sequestering of witness is such a basic right of the accused. Moreover, not permitting one complainant from listening to the other in no way would violate the non-testifying complainant's right. Plaintiff immediately voiced his objection to the fact that the complainants were able to listen to each other's statements and this objection was dismissed and nothing was done to rectify the situation.

Shortly after learning of the non-sequestration of the complainants, Plaintiff learned that the complainants were texting during throughout the proceedings.  Instead of immediately declaring the need for a new hearing, as requested by the Plaintiff, the response by the UWC and Yale's administrators was simply that the complainants provide copies of the texts they had exchanged. This was voluntary and the panel had no way of knowing how many texts had been deleted or excluded from those proffered by the complainants. In fact, the text messages stated that one of the complainants had also been on Snapchat all morning, involving messages exchanged with others that could not be retrieved.

Yale's General Counsel Mr. Rose once again interjected his bias against the Plaintiff during the panel hearing when one of panel member began a line of questioning about whether Plaintiff's conservative political beliefs were an underlying issue to the complainants' reports. Mr. Rose got up from his chair to confer with Ms. Menon.  Plaintiff and his advisor were asked to leave the room for approximately ten minutes without explanation.  Once Plaintiff and his advisor returned

to the room, a new line of questioning began. The discussion regarding the political climate at Yale

had been abruptly discontinued and not pursued again during the hearing

### d. Defendants Found the Plaintiff Responsible for Alleged "Groping" Even Though Yale Does Not Have A Definition of "Groping" in UWC's Policy.

The allegations against Plaintiff were for violations of Yale's Sexual Misconduct Policy

for "groping," a violation included under the policy for "sexual assault."  Sexual assault was

defined in the policy as "any kind of nonconsensual sexual contact, including rape, groping or any

other nonconsensual touching."  The policy does not have a definition for "groping."  Neither Jane

Roe or Sally's complaints contained any description of the alleged "groping" to provide Plaintiff

with proper notice of the allegation.  The preponderance of evidence could not support a finding

of "groping" as that term is undefined in the Policy.

### e. The Decision Maker Did Not Provide A Rationale For The Decision and Sanction In Violation of Yale's Policy.

The decision maker (Dean Chun) issued a decision that lacked any stated rationale for his

determination and final decision and sanction. The arbitrary and capricious finding of Plaintiff's

responsibility had been pre-determined. The decision maker failed to conduct due diligence in

writing his report. The decision lacked any analysis of what had been recommended at the panel

level.  There was no data regarding sanctions from similar matters. Ms. Menon, who had received

Plaintiff's to Dean Chun on Friday, December 22, 2017 (Christmas weekend) received the decision

from Dean Chun on Tuesday, December 26, 2017. Significantly, had Dean Chun decided to

deviate at all from the UWC panel's recommendation, according to policy, he would have had to

meet with the panel before providing Plaintiff with his Decision:

> Based on extensive feedback from the University community, and to reflect
> the UWC's current practice, the procedures were modified to require the decision
> maker  to meet with members of the panel to discuss the proposed decision, if the
> decision maker contemplates materially modifying the panel's conclusions or
> recommendations.  This is intended to ensure that the decision maker has a

thorough understanding of the UWC panel's deliberations, conclusions and recommendations.

(UWC Procedures, Section 7.5) Given the holidays and University closure for the week, it would require reconvening the panel in January if the decision maker wanted to consider a different finding or sanctions other than those recommended by the panel. Clearly, this was easily avoided with a one-page letter by the decision maker effectively "rubber-stamping" the hearing panel's unsubstantiated Decision. The decision maker provided no rationale for upholding the flawed recommendation by the hearing panel in a rush by the UWC to finalize my suspension before the start of the next semester.

### f.  The Breach of the Duty Of Good Faith To Provide A Fair Hearing.

Defendants breached the implied contract duty of good faith to ensure that the proceedings against Plaintiff were conducted in good faith and with basic fairness by:

- Failing to provide Plaintiff with the same protections explicitly afforded the complainant under Yale's Sexual Misconduct Policy, including, without limitation, the right to policies and procedures designed to protect the rights of *both* complainants and respondents; the right to have the sexual misconduct investigation process explained to him in detail prior to engaging in that process; and the right to a presumption of innocence unless and until the preponderance of evidence warrants a finding of responsibility;

- Failing to provide Plaintiff the opportunity of a fair hearing;

- Failing to sequester the complainants during the other's reading of their own statement to the hearing panel;

- Failing immediately to order a new panel hearing once Defendants learned of the complainants' collusion by texting with each other during the panel hearing;

- Arbitrarily and capriciously finding that the Plaintiff responsible for "groping" the complainants  as Yale Defendants have no definition for the act of "groping"; and

- Arbitrarily and capriciously suspending the Plaintiff for two semesters when the same penalty of suspension had been handed down to other found responsible for non-consensual penetration (rape).

33

### 3. __Title IX.__

Title IX provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault, *Davis v. Monroe Bd. Of Education*, 526 U.S. 629 (1999), or by "the imposition of university discipline where gender is a motivating factor in the decision to discipline," *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994). In either case, the statute is enforceable through an implied private right of action. *Yusuf*, 35 F.3d at 714.

*Yusuf* classified challenges to university disciplinary proceedings for sex discrimination as falling in two categories: (1) "erroneous outcome" cases, in which "the claim is that plaintiff was innocent and wrongly found to have committed an offense"; and (2) what some courts have called "selective enforcement" cases, but are better called "severity of penalty/selective initiation" cases, in which "the claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender." 35 F.3d at 715.

According to *Yusuf*, for either kind of claim, the plaintiff must plead and prove that conduct was discriminatory; for an "erroneous outcome" case, the plaintiff must allege "particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and must "also allege particular circumstances suggesting gender bias was a motivating factor behind the erroneous findings," such as (but not only) statements by disciplinary tribunal members and university officials and patterns of decision-making. 35 F.3d at 715.

Proscribed gender bias is reflected in how the sexual misconduct process is structured and how the decisions are made. Only an anti-male bias to find for the female complainant and against

34

the male respondent can explain the Yale Defendants' decision to hold Plaintiff responsible despite the lack of supporting non-party evidence.

The crux of the problem is the ideology of Title IX administrators -- an ideology at odds with the text of Title IX passed by Congress.  Title IX by text and legislative history is a non-discrimination statute, for fairness for men and women, and not a political device for having kangaroo courts to be used against men based on radical political sentiments that treat males as rapists and female "victims" as presumptively telling the truth.  See Professor Aya Gruber's writings in, for example, *Consent Confusion*, 38 Cardozo L. Rev. 415 (2016) and *Anti-Rape Culture*, 64 Kansas L. Rev. 1029 (2016).  Such radical political sentiments are not found in the text of Title IX and are not found in the legislative history of Title IX.  For the importance of text in statutory interpretation, *see* A. Scalia, *Reading Law: The Interpretation of Legal Texts* (West Pub. 2012); and for the argument for examining legislative history, *see* R. Katzman, *Judging Statutes* (Oxford Univ. Press 2014).  The 2015 Yale Policy and Procedures and how they are applied in cases such as Plaintiff's fully reflect the gender bias of the Title IX administrators.

The approach taken in the Complaint here is supported by the prominent case of *Doe v. Columbia*, 831 F.3d 46 (2016).  There, the Second Circuit upheld a Complaint alleging an intentional discrimination Title IX case based on, among other things, a number of defects in the process (particularly the investigation), the questionable outcome given the evidence and the political pressures affecting the treatment of sexual misconduct cases. Notably, the Second Circuit observed: "[w]hen the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side…it is plausible to infer…that the evaluator has been influenced by bias." *Doe v. Columbia,* 831 F.3d at 57.  The Second Circuit added:

> [T]he Complaint alleges that during the period preceding the disciplinary hearing, there was substantial criticism of the University, both in the student body and in the public media, accusing the University of not taking seriously complaints of female students alleging sexual assault by male students. It alleges further that the University's administration was cognizant of, and sensitive to, these criticisms, to the point that the President called a University-wide open meeting with the Dean to discuss the issue. Against this factual background, it is entirely plausible that the University's decision-makers and its investigator were motivated to favor the accusing female over the accused male, so as to protect themselves and the University from accusation that they had failed to protect female students from sexual assault.

831 F.3d at 57. *See also Yusuf*, 35 F.3d at 715: for the "erroneous outcome" category, "a complaint may allege particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of a complainant or witnesses, particularized strengths of the defense, or other reason to doubt the veracity of the charge. A complaint may also allege particular procedural flaws affecting the proof."

### 4.  <u>The Violations of Title IX.</u>

The Yale Defendants have violated Title IX, such that Plaintiff is likely to succeed on his Title IX claim against the Yale Defendants.

An "erroneous outcome" occurred in this case because Plaintiff was innocent and wrongly found to have committed sexual assault and gender bias was a motivating factor for the same reasons that caused the Second Circuit in *Doe v. Columbia*, *supra*, 831 F.3d 46, to rule that gender bias was pleaded: the lack of due process, the treatment of facts not in accordance with the evidence, investigator prosecutorial behavior and bias, political pressures from the campus and from the federal government.

The practical reason why due process matters is so that cases are not decided "on the basis of an erroneous or distorted conception of the law or the facts." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980).   The Yale Defendants failed to conduct an adequate, reliable, and impartial investigation when it conducted a prosecutorial investigation of Jane Roe and Sally's allegations

36

and subsequent adjudication in a manner that discriminated against Plaintiff.  Among other things, the investigator report managed to support complainants' stories despite the lack of any non-party witness testimony supporting the "groping" charge (fourteen were interviewed and none saw it), and the investigator report further contained unrelated hearsay and derogatory character statements about John Doe that had nothing to do with the allegations, whereas the female complainants had no such descriptions of their character in the report.  At the hearing, Plaintiff was unfairly prejudiced by the Yale Defendants' failure to sequester, allowing complaints to hear each other's statements to the panel and permitting the panel to render a decision despite the fact that the complainants were texting each other during the hearing.  The Decision, which in itself has no supporting findings and rationale, did not reflect a preponderance of the evidence, as the findings of responsibility in the panel report were and had to be based on the word of the complainants that was not just denied by Plaintiff, but also (i) flew in the face of the evidence that witnesses who were in the position of seeing any "groping" said they did not see it and (ii) the complainants delayed a year before even bringing their complaints that in Jane Roe's case lacked any details and in Sally Roe's case had details that changed during the hearing; the fact that Jane Roe and Sally Roe were texting each other during the hearing reflected their need to get straight their concocted stories.  In sum, the responsibility findings were based on gender biased premises informing Yale's gender biased Title IX administration: a presumption of female truth telling and a need to protect female "victims"; the flawed "investigation" and "hearing" in this case resulted in an "erroneous outcome" based on erroneous and distorted conception of the facts rooted in gender bias.

Additionally, a sanction of undue severity -- two semesters of suspension for year old incidents of over-the-clothing "groping" that no one else said happened -- was issued because of gender bias that treats males as rapists who need to be punished severely.  Plaintiff received the same sanction as three male respondents who were disciplined in the period July 2016 to July 2017

-- suspension -- but those three male respondents were found to have engaged in non-consensual

sexual intercourse, a more serious matter than outside-the-clothing "groping."

**C.**   **The Balance Of Hardships Tips Decidedly In Plaintiff's Favor.**

Plaintiff satisfies the third prong for a preliminary injunction, which is that the balance of

hardships tips decidedly in Plaintiff's favor.

As noted above, without injunctive relief, Plaintiff will lose the Brady-Johnson Program

participation, the internship with the investment banking firm and most certainly potential future

employment with that investment banking firm, and in the future, Plaintiff will lose out on graduate

school and on employment opportunities he would have been able to secure with a degree from

Yale without the black mark of a sexual misconduct disciplinary sanction on his transcript.  On top

of it all, Plaintiff has also been branded – unfairly and unjustifiably – a sexual predator as he faces

an uncertain professional future.  Plaintiff faces severe hardships if injunctive relief is not granted.

In contrast, granting an injunction to reinstate Plaintiff places no real hardship on Yale.

Throughout the course of Yale's investigation Plaintiff continued his studies, without issue; there

was no university interim relief that was ordered as to Plaintiff and the Yale student body.  The

only restriction Yale placed upon him was to prevent him from contacting complainants, either

directly or indirectly, and Plaintiff faithfully abided by this directive, also without issue.

Consequently, his reinstatement would simply restore the status quo prior to his expulsion. While

Yale will suffer interference with its process and sanction if the Court grants the motion, if Yale

prevails on the merits, it can direct that suspension be served and maintain Plaintiff's disciplinary

record in its files.

The balance of hardships tips decidedly in favor of granting the temporary restraining order

and preliminary injunctive relief.  *King v. DePauw Univ.*, *supra*, 2014 WL 4197507,*14 (finding

the balance of harm in student's favor even though university has "interest in enforcing its own rules of conduct pursuant to its own procedures" and is harmed by having its actions second-guessed by a court because "the harm [university] will have suffered by [student's] court-ordered return to campus . . . , while real, will not be as great as the harm [student] will have suffered if he is not permitted to return to campus but ultimately wins Accordingly, the balance of hardships tips decidedly in favor of Plaintiff.

**D.**     **The Requested Injunction Is In The Public Interest.**

Plaintiff satisfies the fourth prong for a preliminary injunction, which is that the requested injunction is in the public interest.

What should be clear is that the public, as well as the parties involved in this lawsuit, have a shared interest in the fairness, reliability, and transparency of these proceedings. *See*, *e.g.*, Nancy Gertner, *Complicated Process*, 125 Yale L.J. Forum 442, 448-449 (2106) ("There is . . . 'a real contest about where the line between sex and sexual violence or harassment is, and as with all lines, there will be uncertainty over where some marginal cases fall.' An administrative framework – the 'sex bureaucracy' – policing these lines with few procedural protections, and less than transparently, raises . . . questions about fairness"); Stephen Henrick, *A Hostile Environment for Student Defendants: Title IX and Sexual Assault on College Campuses*, 40 N. Ky. L. Rev. 49, 87 (2013) ("There is a difficult tension in sexual assault adjudication between avoiding the injustice of a wrongful conviction and avoiding the injustice of a wrongful acquittal. Nevertheless, any process designed to resolve such claims can only be legitimate if determining guilt or innocence is the first priority").

The regime of the April 4, 2011 Dear Colleague Letter led to campus sexual misconduct tribunals where there was use of prosecutorial "investigation," lack of reasoned decision-making, presumption of male guilt, a failure to apply the burden of proof in fact, denial of meaningful

appeal, manifest bias against males and unfair hearings.  That the public is not served by such proceedings was recognized by Department of Education Secretary Betsy DeVos, who in vacating the April 4, 2011 Dear Colleague Letter has rightly denounced recently as involving denials of due process that are wholly un-American:  www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement.  Granting the requested temporary restraining order and preliminary injunction in this case serves the public interest.

## CONCLUSION

For the reasons stated above, the Court should grant a temporary restraining order and preliminary injunction restraining Defendants from suspending Plaintiff from school pending the adjudication of the merits of the Complaint.

## REQUEST FOR EVIDENTIARY HEARING

**PLAINTIFF HEREBY REQUESTS AN EVIDENTIARY HEARING ON THIS MOTION.**

Dated: New York New York
        January 18, 2018

                                        Respectfully submitted,
                                        *Attorneys for Plaintiff*

**NESENOFF & MILTENBERG LLP**          **WILLIAM B. BILCHECK JR LAW OFFICES**

By:  /s/ *Philip A. Byler, Esq.*          By: /s/  *William B. Bilcheck Jr.*
Philip A. Byler, Esq. (pro hac vice       William B. Bilcheck Jr., Esq.
        admission pending)                 12 Brookside Road
Andrew T. Miltenberg, Esq. (pro hac       Madison, Connecticut 06433
        vice admission pending)           (203) 245-6252
Stuart Bernstein, Esq. (pro hac           madctatty@aol.com
        admission pending)
363 Seventh Avenue, Fifth Floor
New York, New York 10001
(212) 736-4500
pbyler@nmllplaw.com
amiltenberg@nmllplaw.com
sbernstein@nmllplaw.com