**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| JOHN DOE, | : |
| | :    **Civil Action No:** |
| | : |
| **Plaintiff,** | : |
| | : |
| | : |
| **-against-** | : |
| | : |
| | : |
| | : |
| **YALE UNIVERSITY, YALE UNIVERSITY** | : |
| **BOARD OF TRUSTEES,** | : |
| | : |
| | : |
| | : |
| **Defendants.** | : |

**DECLARATION OF JOHN DOE**
**IN SUPPORT OF PLAINTIFF'S MOTION FOR A TRO/PRELIMINARY INJUNCTION**
**PROHIBITING DEFENDANTS FROM PRECLUDING PLAINTIFF FROM**
**ATTENDING CLASSES DURING THE 2018 SPRING SEMESTER AT YALE**
**UNIVERSITY**

1.      Plaintiff, who wishes to proceed under the pseudonym John Doe, a separate

application seeking the Court's approval has been filed, hereby declares subject to the penalties

of perjury pursuant to 28 U.S.C. § 1746:

2.      I am the Plaintiff in this action and submit the following in support of the current

application.

3.      Having immigrated to the United States in 2011, my older sister, younger brother

and I were raised by our parents in New York.

4.      Prior to my acceptance into Yale University, I attended a New York City

university-preparatory high school. I taught kindergarten part time and participated in a

mentorship program for underprivileged students.

5.      I began attending Yale University in the fall of 2015. I performed very well academically and currently am on the board of the Yale Hunger and Homelessness Action Project. I am active in the Yale community as a columnist for the *Yale Daily News*. On April 28, 2017, Yale's President Peter Salovey wrote me a personal letter expressing his appreciation for an article I wrote in support of a recent controversial gift made to Yale University.

6.      As a result of my current suspension, I am being denied the opportunity to continue with my Yale University education, participation in Yale University's prestigious Brady-Johnson Program in Grand Strategy, and employment with a well-known highly respected Wall Street Investment Banking Firm for the summer of 2018. The summer position would have been my second consecutive summer position with this firm which is a precursor to a full-time position following graduation in May 2019.

7.      Respectfully, I am before Your Honor because I have been wrongly accused of sexual misconduct. I was shocked and saddened to learn of the allegations made against me by the complainants. The two (2) women are very close friends, and in fact the three (3) of us had all been friends during our sophomore year.

8.      Based not only on the fact that the complaints were made three (3) minutes apart on the same day, (September 18, 2017; 15 months after the first alleged incident) but in conjunction with my review of Yale's Investigative Report, it is apparent that the complainants had discussed how they would tailor their allegations against me. In addition, it is uncontroverted that during Yale's panel hearing, the two (2) complainants were texting each other while listening to each other's statements to the panel to provide one cohesive story. It is also apparent that the two women spoke to those they enlisted as witnesses, and nearly all of the witnesses in the report are their friends.

9.       The first allegation made against me pertains to a night in Paris, France back in June 2016. The complainant alleges that as we walked between a party at a mutual friend apartment and a nightclub, I placed my hand on her buttock. This in fact never happened.

10.       During Yale's investigation and hearing, none of the individuals who were present in Paris, at the time of the alleged incident, ever gave testimony that I in fact placed my hand on the complainant's buttock. Additionally, Yale's Fact-Finder failed to interview one of the witnesses I presented.

11.       The complainants alleged that on November 18, 2016, some 10 months prior to the complaints being filed, that during a bus ride from New Haven to Cambridge that I inappropriately touched them. One complainant alleges I touched her buttock and the other alleges I touched her breast and buttock.

12.       The complainant who alleged the Paris incident alleges that I sat down next to her and grabbed her right buttock. However, when questioned by Yale's Fact-Finder, the complainant stated, "She does not remember if she said anything, and does not recall who was sitting or standing nearby who might have seen what happened to her."

13.       The second complainant claims that I sat down next to her and proceeded to squeeze her breast and buttock. Again, this is a total fabrication and never happened. My denial was in fact confirmed by a witness, identified by the complainant, who confirmed that an interaction took place between the complainant and myself and that the interaction did not include groping. Another witness indicated that I put my arm around her and whispered in her ear. This witness never advised the Fact-Finder that I groped the complainant.

14.       Yale's Fact-Finder interviewed fourteen witnesses, eleven recall *no interaction whatsoever* between the complainants and me. **More importantly, not one witness stated that they**

**saw me grope the complainants.**

15.     The Fact-Finder met with the complainants for a total of seven (7) interviews: four (4) with the first complainant and three (3) with the second. The Fact-Finder met with eight (8) witnesses identified by the complainants **before** ever meeting with me. When the Fact-Finder did interview me, she only met with me on two (2) occasions.

16.     Additionally, after speaking with me, the Fact-Finder voluntarily elected to ignore my statements and not re-interview six (6) witnesses she had met with previous to learning my recollection of the events in question.

17.     The Fact-Finder further elected to question me on issues outside the scope of the stated investigation. I was notified by David Post, Chair of Yale's University Wide Committee on Sexual Misconduct ("UWC"), that the interview with the Fact-Finder would relate to only the alleged November 18, 2016 incident.  However, in our first interview the Fact-Finder went far afield of that incident, referring to allegations of which I had not received notice.

18.     Additionally, the Fact-Finder repeatedly solicited impermissible character evidence about me from the witnesses including hearsay and derogatory character statements. This information was improperly contained in the Fact-Finder's report.

19.     Following the Fact-Finder's investigation, my case proceeded to a hearing. Although I was aware that there be a single hearing, neither myself nor my advisor were informed that both complainants would have access to listen to each other's statements as they were made to the panel.

20.     When my advisor heard one of the complainant's make a statement identical to the other complainant who had just addressed the panel, my advisor immediately sent a text

message to Lani Danilowitz, UWC Coordinator, inquiring, "have the two witnesses been allowed to hear the other's testimony?"

21.     After Ms. Danilowitz failed to respond, my advisor spoke with another University official who confirmed that the complainants had full audio access at all times during the entire hearing. Mr. Harold Rose, Yale's Senior General Associate Counsel, who was present at the hearing as legal counsel to the UWC panel, suggested that because these matters were proceeding under a joint hearing that this somehow excused the UWC from sequestering the witnesses.

22.     The complainants at times not only gave identical statements to the hearing panel, but they were caught actually texting each other during the panel hearing which included specific texts about the hearing and my testimony. Instead of immediately declaring a mistrial, as requested by my advisor, the UWC simply asked that the complainants to voluntarily provide copies of their texts. As this was voluntary, the panel had no way of knowing how many texts had been deleted or excluded from those proffered by the complainants.

23.     The UWC not only didn't declare a mistrial, Mr. Rose in fact required me, as respondent, to provide him with evidence from the text messages to prove that the hearing was tainted.

24.     Respectfully, I believe your Honor should know that the first complainant lied when she told the panel that she "never intended to get sympathy through illness from the panel" when she sent texts stating that she wanted to "puke while they were questioning [her] just for dramatic effect."

25.     The second complainant in her response statement to the panel's findings indicated that her texting during the hearing was to "destress" and then she goes so far as to state there was *a theme* to the Complainants' texts: encouragement.

26.     I reported to Mr. Post a clear conflict of interest that existed. The second complainant's father is a well-known faculty member at Yale and that the first complainant's parents are Yale alumni and her father a legal scholar. Additionally, Mr. Post is a colleague in the same field as the second complainant's father.

27.     After being found responsible, I was suspended from Yale for the upcoming Spring 2018 semester and the following Fall 2018 semester. This punishment is severely disproportionate to the alleged offense.

28.     During the nearly four months of investigation and adjudication of the allegations against me, at no time did the University find the need to impose an interim suspension or other restrictions. This fact undeniably demonstrates that the University knew I was not a threat to anyone nor did I create a hostile environment on campus.

29.     On January 3, 2018, I filed an appeal in accordance with Yale's policies and procedures. On January 12, 2018 my appeal was denied.

30.     In light of all the factors that denied me a fair and impartial hearing, plus the educational and moral growth I have undergone since the alleged incidents in November 2016, I do not warrant a permanent notation on my educational record stating that I violated the Sexual Misconduct Policy, requiring me for the rest of my life to explain that I was found responsible for sexual assault.

31.     If forced into suspension from Yale, I will lose the internship I worked for years to obtain, and will be prevented to pursue a career in professions which require a license or background check.

Dated: January 16, 2018

_____
John Doe