**EXHIBIT K**

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
Dec. 12, 2017
Response to Supplemental Fact-Finder's Report

Supplemental Fact-Finding Report

**Initial Selection of Witnesses**

The Investigator stated in her Dec. 7, 2017 Supplemental Report that "None of the parties suggested that I speak with ▆▆▆▆▆▆▆▆." However, the Fact-Finder's Report (pg. 14) stated that, "The only women ▆▆▆▆▆▆▆▆▆▆ recalls touching at all on the bus were two women with whom he danced - ▆▆▆▆ and ▆▆▆ [sic] – and that was hand to hand touching, not close dancing or sexual touching of any sort." This statement is incorrect; I did not say they were the only women I touched "at all." Nevertheless, ▆▆▆▆▆▆▆ name was provided by me, and her name was on the list of invited students (Exhibit M) in a group message that the Fact-Finder used for her selection of witnesses.

Despite the foregoing, the Fact-Finder decided to contact nine (9) "witnesses not identified by any parties," some of whom were not present at *any* of the alleged incidents. Although I had provided information about having physical contact with ▆▆▆▆▆▆, the Fact-Finder chose not to contact her as a witness. The exclusion of a witness who might substantiate my claims, while interviewing others who had not witnessed anything, is further indication of the biased methods used by the Fact-Finder which I experienced throughout the investigation and I reported to ▆▆▆ Post in an email on October 17, 2017. During our interviews, the Fact-Finder was combative and responded harshly when I refused to answer questions unrelated to the allegations. As I reported to the UWC Chair, the Fact-Finder, with a presumption that the accused must be guilty, quizzed me on sexual misconduct, including whether I "had read the manual with the Sexual Misconduct guidelines," focusing more on my knowledge and opinions on sexual misconduct than the facts of the case. She asked about incidents unrelated to the bus ride, despite the fact that David Post had specified that only the bus ride would be discussed. Moreover, the Fact-Finder interviewed the two (2) Complainants and eight (8) witnesses before ever interviewing me. She acted as a prosecutor compiling evidence against me rather than an impartial Fact-Finder, interviewing the Complainants' hand-picked witnesses (often roommates and best friends) before bothering to hear from me. At every turn, the Fact-Finder pursued lines of questioning irrelevant to the allegations that might cast me in bad light, while never questioning the claims of the Complainants.

Unsurprisingly, unhappy to have to reopen an investigation because I pointed out her bias and mistakes—including, I should add, roughly fifteen typos and several completely baseless factual inaccuracies[1]—the Fact-Finder wrote a biased Supplemental Report. Throughout the Fact-Finder's November 16, 2017 Report and December 7, 2017 Supplemental Report, there were

---

[1] e.g. that I invited ▆▆▆▆▆▆▆ on the bus, that I claimed not to be intoxicated at the Fence party, that the Fence Club is on High Street

1

numerous witness responses that indicated leading questions were employed by the Fact-Finder to elicit support for the allegations, and the inclusion in the reports of hearsay and irrelevant character testimony from the witnesses. Additionally, the Fact-Finder included statements irrelevant to the allegations. The Complainants' claims, however, went unchallenged and unverified by the Fact-Finder. The Fact-Finder had the discretion to decide the relevance of all proffered evidence and she determined that certain types of evidence would be included or excluded in the Reports. The confirmation bias in the process influenced the Fact-Finder's conclusions in the resulting biased Reports.

**Supplemental Interviews**

1) The Harvard-Yale Bus Incident

During the hearing on November 27, 2017, I pointed out that claims of inappropriate behavior made by certain witnesses must have pertained to my behavior towards ▮▮▮▮ or ▮▮▮▮. I deduced this from the fact that accusations of "indiscriminate groping" did not comport with the women interviewed who were on the bus whose worst allegations were that I put my arms around their shoulders. Specifically, ▮▮▮▮ had claimed I allegedly groped three women, none of whom were the Complainants, which left only two women who could possibly have been the subjects of ▮▮▮▮ speculation.

To be clear, I did not mention these two women, ▮▮▮▮ and ▮▮▮▮, as supportive witnesses, but as people towards whom my behavior had informed an impression with others on the bus. Additionally, I told the panel that both at the time and subsequently, neither ▮▮▮▮ nor ▮▮▮▮ had indicated that they took issue with my behavior towards them. Specifically regarding this UWC case, ▮▮▮▮ told me she did not take a side. She also indicated in the report that her memory of the bus ride is unclear. Furthermore, it seems that the Fact-Finder was asked to determine if the behavior between me and ▮▮▮▮ and ▮▮▮▮ was "intimate dancing." In fact, I stated there may have been dancing, "roughhousing," and touching of other sorts.

▮▮▮▮

▮▮▮▮ account confirms those of several witnesses and myself: any touching was friendly and not sexual. She stated that "he was trying to be friendly, not aggressive" and "[s]he recalls him "trying to be friends" with her, putting his arm around her and possibly hugging her while talking to her. She may have hugged him, or he may have kissed her on the cheek. ▮▮▮▮ does not specifically recall those activities but told me they would have been likely." Furthermore, ▮▮▮▮ said she witnessed me in a "friendly embrace" with ▮▮▮▮ and that ▮▮▮▮ "did not look unhappy or say anything afterwards."

▮▮▮▮ stated she does not remember dancing with me, although I remember touching hands and dancing with her. She stated she thinks "she is not a good dancer" and would not have actively danced with me. She stated, "she definitely does not remember any intimate dancing" to which I agree; I never stated that ▮▮▮▮ and I danced intimately. I told the panel there had been a variety of different interactions with both girls that may have included dancing.

2

     Toward the end of her interview, as if responding to the Fact-Finder to think hard about *anything* untoward she may have seen, ▓▓▓▓ stated she "did see one thing" on the bus that was troubling and left a 'menacing' impression on her." The language "did see one thing" indicates that ▓▓▓▓ was exhorted by the Fact-Finder to rack her brain for any impropriety. ▓▓▓▓ thinks she may have seen me put my hand on a woman's leg between her thighs, and she speculates it could have been ▓▓▓▓ or ▓▓▓▓; however, neither of these women have claimed that I did this. Incredulously, ▓▓▓▓ further stated that she could not remember who the woman was but somehow remembers her facial expression. ▓▓▓▓ could easily identify the face of ▓▓▓▓ or ▓▓▓▓, both of whom she has known for years. This entire discussion was undoubtedly based on hearsay and a solicited "impression" from ▓▓▓▓ and not a "memory" of an event that she witnessed and could recall with clarity. The convoluted language in this paragraph confirms this.

     A Communication and Consent Educator (CCE) herself, ▓▓▓▓ would have responded to inappropriate behavior; however, she concluded that I was being friendly. As I stated to the hearing panel, ▓▓▓▓, as a ▓▓▓▓, would undoubtedly find it uncomfortable to be asked to defend me, risking judgment and retaliation by fellow ▓▓▓▓ and her friends. Nonetheless, ▓▓▓▓ has stated she did not witness groping or any other alleged sexual misconduct by me on the bus.

▓▓▓▓

     As with ▓▓▓▓, ▓▓▓▓ did not want to be interviewed for this investigation and only acquiesced after being repeatedly contacted by the Fact-Finder. Because ▓▓▓▓ has heard many people speak about the Harvard-Yale bus trip since it happened over one year ago, she was rightly concerned that she could be conflating what she remembers with discussions after the fact.

     Again, the Fact-Finder stated that ▓▓▓▓ had "an impression," and not a vivid memory, that I "was pretty forward and made some girls on the bus uncomfortable." Clearly, this "impression" had been formed by conversations with others, and not events she had witnessed herself, because ▓▓▓▓ stated, "her memory of specific interactions is unclear" and she "unsure about what happened on the bus." In fact, ▓▓▓▓ never stated she had witnessed any "groping" as the Complainants have alleged.

     As if corroborating a claim posited by the Fact-Finder, ▓▓▓▓ replied that she "*knows* ▓▓▓▓ was 'physical' with her." She would only use the verb "know" if the Fact-Finder told her that I had been physical with her; otherwise she would posit this herself. That she "recalls" pushing me off reveals the same biased questioning from the Fact-Finder. ▓▓▓▓ did not say this in her account of the alleged events, but responded to the supposition of the Fact-Finder. Much like ▓▓▓▓ "did see one thing," the wording here is not that of a witness giving her account, but rather answering leading questions meant to indicate wrongdoing on my part. The Report next states, "▓▓▓▓ may have had his arm around her. She doesn't remember precisely where else he may have touched her." Did the Fact-Finder, in response to my arm around her, then ask ▓▓▓▓, "Where else did he touch you?" The next question posed caused ▓▓▓▓ to respond that "She did not feel seriously violated, but she definitely

3

felt uncomfortable." Was she asked by the Fact-Finder if she felt 'seriously violated' or simply 'uncomfortable'? Although the Fact-Finder used the word "uncomfortable" four (4) times in this interview summary, ▮▮▮▮ had never indicated any discomfort to me. When I told the Fact-Finder I felt uncomfortable when ▮▮▮▮ made advances towards me in Paris, she demanded specifics and a rationale. Why don't we get this from ▮▮▮▮?

As ▮▮▮▮ acknowledged, our relationship at the time was "flirty" and intimate. She does not claim that I "groped" or tried to grope her. ▮▮▮▮ stated herself that she is "*now embarrassed*" by not having castigated me. Her embarrassment indicates: (i) that she did not object to or discourage my behavior during the bus ride; and (ii) that her account is informed by her knowledge that the women involved will judge her, either for flirting with me, or as a gender traitor for not supporting the Complainants. I know this to be true, because ▮▮▮▮ did everything she could to avoid being part of this process. ▮▮▮▮ lives with ▮▮▮▮, who has sided with the Complainants, and would pressure ▮▮▮▮ to give a negative account.

Critically, ▮▮▮▮ stated, "she does not recall seeing any interactions between ▮▮▮▮ and ▮▮▮▮ or ▮▮▮▮," the Complainants whose allegations are the basis for this investigation and hearing. If there were no interactions between myself and the Complainants, why has the Fact-Finder included irrelevant witness hearsay that does not inform the allegations in question? Additionally, ▮▮▮▮ stated at the beginning of the interview that her recollection of the events is unclear, agreeing only to speak about direct interactions with me, "as distinguished from events involving other people." Given that ▮▮▮▮ herself stated her memory of events involving others is unreliable, the Fact-Finder's questions about others are clearly inappropriate and indicate a desire to gather negative testimony against me, rather than find out the truth of what happened.

As they departed the bus, the Report stated some people "felt uncomfortable about ▮▮▮▮ behavior and were saying 'leave him on the bus.' It was hard for her to know if the women who said that were just joking around or if they really felt sexually violated." Indisputably, the Fact-Finder has led the witness to consider – "it was hard to know" – if people were annoyed with me for appearing intoxicated, or if "they really felt sexually violated." This inflammatory statement was not put in quotes in the Report, meaning that the words were the Investigator's, *not* ▮▮▮▮. This biased statement was inserted by the Fact-Finder in both her questions to the witnesses and in the Report itself.

▮▮▮▮ interview ends with her "recognizing" my behavior "as inappropriate." Again, the wording leaves no doubt that ▮▮▮▮ was reacting to claims made by the Fact-Finder, rather than giving her account of the bus ride. If the testimony were her own, she would not "recognize," but "think" or "believe."

2) The Fence Club Incident

The purpose of investigating the alleged incident at the Fence Club was because ▮▮▮▮ "[i]n the second supplement to her complaint…alleges that on November 2, 2016, she witnessed ▮▮▮▮ acting very aggressively towards another woman at a social event hosted by

4

Fence Club. She alleges that he was standing very close to the woman and pressing her for sexual interaction." In fact, ▮▮▮▮ stated she was not sure she witnessed anything, having glanced for only seconds at an unknown woman at the Fence Club party. Not only was the behavior she alleges not inappropriate enough to catch her eye for more than mere seconds, but she claims that looking at me standing close to a woman for no more than five seconds interfered with her academics.

▮▮▮▮

▮▮▮▮ conversations with me were different from what he had indicated to the Fact-Finder. I maintain that he told me a completely different version of events. Rather than pursue the specifics of what I had told the panel, the Fact-Finder was content with ▮▮▮▮ assertion that he "does not remember any substantive discussion of it." There was substantive discussion, as I told the panel. Contrast the Fact-Finder's approach to ▮▮▮▮ with her approach with ▮▮▮▮, who she pressured into making unspecific claims against me when her account was exculpatory, or with ▮▮▮▮, whom she "embarrassed" into making attacks on my character, and whom she prompted to "recognize" subjective claims about my behavior.

In any event, the entirety of ▮▮▮▮ original testimony is hearsay, as, despite the fact that he was at the Fence party, and spent the majority of the party with me, he "did not witness the alleged incident." Somehow, his eyewitness account of no sexual misconduct, which supports my claims, has been contrived into a string of unsubstantiated accusations based on hearsay, turning an exculpatory witness into an opportunity to reinforce rumors, further evidence of the Fact-Finder's bias.

Conclusion

In short, this Supplementary Report, though containing vague, subjective claims about my behavior, nonetheless corroborates my account of the events on the bus. Moreover, it raises the number of people who state no groping ever took place from thirteen to fifteen, and removes all credibility from the account of ▮▮▮▮. All the witnesses seemed to be discussing my alcohol use – which has dramatically changed since a year ago – and not alleged sexual misconduct.

Throughout this investigation, I have been subject to broad, unsubstantiated attacks on my character by Complainants who, in their own words, sought to put me through "hell" during the hearing. During the hearing, ▮▮▮▮ bragged about being hungover and stated in her texts, "I've thrown up twice since I got here winning the pity vote." She continued, "kind of wanted to puke while they were questioning me just for dramatic effect." ▮▮▮▮ went on to state that "▮▮▮ is in hell" to ▮▮▮▮ agreement. After seeing texts in which ▮▮▮▮ and ▮▮▮▮ maligned my ethnicity and talked about scoring pity points, and listening to testimony by ▮▮ ▮▮ about how she "planted the seed" in the heads of women at Yale to "come forward as a group" so they could force allegations of "a pattern," I am uncertain as to how the hearing panel can be tasked with providing a fair and impartial assessment. Because of the inclusion of so many extraneous character attacks and subjective impressions brought by the roommates and best friends of the Complainants, the panel may forget that the allegations brought by the Complainants remain completely unsubstantiated.

In the case of ▮▮▮▮▮, ▮▮▮▮▮▮▮▮—whom she claims saw the entire alleged incident and communicated to her that there had been wrongdoing—contradicts her account of the events and says there was no groping. At first, she claimed I groped her breast and butt, but when the panel rightfully pointed out that it was impossible for ▮▮▮ and ▮▮▮ not to have seen this, she stated that it had been the side of her breast (also known as the armpit or ribcage) and the side of her butt (also known as the hip or upper high). She changed her story when faced with the fact that it was not credible.

In the case of ▮▮▮▮▮▮, no one saw even a brief interaction between us. She claimed I groped her butt while she was seated, the practicality of which the panel has already called into question. She claims I grabbed her arm and tried to pull her down, and that other men saw and intervened, which is disproven by the testimony of every other male on the bus. She also claimed I groped many other women on the bus, but is disproven by the accounts of every other woman on the bus, again calling her credibility into question.

Over a year has passed since the alleged incidents. Since then, I have rarely spoken with or seen the complainants, and have gone to very few parties at Yale. I have focused much more on my academics, extracurricular commitments ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮), and career. In fact, after hearing about the informal complaint in the fall of 2016, I went to Yale's Mental Health services to receive counseling on alcohol use. In the following semester, I continued counseling outside of Yale, going home to New York on most weekends. This semester, beginning one month before I heard of the complaint brought against me, I had weekly meetings with a therapist at Yale Health and stopped drinking and going to parties altogether. I hesitate to share this with the panel because I do not want my efforts to deal with mental health and substance abuse issues (which have been successful) to be interpreted as an admission of responsibility. While I recognize that my behavior at parties may not have portrayed me in the best light, I also know with certainty that I never violated Yale's policies on sexual misconduct. At all times since I started Yale, I've been cognizant of the specific sexual misconduct policies, and without a doubt never violated them, as the preponderance of the evidence in this case indicates.

6