**EXHIBIT N**

██████████████
Response to the Hearing Panel's Report
Dec. 22, 2017

Dear Dean Chun,

      I write to respond to the UWC panel report which concluded by a preponderance of the evidence that I had violated Yale's sexual misconduct policy. There are a few major issues with the UWC Panel's Report from December 15, 2017 that you should know about before proceeding with this process. Before addressing them, I will give some background on myself and this situation.

      My parents are from ████████████████, and raised my two siblings and me between New York and ██████ until 2011, when it became too dangerous for us to go there. My older sister recently graduated ████████████████ and is currently doing ████████████████, and my younger brother is a junior at ████████████████, where I studied. While in high school, I was ████████████████████████████████████████, taught kindergarten part time ████████████████████, and participated in a mentorship program for underprivileged students. I decided to attend Yale because of its strong sense of community and ████████████████████████████. Hoping to take advantage of the resources Yale offered, I enrolled in the ████████████████████ my freshman year, and am majoring in ████████████. I have performed very well academically, and recently got accepted to participate in the ████████████████████ for the next two semesters. Outside of the classroom, I am on the ████████████████████████████████████████████████████, ████████████████████████████, ████████████████████████████████████████████████████████████ during my freshman and sophomore years. I have worked hard at Yale, and have enthusiastically contributed to the Yale community. I currently have a ████████████████████████████████████████████████, which is contingent on a disciplinary background check, and for which I was selected based upon, among many stringent qualifications, my demonstrated ability to relate to others.

      I was shocked and saddened to learn of the complaints made against me. In the thirteen months that have passed since the alleged events, I have rarely spoken with or seen either of the complainants, and have gone to very few parties at Yale. I have been focused on my academics, extracurricular commitments, and career. The complaints—not sexual in nature, but actually pertaining to alcohol use—were made in the fall of 2016. As it turns out, during this same period, I went to Yale's Mental Health services to receive counseling on alcohol use. In the following semester, I continued counseling outside of Yale, going home to New York on weekends. This semester, beginning one month before I heard of the complaint brought against me, I had weekly meetings with a therapist at Yale Health and stopped drinking and going to parties altogether. I see part of my education here at Yale as a project of moral improvement, and over the past two and a half years, I have developed and grown as a person. I hesitated to share this with the panel because I did not want my efforts to deal with mental health and substance abuse issues (which have been successful) to be interpreted as an admission of responsibility. That being said, I know the UWC process is meant to be educational, and I want to convey my understanding that a safe and productive community requires high standards of conduct. While I did not violate Yale's policies, I am also aware that there is always room for improvement, and have taken considerable, concrete steps to actualize that improvement. As a result, over the past year, I have actively avoided

1

situations where I might make myself uncomfortable, sacrificing a robust social life in order to make sure I do not interfere with the lives of others.

**Complaint**

The carefully crafted complaint, and ▮▮▮▮ approach to the complaint process, raise red flags. Before filing her complaint, ▮▮▮▮ had separate meetings with ▮▮▮▮ ▮▮▮▮. When asked during the hearing about those meetings, ▮▮▮▮ admitted to formulating a strategy for bringing a complaint against me. The UWC has rightly made initiating a formal complaint a simple process, requiring just one short email, in order to reduce the burden on true victims of sexual assault. In light of this, why did ▮▮▮▮ require so many meetings in order to decide to file a formal complaint? Stating that she attempted to convince many women to file complaints against me, ▮▮▮▮ said she "planted the seeds in their heads" in order to build claims of a pattern of behavior, because of her "obligation as a feminist." She carefully crafted complaints that included a "hostile academic environment," which is a standard of legal evaluation and not an accusation of misconduct. This is significant for a number of reasons. Her attempts to enlist others demonstrate that whatever complaints she had were not sufficient to constitute a violation if not brought in tandem with others. Moreover, by including jargon specific to Yale's misconduct policies and holding several meetings to plan strategy with Yale administrators, ▮▮▮▮ evinced a calculated motive to manipulate a system she knew very well, rather than a genuine desire to address a real wrongdoing.

Both ▮▮▮▮ and ▮▮▮▮ had advisors from the SHARE Center, who have experience with the UWC and are on the Yale faculty. Along with their multiple strategic meetings with Yale administrators, their SHARE advisors offered specific advice on how to best use the UWC hearing to their calculated ends. They knew exactly how to work this process, used all the right language, and piled on claims with no factual basis. I did not have access to advice from someone who knew Yale's process well, and therefore was at a disadvantage. Despite the foregoing, ▮▮▮▮ stated regarding her and ▮▮▮▮ complaints that it was "purely coincidence" that she and ▮▮▮▮ "filed within minutes of each other" nearly a year after the alleged event. The complainants went to incredible lengths to deny clear collusion. That they did this raises questions about their credibility and motives in bringing these complaints.

In her opening statement during the hearing, ▮▮▮▮ made a plea about alleged misbehavior before the panel at the same time she was texting her co-complainant ▮▮▮▮ that she had "thrown up twice since I got here winning the pity vote" and "I'm never drinking again" even though "everyone is v concerned about me lololol." In fact, ▮▮▮▮ said in her texts, "kind of wanted to puke while they were questioning me just for dramatic effect." No oath is required to be a witness before the hearing panel, yet we are instructed that a referral for discipline will result for those who are not honest. During the hearing, ▮▮▮▮ lied about the contents of those utterly inappropriate texts, which has not been addressed. ▮▮▮▮ and ▮▮▮▮ made a mockery of the UWC process and panel by using the system to retaliate against me for alleged incidents from 2016, not to redress a real grievance.

2

**Policy**

The UWC panel report included relevant sections of the University's definitions of sexual misconduct.  Notably, throughout the UWC panel report, there is no discussion of (1) how any of the alleged conduct had the "purpose or effect of threatening, intimidating, or coercing a person"; (2) a definition for the sexual assault term "groping"; (3) a discussion or application of "consent" to any of the alleged behavior; and (4) specifically how the alleged conduct had "the purpose or effect of unreasonably interfering with an individual's work or academic performance or creating an intimidating or hostile academic or work environment."

Before imposing a penalty, you should understand the implications of these omissions. The only assessment made in the Panel's Report pertains to the credibility of the complainants, not the nature of the complaints. For a Panel to find a policy violation, they must determine that an allegation is credible, determine whether the specific allegation in question violates policy, and give a rationale for that conclusion. Because the Panel does not discuss the four aforementioned points, the findings in the Panel's Report do not constitute a violation of Yale's sexual misconduct policy. The Panel has found the complainants credible without explaining how the complaints constitute nonconsensual sexual activity. In other words, any disciplinary sanction would be imposed without a proper finding of responsibility, and would represent readily demonstrable breach of contract.

**Fact-Finding**

On October 17, 2017, I sent an email to UWC Chair David Post explaining that Dorit Heimer, the Fact-Finder selected by Yale to deal with my case, had discriminated against me and acted inappropriately. Prior to our first interview, the Fact-Finder interviewed the two (2) complainants and eight (8) witnesses. She acted as a prosecutor attempting to compile testimony against me rather than an impartial Fact-Finder, interviewing the complainants' hand-picked witnesses (often roommates and best friends) before bothering to hear from me.

During our interviews, Ms. Heimer was combative and responded harshly when I refused to answer questions unrelated to the allegations. As I reported to the UWC Chair, the Fact-Finder, with a presumption that the accused must be guilty, quizzed me during the first interview on sexual misconduct, including whether I "had read the manual with the Sexual Misconduct guidelines," focusing more on my knowledge and opinions on sexual misconduct than the facts of the case. She asked about incidents unrelated to the bus ride, despite the fact that David Post had specified that only the bus ride would be discussed. She went so far as to say, in reference to her interviews with complainants, that they "told her what happened," as opposed to my accounts, which were merely a defense.

At every turn, the Fact-Finder pursued lines of questioning irrelevant to the allegations that might cast me in bad light, while never questioning the claims of the complainants. In the report, she made fifteen typos and stated several factual inaccuracies. To give you an idea of the negligence, incompetence, and indifference with which this process was carried out, one of Ms. Heimer's factual inaccuracies ended up as "Undisputed Facts" in the Panel's Final Report. The implications of this should not be understated. Imagine reading a report finding that you have

3

committed a sexual offense that misstates basic facts. The correct name of the nightclub we went to in Paris was stated in my account, whereas the incorrect name was in ▮▮▮▮ account. The Panel took ▮▮▮▮ statements as "undisputed fact," even where I provide the truth of the matter.

I addressed these concerns at various junctures to Mr. Post, Ms. Menon, and the Panel. They were never rectified, and represented a clear violation of Yale's stated procedures of enlisting an "impartial fact-finder." That mistaken claims in the Fact Finder's Report ended up as "Undisputed Fact" in the Panel's Report evidences the extent to which the bias of the Fact-Finder tainted the Panel.

**Paris Incident**

On June 16, 2016, ▮▮▮▮ made sexual advances towards me, and went out of her way to be physically close to me the entire night, captured in photos submitted as evidence. The photos depict nonconsensual touching done by her, yet were not addressed by the Panel. Significantly, there is a photo taken from behind of the two of us walking together, which proved nothing untoward occurred, and further proved that witnesses were observing us from behind at a short distance for the entire walk. Despite photographic evidence submitted by the complainant, the Panel failed to consider my account of the incident at all. In fact, the Fact-Finder failed to interview a witness to the incident, ▮▮▮▮, even after I repeatedly stated she had been there and requested that she be interviewed.

Additionally, the Panel failed to interview two people whom I said had been witnesses to ▮▮▮▮ sexually aggressive behavior towards me that night. Even when the Panel asked the Fact-Finder for a Supplemental Report, they did not ask for accounts from any of the witnesses that night. The two witnesses interviewed from that night—▮▮▮▮ and ▮▮▮▮—each deny the claims of groping. The witnesses were walking directly behind myself and ▮▮▮▮, and took at least one photo, which indicated they were observing ▮▮▮▮ and me walking.

The panel relied on ▮▮▮▮ best friend, ▮▮▮▮, confirming her account, despite the fact that ▮▮▮▮ said there was no groping. As ▮▮▮▮ best friend, ▮▮▮▮ must have felt obligated to give a report consistent with the complaint, despite not having witnessed inappropriate behavior. Moreover, the supposed report to her friend ▮▮▮▮ the day following the alleged incident is now being discussed a year later as fact after ▮▮▮▮ had "planted the seed" with her friends to bring a complaint against me. On the other hand, the fact that ▮▮▮▮ continued to see me frequently—even coming over to my family home after the alleged event—was completely ignored.

One reason the Panel stated for finding me responsible was ▮▮▮▮ "consistently maintained report" which is patently untrue. ▮▮▮▮ shifted the facts of the report during the hearing. When I mentioned that we had "skipped together"—a claim she made in her interview with Ms. Heimer—▮▮▮▮ objected, now saying she did not remember any skipping. This alone negates a key reason why the Panel would find her story consistent. ▮▮▮▮ also claimed during the hearing that we did not get into the nightclub because I was too intoxicated, whereas

4

texts from the Fact-Finder's Report showed that in fact it was because we did not have a reservation. Not only did the Panel inaccurately apply consistency to find ▮▮▮▮ credible, they did not evaluate the consistency of my account to determine my credibility. This represents selective enforcement of the consistency standard on the basis of gender. Moreover, in order for the Panel to have accurately confirmed consistency, they would have had to interview ▮▮▮▮▮▮▮▮, ▮▮▮▮▮▮▮▮, ▮▮▮▮▮▮▮▮, and ▮▮▮▮▮▮▮▮ to discover how ▮▮▮▮ story changed as she crafted and planned her complaint.

The UWC panel report repeated their reliance on the "narrow, specific nature of the claim" without explaining their rationale at all. What constitutes a "narrow, specific" claim? What about this claim makes it more believable than other claims of groping? Using a vague claim withouth substantiation to find me responsible of a policy violation, the Panel commits a serious misstep.

Ironically, all of the evidence in this case indicated she was sexually aggressive towards me. Moreover, as I point out in the "Policy" section of this letter, merely by finding her account credible, the Panel does not find a violation Yale's sexual misconduct policies. The Panel must find that I violated the policy with a culpable state of mind, yet they do nothing to pursue this. In fact, the panel never raised the question of consent, and did not address it in their Final Report. Because Yale policy provides no definition for groping, we must defer to Merriam-Webster's definition: "to touch or fondle (someone) for sexual pleasure," the implication being that such touching is unwelcome. In concluding that ▮▮▮▮ claims are "credible," the panel does not conclude that "groping" took place. They prove neither that the alleged touching was not consented to, nor that it had sexual intent. By the principle of *mens rea,* in order to be found responsible for groping, I must have intentionally fondled the complainant in pursuit of sexual pleasure. The Panel's Report, therefore, does not find me responsible for groping. If they had pursued a conclusion—rather than merely assessing the complainants credibility—they would have been faced with ▮▮▮▮ admitted physical contact towards me, photographic evidence of her clinging to me, and the fact that I did not display any sexual intent towards ▮▮▮▮—before, during, or after the alleged groping.

**Bus Incident**

The panel, basing their finding on credibility, failed to take into account any of the numerous objections I provided to the witnesses' claims. ▮▮▮▮, cited as a significant witness, claimed I groped three women other than the complainants—stating there was no groping of the complainants—yet all the women on the bus were interviewed and none claimed either to be victim of or witness to groping. Any reasonable panel member would conclude that ▮▮▮▮ was deliberately manipulating and exaggerating facts, as his testimony contradicted those of *every other witness*. As I stated, this was likely, since he is ▮▮▮▮ roommate. Instead, he was cited as supporting ▮▮▮▮ claims. ▮▮▮▮ stated I was "wasted within minutes of the start of the bus ride," contradicting every other witness. At no point does the panel do its job and evaluate the credibility of the witnesses. More importantly, none of the witnesses claimed there was groping. How the Panel claim to make a fair finding if the witness accusations are selectively used only to support the complaints?

5

In the Supplemental Report response, my explanation was that my behavior towards ▮▮▮ ▮▮▮▮▮ and ▮▮▮▮▮▮▮ informed the assessment of "moving around between women" as sexual. Because the behavior described by the witnesses—consisting of sitting "close" to women and putting arms around them in a party environment—was common to the bus ride, not objected to, and is not at all sexual in nature, there had to be another explanation for these subjective characterizations. My argument was that the precise behavior subjectively characterized by these witnesses was not sexual or inappropriate. I am supported by ▮▮▮▮▮▮▮▮▮▮, who is a ▮▮▮, as well as ▮▮▮▮▮▮▮▮ and ▮▮▮▮▮▮▮▮. In totally circular reasoning, the Panel used those subjective accounts, and not factual accounts of behavior, to wrongly conclude that I had groped ▮▮▮▮▮▮▮. Moreover, for all the detail that everybody on the bus supposedly remembers, nobody says I physically interacted with ▮▮▮▮▮▮, and yet remarkably the panel concluded that it must have happened.

Despite the foregoing substantiations of my claims, the panel concluded in pejorative and biased remarks that my testimony was an "attempt to explain away or undermine the reports of witnesses," My consistent accounts were not deemed as evidence of credibility as had been cited by the panel as reason for their finding of a preponderance of the evidence, again an instance of selective enforcement that constitutes discrimination against me.

Moreover, the Panel again finds ▮▮▮▮▮▮▮ credible without giving a basis for their conclusions of a policy violation. Again, even accepting their findings of fact, their conclusions are baseless, rendering a penalty unjustified.

**Complaint of** ▮▮▮▮▮▮▮▮

The most appalling finding in this Report is that I groped ▮▮▮▮▮▮▮, because it has been completely disproven not only by witness accounts but also by her inconsistent account of the alleged incident. The report reads, "*The Panel notes that no witness reported seeing* ▮▮▮▮▮▮ *grope* ▮▮▮▮▮▮▮." Yet in her original complaint, ▮▮▮▮▮▮ claimed that the groping was "in view of others." Throughout the investigation and the hearing, she maintained that ▮▮▮▮ ▮▮▮▮ and ▮▮▮▮▮▮▮ had seen the entire interaction. She even said that ▮▮▮▮▮▮▮ indicated to her that he had witnessed wrongdoing. Yet, in their accounts, these witnesses *deny any groping*. Not only does the panel ignore this exculpatory evidence, but they *include* ▮▮▮ and ▮▮▮ as witnesses whose reports are consistent with ▮▮▮▮▮▮▮ account. The panel again cherry picks facts that will find me responsible but ignores the undeniable exculpatory nature of those facts. The Panel's selective use of evidence represents a clear breach of contract to Yale's UWC Procedures.

While the witness accounts are enough to exonerate me by preponderance of evidence, the inconsistency of ▮▮▮▮▮▮▮ account all but proves her allegations false. At first, she claimed I groped her breast and butt, but when the panel rightfully pointed out that it was impossible for ▮▮▮ and ▮▮▮ not to have seen this, she changed her story to state that it had been the side of her breast (also known as the armpit or ribcage) and the side of her butt (also known as the hip or upper high). She changed her story when faced with the fact that it was not credible. The Panel did not address this crucial fact in their Report. More important, the panel never addressed the fact that ▮▮▮▮▮▮▮ adjusted story did not include even the possibility of a policy violation. If, as she

6

alleges, my hands were so far to the side of her body that they would not be visible to someone directly across from her, they were not on her butt or breasts. The panel completely ignores this exculpatory point presented by █████. Moreover, only one week after this alleged incident, █████ went out of her way to come to New York and attend a party on my invitation, as shown in texts provided to the Fact-Finder. One month later, █████ invited me on vacation with her and █████. The Panel leaves this out, finds her credible, and ignores exculpatory evidence. Again, this represents breach of contract and biased, motivated reasoning from the Panel. Additionally, it represents gender discrimination against me, as if the genders were reversed such a finding would have been impossible.

As if the case against █████ were not convincing enough, she lied before the panel about the contents of the text messages she exchanged with █████ during the hearing. When asked about the inappropriate, derisive messages, she said they were only about "lunch plans." The Panel members stated that lying would incur disciplinary recourse, making me wonder why █████ lie was ignored by the Panel. The Panel found that the complainants were credible despite the offensive text messages, but gave no reasoning for this whatsoever. Moreover, the panel, administrators, and general counsel accepted the complainants' word without proof that there were no other messages exchanged. Given their willingness to lie before the Panel, there is no reason to believe them on this point. I implore you, Dean Chun, to look through the text messages they sent during the hearing and decide for yourself whether they compromise the credibility of the complainants.

As with the other complaints, the Panel assesses only the credibility of █████, not whether the complaints constitute a violation of Yale's policy. Crucially, they do not even specify the body part where they believe I touch █████. For the same reasons as the aforementioned claims,

**Hostile Environment Claims**

█████ stated before the panel that my alleged behavior, even if true, did not result in a hostile environment for her. Yet, the panel, which presumed my responsibility based upon the credibility of █████ accounts with her roommates and her friends as witnesses, further used this presumption to find for the creation of a hostile academic environment for █████.

Again, solely by determining that █████ is credible, the panel claims that I created a hostile academic environment for her. Nowhere do they assess how the environment she inhabited was shaped by the allegations, and whether that environment was hostile. It is hard to imagine that these allegations—even if true—had the effect that █████ claims, as I had no influence on her academic work, and her grades did not suffer. If interacting with me created a hostile environment for her, it is unlikely that she would spend time with me and invite me on vacation with her after the alleged incidents. Thus, the Panel neither demonstrates that █████ inhabited a hostile academic environment, nor that it resulted from interactions with me.

More important, according to Yale's policy, the creation of a hostile academic environment violates policy only if it is the result of "unwanted sexual advances." However, the Panel does not conclude that the instances described by █████ are "unwanted sexual advances." In fact, the

allegations ▮▮▮ describes are not advances at all. There is no indication that I intended to engage ▮▮▮ sexually or that any touching was intentional and for some sexual end. ▮▮▮ ▮▮▮ herself does not even claim that I made a sexual advance towards her. Without finding sexual advances, the Panel cannot conclude that I created a hostile environment. Again, the Panel's Report does not actually find a violation.

**Procedure**

Early in the semester, when I met with David Post and Aley Menon regarding the breach of confidentiality and retaliation by the complainants, Mr. Post and Ms. Menon disregarded my claims as inevitable. I cannot imagine the same response would be made to a complainant alleging the same behavior had been directed at her. Around campus, there were rumors documented in texts that I had been expelled for rape. I have since been maligned as a rapist as a result of these confidentiality breaches, significantly impeding my education. This was easily traceable to the complainants, yet when I explained this to Mr. Post and Ms. Menon, they said it was not provable and there was no recourse they could take.

The collusion by the complainants started with their efforts to "plant the seed" in the minds of their roommates and friends that they could form a group to make a Title IX complaint against me and use this collaboration to present a "pattern of behavior." ▮▮▮, as a ▮▮▮, made it clear she knew all the right administrators to involve and the buzz words to use when discussing me during her campaign to make sure "▮▮▮ is in hell" as she stated in her texts. The mere fact that the complainants were texting each other during the hearing was proof of their collusion and cause for a mistrial. I cannot help but point out the overlooked fact that ▮▮▮ father is a well-known faculty member at Yale and that ▮▮▮ parents are Yale alumni and her father a legal scholar. It seems that the panel and administrators' knowledge of who the parents of the complainants are in this matter influenced the willful denial by the panel of the complainant's collusion. David Post, a colleague of ▮▮▮ in the same field, was aligned throughout my investigation and adjudication in emails and meetings, and should have recused himself from the beginning of the process.

Furthermore, earlier during the hearing and prior to discovery of the texting between the complainants, my advisor became aware that the complainants were allowed to hear each other's testimony throughout the hearing. While I had agreed to the UWC's decision to treat the two filed complaints as one investigation and with one adjudication, the UWC never stated that the complainants would be allowed to hear each other's testimony throughout the hearing. My advisor heard one complainant use the exact same language as the other complainant in her allegations against me while speaking to the panel, prompting her to send a text to Lani Danilowitz to inquire. When we did not receive a response, we asked Aley Menon, who replied that yes, the complainants had full access to hear each other's statements. Basic Title IX hearing protocol procedures at Yale require that witnesses be excluded from the hearing room while another witness is speaking to the panel, which would include audio access.

The aforementioned egregious procedural errors during the hearing were documented by my advisors to general counsel at Yale, and I submitted this information in a complaint to the Department of Education Office for Civil Rights. During the UWC hearing to determine if I had

8

been responsible for the very serious allegations of sexual assault, I was (1) not provided with an agenda; (2) not provided with a hearing packet such as those provided to the panel; (3) not informed that the hearing was being recorded; (4) not asked my permission to be recorded; (5) not informed that the complainants were allowed to hear each other's testimony throughout the hearing; and (6) tasked with determining that the complainants had been texting each other throughout the hearing when the UWC did not address the breach in protocol. These procedural errors during the hearing are in addition to all those before and after which I have described.

After waiting 8 hours to go before the panel and respond to their questions, I decided to proceed even with the revelation of the compounding errors in protocol. I answered all of the panel's questions at length, and although I was consistent in my accounts, this factor was not weighed towards my credibility as the panel had done with the complainants. The outcome was a panel that determined I was responsible based upon ▇▇▇▇ enlisting ▇▇▇▇ to file a complaint, and further, ▇▇▇▇ instructing all of her witnesses to state that my behavior had been unacceptable.

**Conclusion**

In light of all these factors, plus the educational and moral growth I have undergone since the alleged incidents, I do not deserve a permanent notation on my educational record stating that I violated the Code of Student Conduct Sexual Misconduct Policy, requiring me for the rest of my life to explain that I was found responsible for sexual assault, because that is the determination for groping. If a sanction goes on my academic record, I will lose the internship I worked for years to obtain, and will never be able to pursue a career in professions which require a license or background check. While my response to you, Dean Chun, may not be in a court of law, the impact of a non-educational, punitive sanction will permanently alter the trajectory of my life.

Even accepting the Panel's findings of fact—which contradict numerous witness accounts, photographic evidence, and the complainants' own shifting accounts of the alleged events—there has been no conclusory finding of sexual misconduct. The only finding of the Panel is that the complainants are credible. Again, finding the complainants credible is not enough to find me responsible for sexual assault.

Additionally, even accepting the panel's conclusions, as somebody who does not drink alcohol or attend social events at Yale, I am not a threat to anybody on campus. Throughout this process and my time at Yale, I have shown the utmost regard for the wellbeing of the community and of others. The incidents alleged are not sexual advances, they are not pervasive, and they are not incidents I have been in a position to commit ever since.

For this and all of the reasons delineated in this letter, I urge you not to levy a penalty that will permanently destroy my life.

Sincerely,

▇▇▇▇▇▇▇▇▇▇▇▇