**EXHIBIT D**

**EXHIBIT Q**

January 3, 2018

**By Email**
Provost Benjamin Polak
Office of the Provost
c/o Aley Menon
aley.menon@yale.edu

                                        Re:      Appeal of █████████████████

Provost Polak,

      I submit this appeal in response to the letter I received dated December 27, 2017 from Aley K. Menon ("Ms. Menon"), Secretary, University-Wide Committee ("UWC") on Sexual Misconduct notifying me of the Decision (the "Decision") of Marvin Chun ("Dean Chun"), Dean of Yale College, finding me responsible for violations of the University sexual misconduct policy ("the policy") stemming from events that occurred in June and November 2016 alleged by complainants (the "Complainants") ████████ ("█████") and ████████ ("█████").

      Specifically, following a hearing held on November 27, 2017, the UWC hearing panel chaired by Michael Della Rocca, professor of philosophy, determined that I was responsible for violating Yale's sexual misconduct policy by:

        (1) groping ████████ in Paris in June 2016
        (2) groping ████████ on a bus to Cambridge, MA on November 18, 2016
        (3) groping ████████ on a bus to Cambridge, MA on November 18, 2016
        (4) engaging in sexually harassing conduct that created a hostile academic environment for ███████

The Sanction (the "Sanction") decided was that I should (i) be suspended from Yale for the spring semester 2018 and the fall semester 2018; (ii) be required to petition for readmission upon the end of the period of suspension; (iii) be required to receive sexual harassment training before my return to Yale or immediately upon my return; and (iv) continue to receive alcohol counseling upon my return to Yale.

      For the following reasons discussed in my appeal, I respectfully request that the Decision finding me responsible for violations of University policy be reversed and the Sanction vacated. There was no preponderance of the evidence to find me responsible for policy violations because in fact there was no evidence, and because I did not grope ████████ or ████████.

I am appealing the Decision on the following grounds, as stated in Section 7.7 of the UWC procedures: (1) procedural error that prevented the hearing panel or decision maker from judging the matter fairly, and (2) the discovery of facts that were not reasonably available to the appealing party prior to the UWC hearing and that refute the allegation of sexual misconduct.

## I. Procedural error that prevented the hearing panel or decision maker from judging the matter fairly

The investigation and hearing process in my case was replete with procedural errors including, but not limited to: (1) the lack of due process by allowing the Complainants to hear each other's testimonies; (2) the constitutional violation of dismissing the Complainants' texting during the hearing and placing the burden of proof on me to prove that collusion had occurred; (3) conflicts of interest that resulted in a biased adjudication; (4) lack of an official record of the hearing; (5) the failure of to properly investigate and collect all available evidence; (6) the failure to thoroughly interview all relevant witnesses; (7) the complete disregard of contradictions and inconsistencies in the Complainants' and witnesses' statements when making assessments of fact and credibility; (8) the improper inclusion of information in the investigation report which the hearing panel and decision maker relied upon as a determination of my responsibility; (9) failure of the University to provide a burden of proof using the preponderance of the evidence standard; (10) failure to define the policy violation; (11) lack of a rationale for the Decision and Sanction; and, (12) the imposition of an unduly harsh and unwarranted sanction of suspension. All of these procedural errors, individually and when taken together, unfairly and materially affected the outcome of my case.

### A. The Complainants were allowed full access to hear the entirety of each other's testimony during the hearing.

At no time, on the day of the hearing or prior to, was I informed that the Complainants would have full access to hear the entirety of each other's testimony during the hearing. In any other circumstances involving witnesses present for a hearing, witnesses would not be allowed to hear another witness' testimony prior to giving their own statements. At my hearing, it was not until more than five (5) hours after I had arrived for the hearing that my advisor and I were informed of this breach of common protocol.

As each Complainant addressed the hearing panel during her opening statement and as each responded to the panel's questions, the Complainants were allowed to listen to the witness testimony provided by the other Complainant. Standard protocol for any hearing is that it is improper for one witness to learn about another witness' testimony prior to his or her own testimony. The result was that ▮▮▮▮ and ▮▮▮▮ each tailored their responses to the panel to reflect information provided by the other. ▮▮▮▮, who addressed the panel after ▮▮▮▮, referenced ▮▮▮▮ testimony more than once by reiterating "what ▮▮ said." Moreover, when it was later discovered that the two Complainants had been texting each other during the hearing, the Complainants were allowed to hear each other's responses to the panel's questions regarding their egregious actions. This allowed them to hear each other's explanation of their communications, rendering a finding of collusion during the hearing impossible.

2

Having heard one of the Complainant's make a statement identical to the other Complainant who had just addressed the panel, my advisor sent a text message to Lani Danilowitz, UWC Coordinator, at 1:00 p.m. inquiring, "have the two witnesses been allowed to hear the other's testimony?" (Appendix "A") When my advisor did not receive a response, she requested to speak with Ms. Menon.  When we questioned Ms. Menon as to whether both of the Complainants could each listen to the other's testimony via speakerphone during the hearing, Ms. Menon responded affirmatively that the Complainants had full audio access at all times during the entire hearing. Ms. Menon dismissed our concerns and nothing was done to rectify the situation. Harold Rose ("Mr. Rose"), Yale Senior General Associate Counsel who acted as legal counsel to the UWC panel, suggested that because I had agreed to having the two complaints heard by one hearing panel that this somehow excused the UWC from following proper protocol with regard to sequestering witnesses.  While the Complainants could obtain confidential information about each other's complaints through the Fact-Finder's report and the hearing, the purpose of the UWC hearing was to adjudicate each allegation of policy violation separately, requiring each party to address the panel *only* about the alleged policy violation involving the individual complainant and the respondent. Allowing the Complainants to reference each other's statements to the panel to influence and further support her own individual complaint was prejudicial, denying the panel and decision maker the opportunity to adjudicate the charges against me in a fair and impartial manner.

### B. The Complainants exchanged text messages with one another during the hearing.

After learning that the Complainants had been given full access to each other's testimonies during the hearing, I discovered through questions I had submitted to the panel that the Complainants also had been exchanging text messages with each other throughout the hearing.



I had requested that the hearing panel ask ▇▇▇▇▇▇, *"Have you exchanged any text messages with* ▇▇▇▇▇▇ *since the start of this hearing today?"*

After a long hesitation, ▇▇▇▇▇▇ responded, *"Yes."*

My follow up question was, *"If yes, what did you discuss in your texts?"*

▇▇▇▇▇▇ responded that she sent texts *"talking about dinner plans for tonight."*

Regarding ▇▇▇▇▇▇, ▇▇▇▇▇▇ stated, *"She is not doing well. I was comforting her."*

The hearing chair then asked, *"Was there a discussion of the contents of hearing?"*

There was a long silence. ▇▇▇▇▇▇ (dishonestly) stated, *"We made one comment about his testimony."*

The response by the UWC panel and administrators was to request that the Complainants provide copies of the texts they had exchanged. This was voluntary and the panel had no way of knowing how many texts had been deleted or excluded from those proffered by the Complainants. In fact, the texts stated that one of the Complainants had also been on Snapchat all morning, involving messages exchanged with others that could not be retrieved. In further evidence to the

3

absurdity of the hearing, ▮▮▮▮ was asked by the hearing chair about the timing and nature of her texts while ▮▮▮▮ listened to her answers. Had the two contradicted each other, we could have discovered collusion, but the protocol violations made that impossible. At 2:34 p.m. my advisor sent an email to Ms. Menon and David Post declaring, "**For the record, due to the texting between the complainants, the credibility of both parties and the hearing has been compromised. This constitutes a mistrial.**"

The response by Ms. Menon and Mr. Rose was to present me and my advisor with copies of the Complainants' text messages that were exchanged between the time period of 12:30pm to 1:14 p.m., as if to say this was sufficient, and Mr. Rose requested that we provide him with evidence from the text messages to support our assertion of collusion by the Complainants. The mere fact that the Complainants exchanged texts during my hearing was an appearance of impropriety so great that nothing can remedy the significant constitutional violations that occurred. In light of the foregoing, even upon nullification of the hearing, a re-hearing would never bring back the purity originally intended for the hearing now that the Complainants tainted the process.

In her response to the final report, ▮▮▮▮ dismisses her texting during the hearing as "immaturity" and "stupid messages and nothing more" rather than accepting responsibility for causing a mistrial by her own and ▮▮▮▮ deliberate actions. ▮▮▮▮ makes deceitful claims that she "never intended to get sympathy through illness from the panel" when she sent texts stating that she wanted to "puke while they were questioning [her] just for dramatic effect." ▮▮▮▮ says in her response statement that her texting during the hearing was to "destress" and then she goes so far as to state there was *a theme* to the Complainants' texts: encouragement. ▮▮▮▮ argues that my objection to her texting with ▮▮▮▮ during the hearing was an attempt to "tarnish [their] reputations" evidencing her lack of responsibility for the detrimental impact of her actions.

The Complainants, who each submitted a formal complaint against me within minutes of each other in September 2017 from alleged events occurring more than a year prior, adamantly denied any aspect of collusion throughout the investigation and hearing. Despite the foregoing, ▮▮▮▮ – who met with the panel after ▮▮▮▮ – repeatedly referred to ▮▮▮▮ testimony. ▮▮▮▮ stated her reason for filing a report was "as ▮▮ said, this person has done me wrong, my friends wrong. I have an obligation as a feminist and a peer to say something. ▮▮ mentioned we could do this as a group of people." These comments were in reference to ▮▮ ▮▮ earlier statements to the panel that ▮▮▮▮ had tried to "plant the seed in their heads" when attempting to convince others to file a complaint against me.

In addition to their texting one another during the hearing, both ▮▮▮▮ and ▮▮▮▮ *identically* stated in their individual responses to the final report that their texting during the hearing was simply "*a moment of weakness.*" Indisputably, ▮▮▮▮ and ▮▮▮▮ have colluded in their actions against me from the moment they filed their formal complaints within minutes of each other; to providing the Fact-Finder with a list of their roommates and friends as witnesses whom they had "planted the seeds in their heads" to witness against me; to exchanging text messages throughout the hearing; and finally, to both ▮▮▮▮ and ▮▮▮▮ collaborating on their responses to the panel's report by stating their collusion during the hearing was simply "*a*

4

*moment of weakness."*

### C. There was a conflict of interest at Yale which resulted in a biased adjudication.

The Department of Education ("DOE") Office for Civil Rights ("OCR") September 2017 "Dear Colleague Letter" states, "*A person free of <u>actual or reasonably perceived conflicts of interest and biases</u> for or against any party must lead the investigation on behalf of the school. Schools should ensure that institutional interests do not interfere with the impartiality of the investigation.*" (emphasis supplied)

In addition to my objection to the gender biased Fact-Finder (Section "E" of this letter), I reported to David Post and to the decision maker a clear conflict of interest which existed throughout the investigation and hearing. I stated that because ▮▮▮▮▮▮▮▮ father is a well-known faculty member at Yale and ▮▮▮▮▮▮▮▮ parents are Yale alumni and her father a legal scholar, the UWC would have to take steps to mitigate the existence or appearance of conflicts of interest. It was apparent that the UWC hearing panel and administrators' knowledge of who the parents of the Complainants were in this matter influenced the willful denial by the UWC of the Complainants' collusion, despite clear evidence to the contrary. David Post, a colleague of ▮▮▮▮▮▮ in the same field, was aligned throughout my investigation and adjudication in emails and meetings, and should have recused himself from the beginning of the process. On the day of my hearing, I was told by Ms. Danilowitz that he was not present. Suddenly, about halfway through the hearing, I saw him in a room close to the hearing, next to an intercom through which he could listen to the hearing. Why did the UWC decline to inform me he was present, contrary to what Ms. Danilowitz had told me? Why did he feel the need to join the hearing several hours after it had started? In what capacity was he involved in the adjudication? As someone in the same field as ▮▮▮▮▮▮ father, Mr. Post could not risk reputational or professional harm by finding against the Complainants. His involvement throughout the investigation—coupled with lack of clarity surrounding his involvement in the hearing—leads me to believe his conflict of interest biased the Panel. He denied my request for a replacement of the biased Fact-Finder and he allowed the hearing to continue even after he was informed by Mr. Rose that the Complainants' had been communicating throughout the hearing. The September 2017 DCL states, "*Schools are cautioned to avoid conflicts of interest and biases in the adjudicatory process and to prevent institutional interests from interfering with the impartiality of the adjudication.*"

The UWC completely ignored the impropriety of the *actual or reasonably perceived conflicts of interest and biases* that permeated the investigation and adjudication of my case, allowing institutional interests to supersede and interfere with an impartial process, resulting in an erroneous outcome.

### D. The hearing was not recorded and there was no official record of the hearing available to the decision maker, preventing him from judging the matter with a full and fair record, and denying him access to new, relevant and prejudicial information disclosed during the hearing.

5

Upon being seated at the table before the hearing panel to give my opening statement, I was not provided with an agenda, nor was I provided with the documents being considered by the hearing panel. I did not have copies of the Fact-Finder's reports, UWC policies and procedures or any of the addendums. I was not provided with a hearing packet, such as each panel member had in front of him or her, for reference and to address the panel, preventing both myself and the panel from understanding references made to documents during the hearing.

Critically, I was never informed that the hearing was not being recorded, as one would expect of an important, contested hearing. I only learned that a recording was not made of the hearing when I requested an audio copy or transcript of the hearing from Ms. Menon for my appeal. Contrary to policy governing the Yale University Tribunal, "a disciplinary body that has jurisdiction over students in all twelve schools of the University, including students in Yale College," as defined on Yale's website, the Tribunal's policy provides that at a hearing, "A transcript or recording shall be made and furnished to the parties." Additionally, "The Disciplinary Procedures of the Executive Committee of Yale College" state, "The secretary shall keep a comprehensive record of minutes from each meeting of the Executive Committee…They should reflect a full and faithful record of the statements of the witnesses and substance of the discussions and decisions of the committee."

The UWC Procedures, however, state at footnote "[19] *The minutes of a UWC hearing consist of a protocol annotated to indicate the time at which each phase of the process started and ended. The minutes do not record statements, testimony, or questions.*" In fact, there is no official record with the details of what occurred at my hearing.

The OCR September 2017 "Dear Colleague Letter" states that, "*When a school applies special procedures in sexual misconduct cases, it suggests a discriminatory purpose and should be avoided.*" Here, Yale has discriminated against me as the accused by employing "special procedures" for sexual misconduct proceedings, proceedings by which I could be expelled. The UWC policy explicitly does *not* create a record of the hearing via audio recording or transcript of the statements, testimony or questions from the hearing.

Importantly, the decision maker does not attend the hearing and he was not provided with an audio recording or a transcript as evidence regarding the significant constitutional violations of the Complainants' collusion during my hearing. Incredulously, *there is no official record at all of my hearing.* Dean Chun, who has never met nor spoken with me, was denied critical information and evidence necessary for a Decision he made which, if sustained, will cause me irreparable academic and professional damage.

### E. **The Fact-Finder was biased against me as the male accused in conducting the investigation and interviews which resulted in a flawed and biased Fact-Finder's report.**

The Fact-Finder was biased against me as the male accused from the inception of her investigation and during the interviews she conducted, which resulted in a prejudicial Fact-Finder's report, preventing the hearing panel and decision maker from being provided with information that was impartial and fact-based. UWC Procedures, Section 7.3 Fact Finder states:

6

*"The UWC Chair will appoint an impartial fact-finder to assist in the investigation of the allegations."* And, *"Impartiality of the Fact-Finder: Clarified the procedures to reflect the UWC's existing practice of appointing impartial fact-finders to assist in the investigation of a complaint. The essential qualifications for serving as a fact-finder are 1) impartiality; and 2) the appropriate expertise and training in investigating allegations of sexual misconduct."*

a) The Fact-finder in my case <u>met with the Complainants for a total of seven (7) interviews:</u> four (4) with ▇▇▇▇ and three (3) with ▇▇▇▇. <u>I was interviewed only two (2) times</u> by the Fact-Finder to respond to the numerous and widespread allegations that had been made by the Complainants.

b) <u>Prior to my initial interview, the Fact-Finder had already interviewed the two (2) Complainants and eight (8) of the witnesses</u>. It was not possible for the Fact-Finder to carry out a fair and impartial investigation after she had interviewed ten (10) witnesses with their accounts of the alleged incidents without ever interviewing me. It is unlikely that a UWC fact-finder has *ever* conducted an investigation for weeks without hearing from the respondent. In fact, as a demonstration of her deceitful tactics, the Fact-Finder pretended not to know anything about the alleged incidents during our first interview although she had already heard ten (10) "witness" accounts.

c) After interviewing me for the first time, **the Fact-Finder did not contact the six (6) witnesses** she had previously interviewed to discuss my account. These witnesses included ▇▇▇▇, ▇▇▇▇, ▇▇▇▇, ▇▇▇▇, ▇▇▇▇ and ▇▇▇▇, all of whose interview summaries were cited by the hearing panel to find me responsible. The Fact-Finder questioned these witnesses only according to the Complainants' allegations; critically, the Fact-Finder *never* followed up with those witnesses after having interviewed me.

David Post had stated in an email to me that the interview with the Fact-Finder would relate to one specific alleged incident on Nov. 18, 2016, yet in our first interview the fact-finder went far afield of that incident, referring to allegations of which I had not received notice. The Fact-Finder's decision to press me on topics of which I had not received notice constituted a direct violation of both the requirement for notice of allegations in Title IX guidance and of a specific stipulation the UWC had made in David Post's email to me.

Furthermore, **the Fact-Finder repeatedly solicited irrelevant character evidence from the witnesses**. The UWC Procedures, Section 7.3 also states: *"The fact-finder will not consider information that is provided solely to attest to a party's character."*

However, the Fact-Finder included unrelated hearsay and derogatory character statements about me in her report that had nothing to do with the allegations. The female complainants had no such descriptions of their character. For example:

- The Fact-Finder wrote, "Exhibit K is a text from some of the other Yale students saying that they could not get into the club because they did not have reservations. ▇▇▇▇

7

<ul>
<li>

later heard that ▇▇▇▇▇▇▇▇▇▇ had been very belligerent with the bouncer at the club, although she did not recall seeing this behavior and was not certain she and ▇▇▇▇ were at the club at that point" (Pg. 4, footnote 5, emphasis supplied). Nothing in this statement is factual. It is completely hearsay and contradicts the factual evidence provided in the text message.

</li>
<li>

The Fact-Finder wrote, "▇▇▇▇▇▇ told me that in subsequent days and weeks there were many conversations among the bus passengers about all the groping by ▇▇▇▇▇▇▇▇ that had occurred on the bus. It was a general topic of conversation and it was difficult for her to differentiate what she heard from whom on any given date" (Pg. 6, footnote 9). This is entirely *hearsay*. The Complainant cannot name one witness of the "many conversations" and there is nothing factual to this statement which was included by the Fact-Finder in the report; it is meant only to smear me.

</li>
<li>

"He pulled so hard that the next day she checked for bruising (there was none)." The Fact-Finder does not inquire why the Complainant waited until the next day to look at her arm, and if she had stated, regarding a bruise, that there "was none" why is this inflammatory statement included in the report? It appears to be a response to a leading question posed by the Fact-Finder.

</li>
</ul>

As reported by my advisor and myself immediately after the first interview, the Fact-Finder was gender biased and predisposed to the assumption that as the accused male I must be responsible for the allegations against me. My request for a new Fact-Finder was denied by David Post, who continued to oversee my investigation although he had a clear conflict of interest.

### F. **The Fact-finder and hearing panel improperly discussed a prior informal complaint during the investigation and hearing, unfairly prejudicing the entire panel and decision maker.**

The UWC Procedures, Section 7.4 Hearing states, *"The panel may not take into account as evidence of culpability previous accusations of other acts of sexual misconduct that did not result in formal discipline or the fact that a criminal investigation or prosecution is pending in relation to the events complained of."*

On Monday, October 16, 2017, my advisor contacted Ms. Menon to inform her that during the initial interview that same afternoon the Fact-Finder had violated my right to a fair and impartial investigation. My advisor wrote, "The meeting with [the Fact-Finder] was not a neutral fact-finding interview but instead a biased interrogation of an accused student who clearly was not presumed innocent. We object to the continuance of [this Fact-Finder] as the investigator assigned to investigate the allegations against ▇▇▇▇, and we look to you to provide ▇▇▇▇ with a fair and impartial investigation by immediately replacing [this Fact-Finder] with an unbiased investigator."

On Tuesday, October 17, 2017, I sent the same information in an email to UWC Chair David Post explaining that the fact-finder had not been impartial, and had violated two specific stipulations made by the UWC. It is a reasonable expectation that the Fact-Finder would hear from the respondent prior to interviewing any witnesseses, and I expect that this is the standard course

8

of UWC investigations. However, the Fact-Finder in my case acted as a prosecutor compiling evidence against me when she interviewed the Complainants' hand-picked witnesses (often roommates and best friends) before bothering to interview me, the respondent. This violated basic fairness and impartiality guaranteed in the UWC Procedures.

That same day, October 17, 2017, David Post responded via email, *"In regard to informal Title IX complaints, [the Fact-Finder] told me that she raised that subject because of its possible relevance to the delay between the alleged incidents on the bus and the filing of formal complaints with the UWC. UWC panels do want to understand the reason for such delays, and it is fairer to the respondent for that issue to be addressed in the fact-finder's report, rather than to have it arise for the first time at the hearing."* In fact, the existence of a prior informal report should not have been included in the report nor allowed to be discussed with the panel at during the hearing.

Despite the foregoing, and in direct contradiction to the emails I had sent to Ms. Menon and David Post specifically stating that the Fact-Finder had improperly interrogated me regarding a prior informal complaint, on October 18, 2017 the Fact-Finder interviewed ███████ and on October 19, 2017 the Fact-Finder interviewed Dean Nilakshi Parndigamage, improperly questioning both as witnesses about the informal complaint. Summaries of their interviews were included in the Fact-Finder's report.

Throughout the fact-finding process and during the hearing, I was persistently questioned on a brief meeting I had had with Title IX Coordinator ███████ in November 2016 in which she made no references to Yale policy violations. The Fact-Finder interviewed ███████ about the specifics regarding the informal report that had been made, and she also interviewed Dean Parndigamage regarding a meeting I had with the Dean about the same informal report. The Fact-Finder stated in her first interview with me, regarding ███████, "You knew what her concerns would be," implying that I was responsible for misconduct due to this meeting, in direct violation of Yale's stated policy. She then asked me if I had read the Sexual Misconduct manual, and went on to quiz me on sexual misconduct, rather than the facts of the case.

During the hearing, panel member Airenakhue Omoragbon introduced a protracted, persistent line of questioning regarding my knowledge of the Title IX office, attempting to prove that I would have known this informal meeting inculpated me in sexual misconduct. Panel member Margit Dahl further grilled me on the nature of this meeting. Because such a meeting would not inculpate me, the procedures explicitly disallow such considerations as a violation of due process. Both the Fact-Finder and the panel members violated Yale's express policies on disclosing and consideration of previous accusations that did not result in formal discipline.

### G. The hearing panel and decision maker failed to use the preponderance of the evidence standard.

The OCR September 2017 "Dear Colleague Letter" states, *"In every investigation conducted under the school's grievance procedures, the burden is on the school—not on the parties—to gather sufficient evidence to reach a fair, impartial determination as to whether sexual misconduct has occurred and, if so, whether a hostile environment has been created that must be*

9

*redressed."* It is imperative that <u>the burden of proof is on the University</u> to determine (1) <u>whether sexual misconduct has occurred</u>, and furthermore (2) <u>whether a hostile environment has been created (3) that must be redressed</u>.

Regarding the alleged incident in Paris in June 2016, I provided photo evidence of ▓▓▓▓▓ repeated attempts to be physically intimate with me without my consent. She hung onto to me with her arms around me, making provocative gestures for the photograph. During the hearing, ▓▓▓▓▓ told the panel that "drunk men follow women if they are being happy and playful" as she described her advances towards me as we skipped down the street (which she later denied during the hearing, directly contradicting her own account). There was a group of people following us, taking photos, and no one saw *any* groping. As is the case with both of ▓▓▓▓▓ allegations, in Paris and on the Harvard-Yale bus, there were no witnesses because I did not grope ▓▓▓▓▓. The same was true for ▓▓▓▓▓. Although there were approximately 20 people on the Harvard Yale bus, there were no witnesses who saw ▓▓▓▓▓ being groped by me because this did not happen. In fact, the witness ▓▓▓▓▓ selected as having seen the entire encounter himself denied any groping. There was no preponderance of the evidence to conclude that I had violated Yale's sexual misconduct policy, and <u>the hearing panel failed in their burden of proof by a preponderance of the evidence to prove that sexual misconduct had occurred.</u>

▓▓▓▓▓ allegation that my behavior created a hostile environment was entirely unproven. ▓▓▓▓▓ specific complaint was that I created a hostile environment "for countless women at Yale" was vague and unsubstantiated. No other woman, not even ▓▓▓▓▓, claimed I created a hostile environment. ▓▓▓▓▓ claim that women are "in fear and discomfort because of his behavior" was also unproven, and were in direct contradiction to ▓▓▓▓▓ continual friendly interaction with me after the alleged incidents. No one other than ▓▓▓▓▓ claimed to be in "fear and discomfort" and critically, ▓▓▓▓▓ provided no documentation to support her claims of a hostile environment: no mental health records, no evidence of a negative impact on academic progress or her grades, and no witnesses to the allegations. Despite the foregoing, the hearing panel reached a conclusion that my conduct "*had the effect of creating a hostile environment for* ▓▓▓▓▓" and <u>not by a preponderance of (any) evidence that (2) a hostile environment had been created and (3) that it must be redressed</u>. As repeatedly stated, I have had no contact with the Complainants in nearly a year.

The UWC panel repeatedly cited the Complainants' consistency in their reports as reason to confirm their credibility. ▓▓▓▓▓ and ▓▓▓▓▓ reports were not consistent. They made vague allegations, and continually altered the allegations over the course of the investigation. Moreover, the UWC panel discriminated against me by not applying the consistency standard to me. My accounts of the alleged incidents were also consistent, yet the UWC panel chose to malign my character by stating my "attempt to explain away or undermine the reports of witnesses" was "not convincing." The double standard used by the panel in assessing credibility evidenced a lack of presumption of innocence in their attempt to place the burden of proof on me, the male accused of sexual misconduct, rather than on the University where it properly belonged.

**H. <u>The UWC sexual misconduct policy lacks a definition for the violation for which I was found responsible, forcing the hearing panel and decision maker to apply a vague and overbroad policy, resulting in an erroneous outcome</u>.**

10

Although "Yale's Sexual Misconduct Policies and Related Definitions" fails to define "groping," Ms. Menon stated in an October 12, 2017 email to me: "*Groping' is not defined because, in this context, it has a common and clearly understood meaning: to use one's hands to grab, touch, or feel another person's genital area, buttocks, or breast without consent.*" This "definition" of policy violation was arbitrary, it was not stated in the UWC procedures or policies, and it differs from both the "Merriam-Webster Dictionary" definition and legal definitions across the United States, although no U.S. state classifies "groping" as sexual assault, unlike Yale sexual misconduct policy which includes groping with rape as sexual assault.

Despite whether Ms. Menon's ad-hoc definition was applied during the course of the investigation, the UWC Procedures state, "Within 10 days of the final hearing session, the panel will complete a report, *setting out* its findings of fact, its conclusions as to whether those facts constitute a violation of University policy, and its recommended penalty, if any." The panel does not "*set out*" (policy) how the allegations constitute groping. As I stated in my letter to Dean Chun, the only assessment made in the panel's report pertains to the credibility of the complainants, not the nature of the complaints. A judgment of credibility is not tantamount to a finding of responsibility, nor is credibility criteria for evidence. My credibility determination was based in part, on finding that the evidence gathered "corroborated" the Complainants' accounts. Credibility is not the determining factor under Yale's preponderance of the evidence standard. In fact, questions of consent, force, and sexual intent or desire never came up during the course of the investigation or the hearing. By failing to probe these topics and then delineate how exactly the allegations fit the definition of "groping" they choose to apply, the panel committed a serious procedural error.

Notably, the lack of a definition for "groping" within the University's sexual misconduct policy, and the term's inclusion as sexual assault, resulted in the panel applying an unconstitutionally vague and overbroad policy, rendering an erroneous outcome. A policy is unconstitutionally vague if members of the University community must guess as to what is prohibited. Specifically, the policy may be void for vagueness if it fails to give fair notice of the nature of culpable conduct or if the policy so broadly delegates interpretation that arbitrary, discriminatory, and overzealous enforcement result. The failure of Yale to articulate a clear definition of "groping" while nonetheless finding me responsible for engaging in such conduct was clearly a violation of my right to fair process.

### I. The decision maker did not provide a rationale for the Decision and Sanction.

The decision maker's Decision lacked any stated rationale for his determination and final Decision and Sanction. The arbitrary and capricious finding of my responsibility had been pre-determined, and just like the rushed hearing, I was dismissed without substantiation. The decision maker's due diligence was not done in his report. The Decision lacked any analysis of what had been recommended at the panel level. There was no data regarding sanctions from similar matters. Ms. Menon, who had received my letter to Dean Chun on Friday, December 22, 2017 (Christmas weekend) received the Decision from Dean Chun on Tuesday, December 26, 2017. Significantly, had Dean Chun decided not to deviate at all from the UWC panel's recommendation, according to policy, he would have had to meet with the panel before providing me with his Decision:

> *"Based on extensive feedback from the University community, and to reflect the UWC's current practice, the procedures were modified <u>to require the decision maker to meet with members of the panel to discuss the proposed decision, if the decision maker contemplates materially modifying the panel's conclusions or recommendations</u>. This is intended to ensure that the decision maker has a thorough understanding of the UWC panel's deliberations, conclusions and recommendations. (UWC Procedures, Section 7.5)"*

Given the holidays and University closure for the week, it would require reconvening the panel in January if the decision maker wanted to consider a different finding or sanctions other than those recommended by the panel. Clearly, this was easily avoided with a one-page letter by the decision maker effectively "rubber-stamping" the hearing panel's unsubstantiated Decision. The decision maker provided no rationale for upholding the flawed recommendation by the hearing panel in a rush by the UWC to finalize my suspension before the start of the next semester.

## II.  The discovery of facts that were not reasonably available to me prior to the hearing and that refute the allegation of sexual misconduct.

The discovery of facts that were not reasonably available to me prior to the hearing included: the additional investigation undertaken by the Fact-Finder and her resulting Supplemental Fact-Finder's report, which included interviews with ███████, ███████ and ███████; the text messages between the Complainants during the hearing; and additionally, in the Complainants' responses to the final report by the panel, both of the Complainants were allowed to introduce new information that was not in the Fact-Finder's report, without any objection or redaction by Ms. Menon or David Post before forwarding the Complainants' responses to Dean Chun.

For example, in her written response to the final report, ███████ stated more than once that her motivation for making a formal complaint against me was because of prior experiences she had with other men. This was new information not shared with the panel, yet provided to the decision maker, and without giving me the opportunity to respond. ███████ stated, "In September 2016, a few months before the Harvard Yale bus, I had an interaction with a man that left me feeling vulnerable and hurt. As I told the panel, after the incident I rejected physical contact with men and refused advances in an attempt to regain control over my physical body." ███████ did not discuss "an interaction with a man" at the hearing, and most certainly, not how after this incident unrelated to me, ███████ began her discussions with ███████ about filing a complaint against me. Both ███████ and ███████ repeatedly mentioned how their complaints against me were for all the wrongs they had suffered by many males they had known.

After the hearing took place, the UWC Chair decided to reopen the investigation, and the Fact-Finder interviewed witnesses without notifying me. If I had been notified that the Fact-Finder was continuing her investigation after the hearing, I would have requested an interview with the Fact-Finder to respond to the new information provided by the two additional witnesses. As she had done in the beginning of the investigation, the Fact-Finder spoke only to the witnesses and did not follow up with me to allow me to respond. My response was only allowed in writing *after* the

12

panel and decision maker had read the Fact-Finder's supplemental report, which was filled with responses to the leading and biased questions she had asked the additional witnesses.

The motivation by the Complainants to punish me for all the wrongs they had suffered by other men, and the extent of the collusion by the Complainants which included texting during the hearing, were facts not known to me prior to the hearing and which I believe speak to the credibility of the Complainants, which was ultimately the criteria that the panel invoked to support their burden of proof. This new information prevented me from responding properly to the accusations, and prejudiced the Panel against me.

The finding of my responsibility for violations of the sexual misconduct policy was arbitrary and capricious. A review of the key evidence disproving the sexual misconduct allegations against me was ignored by the Fact-Finder, and furthermore, the hearing panel accepted the Complainants' inconsistent statements over the truth, which is that I never groped the Complainants. It was clear that the hearing panel improperly placed the burden of proof on me to prove that I was not responsible for the allegations made against me.

### **Breach of Confidentiality and Retaliation by the Complainants**

The Complainants' breach of confidentiality tainted the witnesses' statements and created a hostile environment for me on campus. UWC Procedures require that, *"All members of the Yale community who are involved in a matter before the UWC are expected to maintain the confidentiality of its proceedings and the information obtains for those proceedings."*

I had raised concerns early in the process about the Complainants breaching the confidentiality policies of the University. With my college dean, Dean Parndigamage, present on Sep. 22, 2017, Ms. Menon told me that UWC proceedings and information regarding those proceedings were confidential and that I could only discuss them with my attorney and my family. She told me there would be disciplinary consequences if I did not follow this. In November of 2017, prior to the hearing and the completion of the Fact-Finder's Report, I received multiple reports that the Complainants had told friends that the UWC would likely expel me from the university, and that I had committed sexual assault.

When I notified Ms. Menon and David Post on Nov. 13, 2017 (via email and in person) that the Complainants had retaliated against me by spreading misinformation about the UWC process and disciplinary penalties, they refused to investigate the matter and stated that the Complainants were allowed "to talk about their experiences." This evinced a double standard for the confidentiality policy, as Ms. Menon had explicitly issued a verbal gag order against me, but also ignored that specific nature of my complaint which regarded UWC proceedings, not the Complainants' experiences. The misinformation spread by the Complainants was not merely a confidentiality breach, it was retaliation, and if gender roles were reversed it would have been addressed. The UWC's lack of response and failure to investigate the Complainants' retaliation against me demonstrated that the UWC expects men to maintain confidentiality, while they allow women to breach it.

According to the U.S. Department of Justice Title IX Legal Manual, "*Retaliation protections are designed to preserve the integrity and effectiveness of the enforcement process itself. Because of this purpose, <u>the merits of any underlying complaint of sex discrimination are irrelevant in assessing a retaliation complaint</u>. The prohibited conduct is the act of retaliation itself.*"

Administrators at Yale failed to enforce the requirements of Title IX and failed to protect my federal privacy rights when they effectively ignored my reports of the retaliation against me by students at the University. Worse, the resulting hearsay incited by the retaliation was included in the Fact-Finder's report, ultimately weighed as "information" informing the panel's decision that I was responsible for violations of the policy. In effect, by spreading rumors expressly prohibited by the University, the Complainants were able to force hearsay against me into UWC documents at the behest of Yale Title IX administrators.

On September 7, 2017 Department of Education Secretary Betsy DeVos proclaimed that, "Due process is the foundation of any system of justice that seeks a fair outcome. Due process either protects everyone, or it protects no one." Ms. DeVos stated that "one person denied due process is one too many." Most importantly, in addressing the inequities that have been prevalent at institutions which have failed to provide due process in their Title IX policies and procedures, Ms. DeVos stated, "Every student accused of sexual misconduct must know that guilt is not predetermined" and that "any school that uses a system biased toward finding a student responsible for sexual misconduct also commits discrimination."

### Procedural Error in Determination of Sanction

The final determination by the decision maker to impose sanctions that are severely disproportionate to the alleged offense was a procedural error in violation of Title IX. The September 2017 "Dear Colleague Letter" states that, "*Any disciplinary decision must be made as a proportionate response to the violation.*"

During the thirteen months that elapsed between the alleged incident and the end of the investigation, at no time did the University find the need to impose an interim suspension or other restrictions because I was not a threat to anyone nor did I create a hostile environment on campus. It was therefore a groundless Decision that the sanction of immediate suspension be imposed.

The "Yale University Reports of Complaints of Sexual Misconduct" by Stephanie Spangler detail the actions taken and penalties imposed by the UWC. According to the report, during the first twelve (14) months of between July 2016 and July 2017, there were three (3) Yale College respondents disciplined by the UWC. The three (3) respondents were all found responsible for <u>sexual penetration without consent, and received the same penalty of suspension that I have received</u>. In effect, the Decision) to impose a Sanction suspending me for two semesters (based on credibility without evidence equates alleged groping (brief contact over clothing) to sexual penetration without consent, i.e. rape, without distinction.

The arbitrary and capricious Sanction handed down is unduly harsh, and unsubstantiated.

14

  In light of all the factors that denied me a fair and impartial hearing, plus the educational and moral growth I have undergone since the alleged incidents in November 2016, I do not deserve a permanent notation on my educational record stating that I violated the Sexual Misconduct Policy, requiring me for the rest of my life to explain that I was found responsible for sexual assault, because that is the determination for groping. If forced into suspension from Yale, I will lose the ███████ I worked for years to obtain, and will never be able to pursue a career in professions which require a license or background check. While my appeal may not be in a court of law, the impact of a non-educational, punitive sanction such as suspension will permanently alter the trajectory of my life.

  For all of the reasons delineated in my appeal, Provost Polak, I implore you to reverse the wrongful Decision and vacate the Sanction imposed that will permanently destroy my life.

                 Respectfully,

                 ██████████████

iMessage with ▓▓▓▓▓▓▓▓▓▓
11/27/17, 10:06 AM

> Can the speaker identify by name
> We do not know who is asking the question

I will pass the message on

> Thanks

Yes of course

Better?

> Perfect!!
> actually they have stopped identifying

I will let them know my apologies

> thanks again

My pleasure

11/27/17, 1:00 PM

> have the two witnesses been allowed to hear the other's testimony?

Delivered