**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| JOHN DOE | : | CIVIL ACTION NO. |
| | : | 3:18-cv-00110-JCH |
| PLAINTIFF | : | |
| | : | |
| v. | : | |
| | : | |
| YALE UNIVERSITY AND YALE UNIVERSITY | : | |
| BOARD OF TRUSTEES | : | |
| | : | |
| DEFENDANTS | : | JANUARY 23, 2018 |
| | : | |

**<u>DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER</u>**

**I. <u>Factual Background.</u>**

The facts of this case are detailed in the two fact-finder's reports and the report of the UWC Panel which were filed by the plaintiff as Exhibits H, J and M in this matter. A reading of those exhibits reveals that the plaintiff in this matter engaged in improper behavior with female students on three separate occasions, while he was highly intoxicated.

After hearing all of the evidence, the UWC Panel concluded that the plaintiff had violated Yale's Sexual Misconduct Policy and recommended to Dean Marvin Chun that the plaintiff be suspended for two semesters, that he be required to petition for readmission at the end of his suspension, that he be required to receive sexual harassment training, and that he continue to receive alcohol counseling upon his return to Yale. The findings and recommendations, as well as the underlying documentation were all reviewed by Dean Chun,

and he accepted the findings and the recommendations of the UWC Panel.  Thereafter, the plaintiff appealed this decision to Yale's Provost, and the appeal was denied.

Both complainants reported that they were the victims of unwanted contact during a bus trip to Cambridge, Massachusetts on November 18, 2016.  One of the complainants reported that during the bus trip, the plaintiff sat down next to her stating, "I want to fuck you," as he groped her breast and buttock.  The other complainant reported that she too had been groped by the plaintiff on the bus.  Plaintiff's moving papers suggest that there was no corroboration of the plaintiff's conduct, despite the fact that there were many other people on the bus.  This is simply untrue. [1]Eleven different students in addition to the complainants reported that the complainant, who was highly inebriated, was inappropriately touching a large number of women on the bus.  Both male and female students reported on the plaintiff's extreme intoxication and his inappropriate behavior.  These statements included the following:

- A male student reported that he observed that the plaintiff would get up and go over to a woman who was sitting alone, sit down next to her, and either put his

---

[1] Similarly, the plaintiff has made an allegation about Professor David Post that is completely unfounded. The plaintiff has claimed that Professor Post should not have served in his supervisory role as Chair of the UWC in this case because of a "conflict of interest." The basis for that claim is the statement that Professor Post and the father of one of the complainants are professors at Yale in the same department.  As will be demonstrated, if the Court grants a hearing in this case, that is simply untrue.  Both are professors at Yale University, but they are not in the same department, nor do they share any assignments or research interests.  Indeed, Professor Post has no recollection of ever speaking with the father of the complainant. It should be noted, in any event, that Professor Post did not serve on the UWC Panel and therefore did not participate in the hearing or in the Panel report.

arm around her shoulder or on her leg. The woman would "look uncomfortable, and either push his arm off or get up and move away." (Exhibit M, p. 4.)

- A woman reported that she and her brother saw the plaintiff "putting his hands on everyone," including the woman herself. Id.

- One of the male students reported that he observed the plaintiff approaching women and putting his arms on them, after which he heard the women "saying things like, 'Go away and stop touching me,'" whereupon he would "move on to the next woman, making his way around to most of the women." Id.

- Another woman reported that she observed the plaintiff putting his arms around women, who would look uncomfortable, and then try to move away from him. She stated that she saw this happen to "at least" four or five women, including herself. Id.

- A different student reported that she saw the plaintiff sit down next to one of her friends and grab her "as if to kiss her." At that point, the friend stood up and the plaintiff "grabbed her buttock." The same student observed that the plaintiff "tried to grab her and she pushed him away." Id.

- A male student reported that he saw the plaintiff "grope at least three different women, and almost every woman on the bus was actively avoiding him." Id.

- Another student reported that the plaintiff acted "very aggressively" towards her friend, "putting his arms around her and on her leg and the friend kept trying to back away." Id.

- A different student reported seeing the plaintiff "touching womens' buttocks and putting his arms around their waists." Id.

- A female student reported that the plaintiff "tried to dance with her, very close in an unwelcome fashion." This continued until one of her friends came to her assistance and told the plaintiff to "back off." Id.

- Another student reported that she saw "a drunken scenario unfold" in which the plaintiff "moved from woman to woman." He also "repeatedly put himself between the dance aisle and a woman, closing her off with her back pressed against the seat." Id. at p.5.

- One student reported that the plaintiff was "following girls around the bus and they were moving away in a group." Id.

- It was also reported that the plaintiff was "moving drunkenly between different women, sitting very close to them and the women looking uncomfortable." Id. at p.5.

- Another student reported that the plaintiff "kept going up to them and after being told to go away and stop touching them, he would move on to the next woman, making his way around to most of the women." Id. at p.5.

- One male student stated that the plaintiff was "indiscriminately groping women" on the bus towards the end of the bus ride. The plaintiff "lay on a bench and just grabbed people as they pass by." The same male student reported that "almost everyone on the bus was actively avoiding him." This male student tried to put himself between the plaintiff and the women. He further stated that there were

- many more women than men on the bus, but that other men in addition to himself also tried to protect the women from the plaintiff. Exhibit H at p.19.

- Yet another student observed the plaintiff "trying to grab at [another student's] legs."

- One student stated that the plaintiff "was much drunker than other people on the bus. He was slurring his words and stumbling, very loud and rambunctious." She was on the bus when both complainants told her that they had been groped by the plaintiff. Id. at p.19.

The plaintiff categorically denies virtually all of these statements made by these witnesses. Indeed, he denies that he was so drunk that he had passed out; instead, it is his claim that he "took a nap" in the back of the bus because he wanted to be "energized for the rest of the evening in Cambridge." See Exhibit H at p. 14.

The UWC Panel, comprised of five individuals, unanimously concluded that the plaintiff's denials were not worthy of credence. Instead, they believed the many witnesses who provided evidence in the UWC process to the contrary. There were witnesses who stated that they did not observe the plaintiff groping the two complainants; however, no witness affirmatively stated that the two complainants were not groped. Under Yale's Sexual Misconduct Policy, the UWC Panel is charged with reaching conclusions as to the credibility of the parties. Given the evidence presented, the UWC Panel was justified in reaching the conclusions it did. It is noteworthy that the five members of the panel were unanimous in their findings.

**II.     The Standard of Proof Applied By the UWC was Appropriate.**

The plaintiff has suggested that the Department of Education Office for Civil Rights has changed the law such that an educational institution may not utilize a lower standard of proof in a sexual misconduct case, and this rule applies in other student misconduct cases. This is simply not accurate. Contrary to the plaintiff's suggestion, the United States Department of Education has <u>not</u> mandated that a different standard of proof be applied in this case. Indeed, the Secretary of Education, in her remarks on this subject, specifically stated that her Department would no longer attempt to regulate by way of "guidance," without the benefit of a properly issued regulation, after notice and comment. Specifically, she stated:

> " The failed system imposed policy by political letter, without even the most basic safeguards to test new ideas with those who know this issue all too well. Rather than inviting everyone to the table, the Department insisted it knew better than those who walk side-by-side with students every day. That will no longer be the case. The era of 'rule by letter' is over."

She went on to say:

> " In order to ensure that America's schools employ clear, equitable, just and fair procedures that inspire trust and confidence, we will launch a transparent notice-and-comment process to incorporate the insights of all parties in developing a better way." <u>Id</u>.

See <u>https:\\www.ed.gov\news\speeches\secretary-devos-prepared-remarkstitle-ix-enforcement</u>.

Thus, no "guidance" from the Department of Education would be binding; instead, the Department intended to propose new regulations and adopt them after appropriate notice and comment. Similarly, Candice Jackson, the acting Assistant Secretary for the Office of Civil

6

Rights, U.S. Department of Education,[2] stated that OCR is "committed to discontinuing the legally dubious practice of issuing sub-regulatory guidance that is then treated through enforcement as binding mandates." Instead, she said that any new regulatory requirements would be done throughout the rule making process. See https:\\www.insidehighered.com\news\2017\06\28\trump-administration-civil-rights-officials-promise-colleges-fairer-regulatory. In other words, there is no new federal law which mandates that Yale alter its standard of proof in sexual misconduct cases.

The plaintiff's claims regarding a change in the law appear to come from the document entitled "Q& A on Campus Sexual Misconduct," which was issued by the Office of Civil Rights in September, 2017, and is attached hereto as Exhibit A. The document in the first paragraph states: "The Department of Education intends to engage in rule making on the topic of schools' Title IX responsibilities concerning complaints of sexual misconduct, including peer-on-peer-sexual harassment and sexual violence. The Department will solicit input from stake holders and the public during that rule making procress." (Emphasis supplied.) The preamble goes on to state that the Office of Civil Rights has prepared a series of questions and answers in order to "provide information about how OCR will assess a school's compliance with Title IX." It is clear that while the questions and answers may give some information as to how OCR will evaluate a school's compliance in connection with its investigation of a school's compliance, before the regulations are adopted, the questions and answers do not constitute rule making, nor were they even published in the form of

---

[2] The Office for Civil Rights ("OCR") is the division of the Department of Education which administers Title IX.

"guidance." Indeed, the only reference to the standard of proof is contained in a footnote to one of the answers. See "Q & A on Campus Sexual Misconduct", p.5, n.19.

It is also noteworthy that Yale's Sexual Misconduct Policies are entirely consistent with the requirements of Conn. Gen. Stat.§ 10a-55m. That statute, which became effective July 1, 2016, sets out the requirements for addressing complaints for sexual misconduct at colleges and universities within the State of Connecticut. The statute specifically requires that secondary education institutions adopt policies providing that "affirmative consent" is the standard to be used in determining whether consent to engage in a sexual activity has been given. Connecticut law <u>requires</u> that Yale University utilize the preponderance of the evidence standard in its UWC proceedings. See Conn.Gen.§ 10a-55m (b)(6)(B). It further stipulates that it is not a valid excuse to a lack of affirmative consent that the respondent "was intoxicated or reckless or failed to take reasonable steps to ascertain whether the student or employee disclosing the alleged violation affirmatively consented." Conn. Gen. Stat. §10a-55. This is consistent with Yale's Sexual Misconduct Procedures.

Since the defendants' Sexual Misconduct Procedures are consistent with both federal and state law, the plaintiff cannot prevail on his claim that the defendant's policies violate federal law.

**III.     The Plaintiff Has Not Set Forth Evidence Establishing Irreparable Harm.**

The plaintiff's principal claims for irreparable harm relate to his concern regarding his ability to enroll in the second semester of the Brady-Johnson program at Yale, and his ability to participate in a summer internship, which he claims he has been offered by an investment banking firm. As to the former, the plaintiff's suspension will not disqualify him from the

Brady-Johnson program. He will be eligible for the program after he has served his two semester suspension and assuming he has complied with the other requirements imposed by Dean Chun. As to the summer internship, the plaintiff has offered no evidence to support a finding that the offer will be withdrawn if he remains suspended. The plaintiff is proceeding anonymously in this case, and presumably will not himself reveal the suspension to others. Yale University, of course, is not permitted to communicate confidential student information to others without permission of the student. Accordingly, the plaintiff has not offered any evidence to suggest that his offer of the summer internship will be revoked absent the issuance of injunctive relief.

The judges in this District have been loathe to grant preliminary injunctions reversing a suspension or expulsion of a student in sexual misconduct cases. See Montague vs. Yale University, Docket Number 3:16-CV-00885 (AVC).[3]; Stockstill vs. Quinnipiac University, 2010 U.S. Dist.LEXIS 49481, at *22-23 (VLB)(D. Conn. May 19, 2010.) Although the plaintiff in his moving papers suggests that one of the cases he cited came from this District, in fact, the case in question was decided by the Southern District of Ohio. See Plaintiff's Memorandum of Law In Support of Motion for a Temporary Restraining Order and a Preliminary Injunction at p.4, citing Doe vs. University of Cincinnati, 223 F.Supp.3d 704(S.D. Ohio, 2016.)

---

[3] During a court conference on January 22, defense counsel pointed the Court to Judge Covello's decision denying the Montague plaintiff's Application for Preliminary Injunction, along with three defendants' briefs in connection with that Motion. Those arguments will not be repeated here.

The entry of a temporary restraining order, in advance of a full hearing, is almost unheard of in student misconduct cases. In all of the following cases cited by the plaintiff, the Court did not enter an order until after an evidentiary hearing: Doe vs. University of Cincinnati, 223 F. Supp.3d 704(2016); Doe vs. Pa. State University, 2017 U.S. Dist. LEXIS 132186 *; Nokes vs. Miami University, 2017 U.S. Dist. LEXIS 136880*; Doe vs. Brown University, 210 F. Supp. 3d 310(2016); Doe vs. University of Notre Dame; 2017 U.S. Dist. LEXIS 69645*(2017); King vs. Depau University; 2014 U.S. Dist. LEXIS 117075*(2014). In each of the foregoing cases, the Court entered injunctive relief only after holding an evidentiary hearing. Although not mentioned in the plaintiff's brief, the case of Doe vs. Brown University, 210 F.Supp.3d 310*(2014), was a decision issued after a full trial; it was not a ruling on a temporary restraining order without hearing. A number of the cases cited by the plaintiff are also distinguishable by virtue of the fact that they involved the alleged deprivation of due process under the Fourteenth Amendment. Of course, since Yale University is not a state actor, those cases are inapposite. See Doe vs. University of Cincinnati, Doe vs. Pa. State University; and Nokes vs. Miami University.

In light of the foregoing, the defendants request an evidentiary hearing prior to the entry of any temporary restraining order or preliminary injunction.

**IV.    The Penalty Imposed by the UWC Was Neither Excessive Nor Discriminatory.**

The plaintiff has suggested that under Yale's policies the penalty of suspension or expulsion is limited to non-consensual intercourse. See plaintiff's Memorandum at pp.37-38. To the contrary, Yale's undergraduate regulations stipulate that the "standard penalty" for "cheating" is "two semesters of suspension." Clearly, no sexual contact whatsoever is required

for proof of cheating. If allowed to do so, Yale will present evidence that a number of other students who were found responsible for violating Yale's Sexual Misconduct Policies were subject to penalties at least as severe as the present plaintiff in instances where the degree of sexual contact was the same or less than the present plaintiff.

One important consideration in fashioning a remedy for a violation of Yale's Sexual Misconduct Policies is consideration of the type of remedy necessary to prevent repeat occurrences. In this case, the present plaintiff was found to have violated Yale's Sexual Misconduct Policy repeatedly and all of the instances occurred when he was highly intoxicated.[4] It was for that reason that one condition of his return to campus be that he "continue to receive alcohol counseling. Another condition is that he receive sexual harassment training. Both conditions are intended to help the plaintiff avoid similar occurrences in the future.

It has been said that one cannot correct a problem without acknowledging the existence of the problem. Unfortunately, the plaintiff, despite all of the evidence against him, continues to claim that all of the individuals who observed his drunken, groping mistreatment of women were wrong. He has categorically denied all of the allegations made by all of the witnesses regarding every incident. Indeed, while he denies the incident occurred at all, he now appears to

---

[4] In addition to the outrageous behavior on the bus trip, the UWC also heard evidence relating to an incident on June 17, 2016 involving one of the complainants and the plaintiff, as well as the plaintiff's conduct at a party at the Fence Club on November 2, 2016. Women who were present at that party complained about the plaintiff's aggressive behavior towards them. It was reported that the plaintiff was seen "careening around the dance floor, stumbling and falling all over women." The plaintiff was informed following a complaint made to the leadership of the Fence Club that he would no longer be allowed to attend Fence Club functions. See Exhibit H, p.17.

believe that groping the side of a breast or the buttock is actually acceptable, because he believes that the side of a breast can also be characterized as the "armpit or ribcage" and a woman's buttock is "known as the hip or upper thigh."  See plaintiff's Memorandum at pp.13-14.  Clearly, the plaintiff has not acknowledged the existence of any problem and he has categorically refused to take any responsibility for any of his actions.  The University justifiably acted within the discretion the law affords to it when  fashioning a remedy that would assist the plaintiff in recognizing the problem in order to avoid the victimization of women on campus in the future.

**V.       The Issuance of a Temporary Restraining Order or Injunction Would Cause Harm to the Defendant and Is Contrary to the Public Interest.**

In denying the request for reinstatement of a student to Quinnipiac University, Judge Bryant noted that the hardship imposed on the defendant was substantial, and the issuance of the injunction was contrary to the public interest:

> "Quinnipiac has a responsibility to all of its students and to the community at large, not just to the Plaintiff.  There are thousands of students attending Quinnipiac. Permitting a student to matriculate when he may pose a danger to other students is a greater harm than the harm caused to the Plaintiff by rescinding his admission and causing him to miss one semester of classes." Stockstill vs. Quinnipiac University, 2010 U.S.Dist. LEXIS 49481, at *22-23 (VLB) (D. Conn. May 19, 2010.)

Allowing the plaintiff to return to campus over the defendants' objection would also compromise Yale's legitimate interest in enforcing its own policies.  See Ruggiero, 2007 U.S. Dist. LEXIS 66290, at *2(WWE)(D. Conn. September 10, 2007.); Bhandari vs. Columbia, 2000 U.S. Dist. LEXIS 3720, at *23(S.D.N.Y. March 27, 2001.) "(Ordering [plaintiff's] return to classes would effectively prevent [the University] from ever suspending [the plaintiff] because, if allowed to return to his classes, he would likely complete his coursework before this

case is tried.") Furthermore, as Judge Bryant noted in the Stockstill case, returning to campus could subject the defendant to "potential liability and reputational liability and damage, all to the detriment of the University, including its students, faculty and alumni." Id. at *35-36.

Judges in other jurisdictions have similarly acknowledged that "there is also a public interest in providing an educational environment that is free from harassment. Colleges and universities are afforded great latitude in administering their rules and regulations, as courts recognize that those institutions' primary responsibility is to provide an atmosphere that is conducive to study and learning for all students." Pierre vs. University of Dayton, 143 F.Supp.3d 703,714 (S.D. Ohio, 2015.) Similarly, it has been noted that "universities have an interest in disciplining students who have committed serious infractions of University rules and in protecting other students from the type of conduct alleged here, and the public has a similar interest." Doe vs. Ohio State University, 2016 U.S. Dist. LEXIS 21064, at*36(S.D. Ohio, 2016.)

The concern over the safety of others on the Yale campus is not speculative in this case. As noted above, every time the plaintiff has found himself in difficulty, it has been preceded by heavy drinking. While this incident was not disclosed to the UWC, the plaintiff's drinking behavior was such that he was found by the Yale University police in the middle of the right hand lane of York Street in the early morning hours at the beginning of the fall semester in 2016. They found him to be heavily intoxicated and breathing, but unresponsive. He was taken to the hospital by ambulance. This incident was not known to the UWC Panel and is not relevant to the question of likelihood of success on the merits. However, it is relevant to the question of harm to the defendant and members of the public,

including other Yale students. It should also be noted that the incidents presented to the UWC were only reported incidents; research on this issue has demonstrated that less than 20 percent of women who have been the victims of sexual misconduct on campus actually report it to any authority. Accordingly, there is no way to know whether or not other incidents of misconduct on the part of the plaintiff have occurred. Yet, the University, and its community, clearly have a significant interest in avoiding any similar occurrences, particularly in an individual who appears to have a significant problem with alcohol and who has been unwilling to recognize his responsibility to change.

## VI. Conclusion.

For all of the foregoing reasons, the defendants respectfully request that the Court deny the plaintiff's Application for Temporary Restraining Order and convene an evidentiary hearing on the plaintiff's Motion for Preliminary Injunction if the Court believes that the plaintiff may have suffered irreparable harm.

**THE DEFENDANTS,**

**YALE UNIVERSITY and YALE UNIVERSITY BOARD OF TRUSTEES**

By: /s/
_____
PATRICK M. NOONAN – CT00189
DONAHUE, DURHAM & NOONAN, P.C.
Concept Park
741 Boston Post Road, Suite 306
Guilford, CT  06437
Telephone:   (203) 458-9168
Fax:               (203) 458-4424
Email:  pnoonan@ddnctlaw.com

**CERTIFICATION**

      I hereby certify that, on the above-written date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

                                                                                            /s/
                                                                   Patrick M. Noonan