### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| | : | |
| JOHN DOE | : | CIVIL ACTION NO. |
| | : | 3:18-cv-00110-JCH |
| PLAINTIFF | : | |
| | : | |
| v. | : | |
| | : | |
| YALE UNIVERSITY  AND YALE UNIVERSITY | : | |
| BOARD OF TRUSTEES | : | |
| | : | |
| DEFENDANTS | : | JANUARY 23, 2018 |
| | : | |

### DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER

#### I.    Factual Background.

The facts of this case are detailed in the two fact-finder's reports and the report of the UWC Panel which were filed by the plaintiff as Exhibits H, J and M in this matter.  A reading of those exhibits reveals that the plaintiff in this matter engaged in improper behavior with female students on three separate occasions, while he was highly intoxicated.

After hearing all of the evidence, the UWC Panel concluded that the plaintiff had violated Yale's Sexual Misconduct Policy and recommended to Dean Marvin Chun that the plaintiff be suspended for two semesters, that he be required to petition for readmission at the end of his suspension, that he be required to receive sexual harassment training, and that he continue to receive alcohol counseling upon his return to Yale. The findings and recommendations, as well as the underlying documentation were all reviewed by Dean Chun,

**DONAHUE, DURHAM & NOONAN, P.C.**
CONCEPT PARK   ●   741 BOSTON POST ROAD
GUILFORD, CONNECTICUT 06437
TEL:  (203) 458-9168   ●   FAX:  (203) 458-4424
JURIS NO. 415438

and he accepted the findings and the recommendations of the UWC Panel.  Thereafter, the

plaintiff appealed this decision to Yale's Provost, and the appeal was denied.

Both complainants reported that they were the victims of unwanted contact during a bus

trip to Cambridge, Massachusetts on November 18, 2016.  One of the complainants reported

that during the bus trip, the plaintiff sat down next to her stating, "I want to fuck you," as he

groped her breast and buttock.  The other complainant reported that she too had been groped by

the plaintiff on the bus.  Plaintiff's moving papers suggest that there was no corroboration of the

plaintiff's conduct, despite the fact that there were many other people on the bus.  This is simply

untrue. [1]Eleven different students in addition to the complainants reported that the complainant,

who was highly inebriated, was inappropriately touching a large number of women on the bus.

Both male and female students reported on the plaintiff's extreme intoxication and his

inappropriate behavior.  These statements included the following:

- A male student reported that he observed that the plaintiff would get up and go

    over to a woman who was sitting alone, sit down next to her, and either put his

---

[1] Similarly, the plaintiff has made an allegation about Professor David Post that is completely unfounded. The plaintiff has claimed that Professor Post should not have served in his supervisory role as Chair of the UWC in this case because of a "conflict of interest." The basis for that claim is the statement that Professor Post and the father of one of the complainants are professors at Yale in the same department.  As will be demonstrated, if the Court grants a hearing in this case, that is simply untrue.  Both are professors at Yale University, but they are not in the same department, nor do they share any assignments or research interests.  Indeed, Professor Post has no recollection of ever speaking with the father of the complainant. It should be noted, in any event, that Professor Post did not serve on the UWC Panel and therefore did not participate in the hearing or in the Panel report.

arm around her shoulder or on her leg.  The woman would "look uncomfortable, and either push his arm off or get up and move away." (Exhibit M, p. 4.)

- A woman reported that she and her brother saw the plaintiff "putting his hands on everyone," including the woman herself. Id.

- One of the male students reported that he observed the plaintiff approaching women and putting his arms on them, after which he heard the women "saying things like, 'Go away and stop touching me,'" whereupon he would "move on to the next woman, making his way around to most of the women."  Id.

- Another woman reported that she observed the plaintiff putting his arms around women, who would look uncomfortable, and then try to move away from him. She stated that she saw this happen to "at least" four or five women, including herself.  Id.

- A different student reported that she saw the plaintiff sit down next to one of her friends and grab her "as if to kiss her."  At that point, the friend stood up and the plaintiff "grabbed her buttock."  The same student observed that the plaintiff "tried to grab her and she pushed him away." Id.

- A male student reported that he saw the plaintiff "grope at least three different women, and almost every woman on the bus was actively avoiding him." Id.

- Another student reported that the plaintiff acted "very aggressively" towards her friend, "putting his arms around her and on her leg and the friend kept trying to back away." Id.

- A different student reported seeing the plaintiff "touching womens' buttocks and putting his arms around their waists." Id.

- A female student reported that the plaintiff "tried to dance with her, very close in an unwelcome fashion." This continued until one of her friends came to her assistance and told the plaintiff to "back off." Id.

- Another student reported that she saw "a drunken scenario unfold" in which the plaintiff "moved from woman to woman." He also "repeatedly put himself between the dance aisle and a woman, closing her off with her back pressed against the seat." Id. at p.5.

- One student reported that the plaintiff was "following girls around the bus and they were moving away in a group." Id.

- It was also reported that the plaintiff was "moving drunkenly between different women, sitting very close to them and the women looking uncomfortable." Id. at p.5.

- Another student reported that the plaintiff "kept going up to them and after being told to go away and stop touching them, he would move on to the next woman, making his way around to most of the women." Id. at p.5.

- One male student stated that the plaintiff was "indiscriminately groping women" on the bus towards the end of the bus ride. The plaintiff "lay on a bench and just grabbed people as they pass by." The same male student reported that "almost everyone on the bus was actively avoiding him." This male student tried to put himself between the plaintiff and the women. He further stated that there were

many more women than men on the bus, but that other men in addition to

himself also tried to protect the women from the plaintiff. Exhibit H at p.19.

- Yet another student observed the plaintiff "trying to grab at [another student's]

  legs."

- One student stated that the plaintiff "was much drunker than other people on the

  bus.  He was slurring his words and stumbling, very loud and rambunctious."

  She was on the bus when both complainants told her that they had been groped

  by the plaintiff.  Id. at p.19.

The plaintiff categorically denies virtually all of these statements made by these

witnesses.  Indeed, he denies that he was so drunk that he had passed out; instead, it is his claim

that he "took a nap" in the back of the bus because he wanted to be "energized for the rest of the

evening in Cambridge."  See Exhibit H at p. 14.

The UWC Panel, comprised of five individuals, unanimously concluded that the

plaintiff's denials were not worthy of credence.  Instead, they believed the many witnesses who

provided evidence in the UWC process to the contrary.  There were witnesses who stated that

they did not observe the plaintiff groping the two complainants; however, no witness

affirmatively stated that the two complainants were not groped.   Under Yale's Sexual

Misconduct Policy, the UWC Panel is charged with reaching conclusions as to the credibility of

the parties.  Given the evidence presented, the UWC Panel was justified in reaching the

conclusions it did.  It is noteworthy that the five members of the panel were unanimous in their

findings.

5

**II.    The Standard of Proof Applied By the UWC was Appropriate.**

The plaintiff has suggested that the Department of Education Office for Civil Rights has changed the law such that an educational institution may not utilize a lower standard of proof in a sexual misconduct case, and this rule applies in other student misconduct cases. This is simply not accurate.  Contrary to the plaintiff's suggestion, the United States Department of Education has <u>not</u> mandated that a different standard of proof be applied in this case. Indeed, the Secretary of Education, in her remarks on this subject, specifically stated that her Department would no longer attempt to regulate by way of "guidance," without the benefit of a properly issued regulation, after notice and comment.  Specifically, she stated:

> " The failed system imposed policy by political letter, without even the most basic safeguards to test new ideas with those who know this issue all too well. Rather than inviting everyone to the table, the Department insisted it knew better than those who walk side-by-side with students every day.  That will no longer be the   case.  The era of 'rule by letter' is over."

She went on to say:

> " In order to ensure that America's  schools employ clear, equitable, just and fair procedures that inspire trust and confidence, we will launch a transparent notice-and-comment process to incorporate the insights of all parties in developing a better way." <u>Id</u>.

<u>See https:\\\www.ed.gov\news\speeches\secretary-devos-prepared-remarkstitle-ix-enforcement</u>.

Thus, no "guidance" from the Department of Education would be binding; instead, the Department intended to propose new  regulations and adopt them after appropriate notice and comment. Similarly, Candice  Jackson,  the acting Assistant Secretary  for the Office of Civil

Rights, U.S. Department of Education,[2] stated that OCR is "committed to discontinuing the legally dubious practice of issuing sub-regulatory guidance that is then treated through enforcement as binding mandates."   Instead, she said that any new regulatory requirements would be done throughout the rule making process.

See https:\\www.insidehighered.com\news\2017\06\28\trump-administration-civil-rights-officials-promise-colleges-fairer-regulatory.  In other words, there is no new federal law which mandates that Yale alter its standard of proof in sexual misconduct cases.

The plaintiff's claims regarding a change in the law appear to come from the document entitled "Q& A on Campus Sexual Misconduct," which was issued by the Office of Civil Rights in September, 2017, and is attached hereto as Exhibit A.  The document in the first paragraph states: "The Department of Education intends to engage in rule making on the topic of schools' Title IX responsibilities concerning complaints of sexual misconduct, including peer-on-peer-sexual harassment and sexual violence.  The Department will solicit input from stake holders and the public during that rule making procress." (Emphasis supplied.) The preamble goes on to state that the Office of Civil Rights has prepared a series of questions and answers in order to "provide information about how OCR will assess a school's compliance with Title IX."  It is clear that while the questions and answers may give some information as to how OCR will evaluate a school's compliance in connection with its investigation of a school's compliance, before the regulations are adopted, the questions and answers do not constitute rule making, nor were they even published in the form of

---

[2] The Office for Civil Rights ("OCR") is the division of the Department of Education which administers Title IX.

"guidance."  Indeed, the only reference to the standard of proof is contained in a footnote to one of the answers.  See "Q & A on Campus Sexual Misconduct", p.5, n.19.

It is also noteworthy that Yale's Sexual Misconduct Policies are entirely consistent with the requirements of Conn. Gen. Stat.§ 10a-55m.  That statute, which became effective July 1, 2016, sets out the requirements for addressing complaints for sexual misconduct at colleges and universities within the State of Connecticut.  The statute specifically requires that secondary education institutions adopt policies providing that "affirmative consent" is the standard to be used in determining whether consent to engage in a sexual activity has been given. Connecticut law requires that Yale University utilize the preponderance of the evidence standard in its UWC proceedings.  See Conn.Gen.§ 10a-55m (b)(6)(B).  It further stipulates that it is not a valid excuse to a lack of affirmative consent that the respondent "was intoxicated or reckless or failed to take reasonable steps to ascertain whether the student or employee disclosing the alleged violation affirmatively consented." Conn. Gen. Stat. §10a-55.  This is consistent with Yale's Sexual Misconduct Procedures.

Since the defendants' Sexual Misconduct Procedures are consistent with both federal and state law, the plaintiff cannot prevail on his claim that the defendant's policies violate federal law.

### III.    The Plaintiff Has Not Set Forth Evidence Establishing Irreparable Harm.

The plaintiff's principal claims for irreparable harm relate to his concern regarding his ability to enroll in the second semester of the Brady-Johnson program at Yale, and his ability to participate in a summer internship, which he claims he has been offered by an investment banking firm.  As to the former, the plaintiff's suspension will not disqualify him from the

Brady-Johnson program.  He will be eligible for the program after he has served his two

semester suspension and assuming he has complied with the other requirements imposed by

Dean Chun.  As to the summer internship, the plaintiff has offered no evidence to support a

finding that the offer will be withdrawn if he remains suspended.  The plaintiff is proceeding

anonymously in this case, and presumably will not himself reveal the suspension to others.

Yale University, of course, is not permitted to communicate confidential student information

to others without permission of the student.  Accordingly, the plaintiff has not offered any

evidence to suggest that his offer of the summer internship will be revoked absent the

issuance of injunctive relief.

The judges in this District have been loathe to grant preliminary injunctions reversing a

suspension or expulsion of a student in sexual misconduct cases.  See Montague vs. Yale

University, Docket Number 3:16-CV-00885 (AVC).[3]; Stockstill vs. Quinnipiac University,

2010 U.S. Dist.LEXIS 49481, at *22-23 (VLB)(D. Conn. May 19, 2010.)  Although the

plaintiff in his moving papers suggests that one of the cases he cited came from this District, in

fact, the case in question was decided by the Southern District of Ohio.  See Plaintiff's

Memorandum of Law In Support of Motion for a Temporary Restraining Order and a

Preliminary Injunction at p.4, citing Doe vs. University of Cincinnati, 223 F.Supp.3d 704(S.D.

Ohio, 2016.)

---

[3] During a court conference on January 22, defense counsel pointed the Court to Judge Covello's
decision denying the Montague plaintiff's Application for Preliminary Injunction, along with three
defendants' briefs in connection with that Motion.  Those arguments will not be repeated here.

The entry of a temporary restraining order, in advance of a full hearing, is almost unheard of in student misconduct cases.  In all of the following cases cited by the plaintiff, the Court did <u>not</u> enter an order until after an evidentiary hearing:  <u>Doe vs. University of Cincinnati</u>, 223 F. Supp.3d 704(2016); <u>Doe vs. Pa. State University</u>, 2017 U.S. Dist. LEXIS 132186 *; <u>Nokes vs. Miami University</u>, 2017 U.S. Dist. LEXIS 136880*; <u>Doe vs. Brown University</u>, 210 F. Supp. 3d 310(2016); <u>Doe vs. University of Notre Dame</u>; 2017 U.S. Dist. LEXIS 69645*(2017); <u>King vs. Depau University</u>; 2014 U.S. Dist. LEXIS 117075*(2014).  In each of the foregoing cases, the Court entered injunctive relief only after holding an evidentiary hearing. Although not mentioned in the plaintiff's brief, the case of <u>Doe vs. Brown University</u>, 210 F.Supp.3d 310*(2014), was a decision issued <u>after a full trial</u>; it was not a ruling on a temporary restraining order without hearing.  A number of the cases cited by the plaintiff are also distinguishable by virtue of the fact that they involved the alleged deprivation of due process under the Fourteenth Amendment.  Of course, since Yale University is not a state actor, those cases are inapposite.  <u>See</u> <u>Doe vs. University of Cincinnati</u>, <u>Doe vs. Pa. State University</u>; and <u>Nokes vs. Miami University</u>.

In light of the foregoing, the defendants request an evidentiary hearing prior to the entry of any temporary restraining order or preliminary injunction.

### IV.    <u>The Penalty Imposed by the UWC Was Neither Excessive Nor Discriminatory.</u>

The plaintiff has suggested that under Yale's policies the penalty of suspension or expulsion is limited to non-consensual intercourse.  <u>See</u> plaintiff's Memorandum at pp.37-38. To the contrary, Yale's undergraduate regulations stipulate that the "standard penalty" for "cheating" is "two semesters of suspension."  Clearly, no sexual contact whatsoever is required

for proof of cheating.  If allowed to do so, Yale will present evidence that a number of other students who were found responsible for violating Yale's Sexual Misconduct Policies were subject to penalties at least as severe as the present plaintiff in instances where the degree of sexual contact was the same or less than the present plaintiff.

One important consideration in fashioning a remedy for a violation of Yale's Sexual Misconduct Policies is consideration of the type of remedy necessary to prevent repeat occurrences.  In this case, the present plaintiff was found to have violated Yale's Sexual Misconduct Policy repeatedly and all of the instances occurred when he was highly intoxicated.[4]  It was for that reason that one condition of his return to campus be that he "continue to receive alcohol counseling. Another condition is that he receive sexual harassment training.  Both conditions are intended to help the plaintiff avoid similar occurrences in the future.

It has been said that one cannot correct a problem without acknowledging the existence of the problem.  Unfortunately, the plaintiff, despite all of the evidence against him, continues to claim that all of the individuals who observed his drunken, groping mistreatment of women were wrong.   He has categorically denied all of the allegations made by all of the witnesses regarding every incident. Indeed, while he denies the incident occurred at all, he now appears to

---

[4] In addition to the outrageous behavior on the bus trip, the UWC also heard evidence relating to an incident on June 17, 2016 involving one of the complainants and the plaintiff, as well as the plaintiff's conduct at a party at the Fence Club on November 2, 2016.  Women who were present at that party complained about the plaintiff's aggressive behavior towards them.  It was reported that the plaintiff was seen "careening around the dance floor, stumbling and falling all over women."  The plaintiff was informed following a complaint made to the leadership of the Fence Club that he would no longer be allowed to attend Fence Club functions.  See Exhibit H, p.17.

believe that groping the side of a breast or the buttock is actually acceptable, because he

believes that the side of a breast can also be characterized as the "armpit or ribcage" and a

woman's buttock is "known as the hip or upper thigh."  <u>See</u> plaintiff's Memorandum at pp.13-

14.  Clearly, the plaintiff has not acknowledged the existence of any problem and he has

categorically refused to take any responsibility for any of his actions.  The University justifiably

acted within the discretion the law affords to it when  fashioning a remedy that would assist the

plaintiff in recognizing the problem in order to avoid the victimization of women on campus in

the future.

**V.**     <u>**The Issuance of a Temporary Restraining Order or Injunction Would Cause**</u>
        <u>**Harm to the Defendant and Is Contrary to the Public Interest.**</u>

In denying the request for reinstatement of a student to Quinnipiac University, Judge

Bryant noted that the hardship imposed on the defendant was substantial, and the issuance of

the injunction was contrary to the public interest:

> "Quinnipiac has a responsibility to all of its students and to the community at
> large, not just to the Plaintiff.  There are thousands of students attending
> Quinnipiac. Permitting a student to matriculate when he may pose a danger to
> other students is a greater harm than the harm caused to the Plaintiff by
> rescinding his admission and causing him to miss one semester of
> classes." <u>Stockstill vs. Quinnipiac University</u>, 2010 U.S.Dist. LEXIS 49481, at
> *22-23 (VLB) (D. Conn. May 19, 2010.)

Allowing the plaintiff to return to campus over the defendants' objection would also

compromise Yale's legitimate interest in enforcing its own policies.  <u>See</u> <u>Ruggiero</u>, 2007 U.S.

Dist. LEXIS 66290, at *2(WWE)(D. Conn. September 10, 2007.); <u>Bhandari vs. Columbia</u>,

2000 U.S. Dist. LEXIS 3720, at *23(S.D.N.Y. March 27, 2001.) "(Ordering [plaintiff's] return

to classes would effectively prevent [the University] from ever suspending [the plaintiff]

because, if allowed to return to his classes, he would likely complete his coursework before this

case is tried.")  Furthermore, as Judge Bryant noted in the <u>Stockstill</u> case, returning to campus could subject the defendant to "potential liability and reputational liability and damage, all to the detriment of the University, including its students, faculty and alumni." <u>Id.</u> at *35-36.

Judges in other jurisdictions have similarly acknowledged that "there is also a public interest in providing an educational environment that is free from harassment.  Colleges and universities are afforded great latitude in administering their rules and regulations, as courts recognize that those institutions' primary responsibility is to provide an atmosphere that is conducive to study and learning for all students." <u>Pierre vs. University of Dayton</u>, 143 F.Supp.3d 703,714 (S.D. Ohio, 2015.)  Similarly, it has been noted that "universities have an interest in disciplining students who have committed serious infractions of University rules and in protecting other students from the type of conduct alleged here, and the public has a similar interest." <u>Doe vs. Ohio State University</u>, 2016 U.S. Dist. LEXIS 21064, at*36(S.D. Ohio, 2016.)

The concern over the safety of others on the Yale campus is not speculative in this case.  As noted above, every time the plaintiff has found himself in difficulty, it has been preceded by heavy drinking.  While this incident was not disclosed to the UWC, ███

███████████████████████████████████████

██████████████████████████████████████

████████████████████████████

███████████████████████ This incident was not known to the UWC Panel and is not relevant to the question of likelihood of success on the merits. However, it is relevant to the question of harm to the defendant and members of the public,

including other Yale students.  It should also be noted that the incidents presented to the UWC were only reported incidents; research on this issue has demonstrated that less than 20 percent of women who have been the victims of sexual misconduct on campus actually report it to any authority.  Accordingly, there is no way to know whether or not other incidents of misconduct on the part of the plaintiff have occurred.  Yet, the University, and its community, clearly have a significant interest in avoiding any similar occurrences, particularly in an individual who appears to have a significant problem with alcohol and who has been unwilling to recognize his responsibility to change.

**VI.** **Conclusion.**

   For all of the foregoing reasons, the defendants respectfully request that the Court deny the plaintiff's Application for Temporary Restraining Order and convene an evidentiary hearing on the plaintiff's Motion for Preliminary Injunction if the Court believes that the plaintiff may have suffered irreparable harm.

**THE DEFENDANTS,**

**YALE UNIVERSITY and YALE UNIVERSITY BOARD OF TRUSTEES**

/s/

By:_____
  PATRICK M. NOONAN – CT00189
  DONAHUE, DURHAM & NOONAN, P.C.
  Concept Park
  741 Boston Post Road, Suite 306
  Guilford, CT  06437
  Telephone: (203) 458-9168
  Fax:  (203) 458-4424
  Email:  pnoonan@ddnctlaw.com

## **CERTIFICATION**

     I hereby certify that, on the above-written date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.


                                 /s/
                               Patrick M. Noonan



UNITED STATES DEPARTMENT OF EDUCATION
OFFICE FOR CIVIL RIGHTS

**September 2017**

**Q&A on Campus Sexual Misconduct**

Under Title IX of the Education Amendments of 1972 and its implementing regulations, an institution that receives federal funds must ensure that no student suffers a deprivation of her or his access to educational opportunities on the basis of sex. The Department of Education intends to engage in rulemaking on the topic of schools' Title IX responsibilities concerning complaints of sexual misconduct, including peer-on-peer sexual harassment and sexual violence. The Department will solicit input from stakeholders and the public during that rulemaking process. In the interim, these questions and answers—along with the *Revised Sexual Harassment Guidance* previously issued by the Office for Civil Rights[1]—provide information about how OCR will assess a school's compliance with Title IX.

**SCHOOLS' RESPONSIBILITY TO ADDRESS SEXUAL MISCONDUCT**

Question 1:

What is the nature of a school's responsibility to address sexual misconduct?

Answer:

Whether or not a student files a complaint of alleged sexual misconduct or otherwise asks the school to take action, where the school knows or reasonably should know of an incident of sexual misconduct, the school must take steps to understand what occurred and to respond appropriately.[2] In particular, when sexual misconduct is so severe, persistent, or pervasive as to deny or limit a student's ability to participate in or benefit from the school's programs or activities, a hostile environment exists and the school must respond.[3]

---

[1] Office for Civil Rights, *Revised Sexual Harassment Guidance* (66 Fed. Reg. 5512, Jan. 19, 2001), *available at* https://www2.ed.gov/about/offices/list/ocr/docs/shguide.pdf [hereinafter 2001 Guidance]; *see also* Office for Civil Rights, Dear Colleague Letter on Sexual Harassment (Jan. 25, 2006), *available at* https://www2.ed.gov/about/offices/list/ocr/letters/sexhar-2006.html.

[2] 2001 Guidance at (VII).

[3] *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 631 (1999); 34 C.F.R. § 106.31(a); 2001 Guidance at (V)(A)(1). Title IX prohibits discrimination on the basis of sex "under any education program or activity" receiving federal financial assistance, 20 U.S.C. § 1681(a); 34 C.F.R. § 106.1, meaning within the "operations" of a postsecondary institution or school district, 20 U.S.C. § 1687; 34 C.F.R. § 106.2(h). The Supreme Court has explained that the statute "confines the scope of prohibited conduct based on the recipient's degree of control over the harasser and the environment in which the harassment occurs." *Davis*, 526 U.S. at 644. Accordingly, OCR has informed institutions that "[a] university does not have a duty under Title IX to address an incident of alleged harassment where the incident occurs off-campus and does not involve a program or activity of the recipient." Oklahoma State University Determination Letter at 2, OCR Complaint No. 06-03-2054 (June 10, 2004); *see also* University of Wisconsin-Madison Determination Letter, OCR Complaint No. 05-07-2074 (Aug. 6, 2009) ("OCR determined that the alleged assault did not occur in the context of an educational program or activity operated by the University."). Schools are responsible for redressing a hostile environment that occurs on campus even if it relates to off-campus activities. Under the Clery Act, postsecondary institutions are obliged to collect and report statistics on crimes that occur on campus, on noncampus properties controlled by the institution or an affiliated student organization and used for educational purposes, on public property within or immediately adjacent to campus, and in areas within the patrol jurisdiction of the campus police or the campus security department. 34 C.F.R. § 668.46(a); 34 C.F.R. § 668.46(c).

Each recipient must designate at least one employee to act as a Title IX Coordinator to coordinate its responsibilities in this area.[4] Other employees may be considered "responsible employees" and will help the student to connect to the Title IX Coordinator.[5]

In regulating the conduct of students and faculty to prevent or redress discrimination, schools must formulate, interpret, and apply their rules in a manner that respects the legal rights of students and faculty, including those court precedents interpreting the concept of free speech.[6]

## THE CLERY ACT AND TITLE IX

Question 2:

What is the Clery Act and how does it relate to a school's obligations under Title IX?

Answer:

Institutions of higher education that participate in the federal student financial aid programs are subject to the requirements of the Clery Act as well as Title IX.[7] Each year, institutions must disclose campus crime statistics and information about campus security policies as a condition of participating in the federal student aid programs. The Violence Against Women Reauthorization Act of 2013 amended the Clery Act to require institutions to compile statistics for incidents of dating violence, domestic violence, sexual assault, and stalking, and to include certain policies, procedures, and programs pertaining to these incidents in the annual security reports. In October 2014, following a negotiated rulemaking process, the Department issued amended regulations to implement these statutory changes.[8] Accordingly, when addressing allegations of dating violence, domestic violence, sexual assault, or stalking, institutions are subject to the Clery Act regulations as well as Title IX.

## INTERIM MEASURES

Question 3:

What are interim measures and is a school required to provide such measures?

Answer:

Interim measures are individualized services offered as appropriate to either or both the reporting and responding parties involved in an alleged incident of sexual misconduct, prior to an investigation or while an investigation is pending.[9] Interim measures include counseling, extensions of time or other course-related adjustments, modifications of work or class schedules, campus escort services, restrictions on contact between the parties, changes in work or housing locations, leaves of absence, increased security and monitoring of certain areas of campus, and other similar accommodations.

---

[4] 34 C.F.R. § 106.8(a).
[5] 2001 Guidance at (V)(C).
[6] Office for Civil Rights, Dear Colleague Letter on the First Amendment (July 28, 2003), *available at* https://www2.ed.gov/about/offices/list/ocr/firstamend.html; 2001 Guidance at (XI).
[7] Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, Pub. L. No. 101-542, 20 U.S.C. § 1092(f).
[8] *See* 34 C.F.R. § 668.46.
[9] *See* 2001 Guidance at (VII)(A).

It may be appropriate for a school to take interim measures during the investigation of a complaint.[10] In fairly assessing the need for a party to receive interim measures, a school may not rely on fixed rules or operating assumptions that favor one party over another, nor may a school make such measures available only to one party. Interim measures should be individualized and appropriate based on the information gathered by the Title IX Coordinator, making every effort to avoid depriving any student of her or his education. The measures needed by each student may change over time, and the Title IX Coordinator should communicate with each student throughout the investigation to ensure that any interim measures are necessary and effective based on the students' evolving needs.

## GRIEVANCE PROCEDURES AND INVESTIGATIONS

Question 4:

What are the school's obligations with regard to complaints of sexual misconduct?

Answer:

A school must adopt and publish grievance procedures that provide for a prompt and equitable resolution of complaints of sex discrimination, including sexual misconduct.[11] OCR has identified a number of elements in evaluating whether a school's grievance procedures are prompt and equitable, including whether the school (i) provides notice of the school's grievance procedures, including how to file a complaint, to students, parents of elementary and secondary school students, and employees; (ii) applies the grievance procedures to complaints filed by students or on their behalf alleging sexual misconduct carried out by employees, other students, or third parties; (iii) ensures an adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence; (iv) designates and follows a reasonably prompt time frame for major stages of the complaint process; (v) notifies the parties of the outcome of the complaint; and (vi) provides assurance that the school will take steps to prevent recurrence of sexual misconduct and to remedy its discriminatory effects, as appropriate.[12]

Question 5:

What time frame constitutes a "prompt" investigation?

Answer:

There is no fixed time frame under which a school must complete a Title IX investigation.[13] OCR will evaluate a school's good faith effort to conduct a fair, impartial investigation in a timely manner designed to provide all parties with resolution.

Question 6:

What constitutes an "equitable" investigation?

---

[10] 2001 Guidance at (VII)(A). In cases covered by the Clery Act, a school must provide interim measures upon the request of a reporting party if such measures are reasonably available. 34 C.F.R. § 668.46(b)(11)(v).

[11] 34 C.F.R. § 106.8(b); 2001 Guidance at (V)(D); *see also* 34 C.F.R. § 668.46(k)(2)(i) (providing that a proceeding which arises from an allegation of dating violence, domestic violence, sexual assault, or stalking must "[i]nclude a prompt, fair, and impartial process from the initial investigation to the final result").

[12] 2001 Guidance at (IX); *see also* 34 C.F.R. § 668.46(k). Postsecondary institutions are required to report publicly the procedures for institutional disciplinary action in cases of alleged dating violence, domestic violence, sexual assault, and stalking, 34 C.F.R. § 668.46 (k)(1)(i), and to include a process that allows for the extension of timeframes for good cause with written notice to the parties of the delay and the reason for the delay, 34 C.F.R. § 668.46 (k)(3)(i)(A).

[13] 2001 Guidance at (IX); *see also* 34 C.F.R. § 668.46(k)(3)(i)(A).

Answer:

In every investigation conducted under the school's grievance procedures, the burden is on the school—not on the parties—to gather sufficient evidence to reach a fair, impartial determination as to whether sexual misconduct has occurred and, if so, whether a hostile environment has been created that must be redressed. A person free of actual or reasonably perceived conflicts of interest and biases for or against any party must lead the investigation on behalf of the school. Schools should ensure that institutional interests do not interfere with the impartiality of the investigation.

An equitable investigation of a Title IX complaint requires a trained investigator to analyze and document the available evidence to support reliable decisions, objectively evaluate the credibility of parties and witnesses, synthesize all available evidence—including both inculpatory and exculpatory evidence—and take into account the unique and complex circumstances of each case.[14]

Any rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms.[15] Restricting the ability of either party to discuss the investigation (e.g., through "gag orders") is likely to deprive the parties of the ability to obtain and present evidence or otherwise to defend their interests and therefore is likely inequitable. Training materials or investigative techniques and approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the investigation proceeds objectively and impartially.[16]

Once it decides to open an investigation that may lead to disciplinary action against the responding party, a school should provide written notice to the responding party of the allegations constituting a potential violation of the school's sexual misconduct policy, including sufficient details and with sufficient time to prepare a response before any initial interview. Sufficient details include the identities of the parties involved, the specific section of the code of conduct allegedly violated, the precise conduct allegedly constituting the potential violation, and the date and location of the alleged incident.[17] Each party should receive written notice in advance of any interview or hearing with sufficient time to prepare for meaningful participation. The investigation should result in a written report summarizing the relevant exculpatory and inculpatory evidence. The reporting and responding parties and appropriate officials must have timely and equal access to any information that will be used during informal and formal disciplinary meetings and hearings.[18]

### INFORMAL RESOLUTIONS OF COMPLAINTS

Question 7:

After a Title IX complaint has been opened for investigation, may a school facilitate an informal resolution of the complaint?

Answer:

If all parties voluntarily agree to participate in an informal resolution that does not involve a full investigation and adjudication after receiving a full disclosure of the allegations and their options for formal resolution and if a school determines that the particular Title IX complaint is appropriate for such a process, the school may facilitate an informal resolution, including mediation, to assist the parties in reaching a voluntary resolution.

---

[14] 2001 Guidance at (V)(A)(1)-(2); *see also* 34 C.F.R. § 668.46(k)(2)(ii).
[15] 2001 Guidance at (X).
[16] 34 C.F.R. § 106.31(a).
[17] 2001 Guidance at (VII)(B).
[18] 34 C.F.R. § 668.46(k)(3)(i)(B)(3).

4

## DECISION-MAKING AS TO RESPONSIBILITY

<u>Question 8</u>:

What procedures should a school follow to adjudicate a finding of responsibility for sexual misconduct?

<u>Answer</u>:

The investigator(s), or separate decision-maker(s), with or without a hearing, must make findings of fact and conclusions as to whether the facts support a finding of responsibility for violation of the school's sexual misconduct policy. If the complaint presented more than a single allegation of misconduct, a decision should be reached separately as to each allegation of misconduct. The findings of fact and conclusions should be reached by applying either a preponderance of the evidence standard or a clear and convincing evidence standard.[19]

The decision-maker(s) must offer each party the same meaningful access to any information that will be used during informal and formal disciplinary meetings and hearings, including the investigation report.[20] The parties should have the opportunity to respond to the report in writing in advance of the decision of responsibility and/or at a live hearing to decide responsibility.

Any process made available to one party in the adjudication procedure should be made equally available to the other party (for example, the right to have an attorney or other advisor present and/or participate in an interview or hearing; the right to cross-examine parties and witnesses or to submit questions to be asked of parties and witnesses).[21] When resolving allegations of dating violence, domestic violence, sexual assault, or stalking, a postsecondary institution must "[p]rovide the accuser and the accused with the same opportunities to have others present during any institutional disciplinary proceeding, including the opportunity to be accompanied to any related meeting or proceeding by the advisor of their choice."[22] In such disciplinary proceedings and any related meetings, the institution may "[n]ot limit the choice of advisor or presence for either the accuser or the accused" but "may establish restrictions regarding the extent to which the advisor may participate in the proceedings."[23]

Schools are cautioned to avoid conflicts of interest and biases in the adjudicatory process and to prevent institutional interests from interfering with the impartiality of the adjudication. Decision-making techniques or approaches that apply sex stereotypes or generalizations may violate Title IX and should be avoided so that the adjudication proceeds objectively and impartially.

---

[19] The standard of evidence for evaluating a claim of sexual misconduct should be consistent with the standard the school applies in other student misconduct cases. In a recent decision, a court concluded that a school denied "basic fairness" to a responding party by, among other things, applying a lower standard of evidence only in cases of alleged sexual misconduct. *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 607 (D. Mass. 2016) ("[T]he lowering of the standard appears to have been a deliberate choice by the university to make cases of sexual misconduct easier to prove—and thus more difficult to defend, both for guilty and innocent students alike. It retained the higher standard for virtually all other forms of student misconduct. The lower standard may thus be seen, in context, as part of an effort to tilt the playing field against accused students, which is particularly troublesome in light of the elimination of other basic rights of the accused."). When a school applies special procedures in sexual misconduct cases, it suggests a discriminatory purpose and should be avoided. A postsecondary institution's annual security report must describe the standard of evidence that will be used during any institutional disciplinary proceeding arising from an allegation of dating violence, domestic violence, sexual assault, or stalking. 34 C.F.R. § 668.46(k)(1)(ii).

[20] 34 C.F.R. § 668.46(k)(3)(i)(B)(3).

[21] A school has discretion to reserve a right of appeal for the responding party based on its evaluation of due process concerns, as noted in Question 11.

[22] 34 C.F.R. § 668.46(k)(2)(iii).

[23] 34 C.F.R. § 668.46(k)(2)(iv).

## DECISION-MAKING AS TO DISCIPLINARY SANCTIONS

Question 9:

What procedures should a school follow to impose a disciplinary sanction against a student found responsible for a sexual misconduct violation?

Answer:

The decision-maker as to any disciplinary sanction imposed after a finding of responsibility may be the same or different from the decision-maker who made the finding of responsibility. Disciplinary sanction decisions must be made for the purpose of deciding how best to enforce the school's code of student conduct while considering the impact of separating a student from her or his education. Any disciplinary decision must be made as a proportionate response to the violation.[24] In its annual security report, a postsecondary institution must list all of the possible sanctions that the institution may impose following the results of any institutional disciplinary proceeding for an allegation of dating violence, domestic violence, sexual assault, or stalking.[25]

## NOTICE OF OUTCOME AND APPEALS

Question 10:

What information should be provided to the parties to notify them of the outcome?

Answer:

OCR recommends that a school provide written notice of the outcome of disciplinary proceedings to the reporting and responding parties concurrently. The content of the notice may vary depending on the underlying allegations, the institution, and the age of the students. Under the Clery Act, postsecondary institutions must provide simultaneous written notification to both parties of the results of the disciplinary proceeding along with notification of the institution's procedures to appeal the result if such procedures are available, and any changes to the result when it becomes final.[26] This notification must include any initial, interim, or final decision by the institution; any sanctions imposed by the institution; and the rationale for the result and the sanctions.[27] For proceedings not covered by the Clery Act, such as those arising from allegations of harassment, and for all proceedings in elementary and secondary schools, the school should inform the reporting party whether it found that the alleged conduct occurred, any individual remedies offered to the reporting party or any sanctions imposed on the responding party that directly relate to the reporting party, and other steps the school has taken to eliminate the hostile environment, if the school found one to exist.[28] In an elementary or secondary school, the notice should be provided to the parents of students under the age of 18 and directly to students who are 18 years of age or older.[29]

---

[24] 34 C.F.R. § 106.8(b); 2001 Guidance at (VII)(A).

[25] 34 C.F.R. § 668.46(k)(1)(iii).

[26] 34 C.F.R. § 668.46(k)(2)(v). The Clery Act applies to proceedings arising from allegations of dating violence, domestic violence, sexual assault, and stalking.

[27] 34 C.F.R. § 668.46(k)(3)(iv).

[28] A sanction that directly relates to the reporting party would include, for example, an order that the responding party stay away from the reporting party. See 2001 Guidance at vii n.3. This limitation allows the notice of outcome to comply with the requirements of the Family Educational Rights and Privacy Act. See 20 U.S.C. § 1232g(a)(1)(A); 34 C.F.R. § 99.10; 34 C.F.R. § 99.12(a). FERPA provides an exception to its requirements only for a postsecondary institution to communicate the results of a disciplinary proceeding to the reporting party in cases of alleged crimes of violence or specific nonforcible sex offenses. 20 U.S.C. § 1232g(b)(6); 34 C.F.R. § 99.31(a)(13).

[29] 20 U.S.C. § 1232g(d).

6

Question 11:

How may a school offer the right to appeal the decision on responsibility and/or any disciplinary decision?

Answer:

If a school chooses to allow appeals from its decisions regarding responsibility and/or disciplinary sanctions, the school may choose to allow appeal (i) solely by the responding party; or (ii) by both parties, in which case any appeal procedures must be equally available to both parties.[30]

## EXISTING RESOLUTION AGREEMENTS

Question 12:

In light of the rescission of OCR's 2011 Dear Colleague Letter and 2014 Questions & Answers guidance, are existing resolution agreements between OCR and schools still binding?

Answer:

Yes. Schools enter into voluntary resolution agreements with OCR to address the deficiencies and violations identified during an OCR investigation based on Title IX and its implementing regulations. Existing resolution agreements remain binding upon the schools that voluntarily entered into them. Such agreements are fact-specific and do not bind other schools. If a school has questions about an existing resolution agreement, the school may contact the appropriate OCR regional office responsible for the monitoring of its agreement.

**Note:** The Department has determined that this Q&A is a significant guidance document under the Final Bulletin for Agency Good Guidance Practices of the Office of Management and Budget, 72 Fed. Reg. 3432 (Jan. 25, 2007). This document does not add requirements to applicable law. If you have questions or are interested in commenting on this document, please contact the Department of Education at ocr@ed.gov or 800-421-3481 (TDD: 800-877-8339).

---

[30] 2001 Guidance at (IX). Under the Clery Act, a postsecondary institution must provide simultaneous notification of the appellate procedure, if one is available, to both parties. 34 C.F.R. § 668.46(k)(2)(v)(B). OCR has previously informed schools that it is permissible to allow an appeal only for the responding party because "he/she is the one who stands to suffer from any penalty imposed and should not be made to be tried twice for the same allegation." Skidmore College Determination Letter at 5, OCR Complaint No. 02-95-2136 (Feb. 12, 1996); *see also* Suffolk University Law School Determination Letter at 11, OCR Complaint No. 01-05-2074 (Sept. 30, 2008) ("[A]ppeal rights are not necessarily required by Title IX, whereas an accused student's appeal rights are a standard component of University disciplinary processes in order to assure that the student is afforded due process before being removed from or otherwise disciplined by the University."); University of Cincinnati Determination Letter at 6, OCR Complaint No. 15-05-2041 (Apr. 13, 2006) ("[T]here is no requirement under Title IX that a recipient provide a victim's right of appeal.").